UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

SHARIF STINSON, MARIAM FARNUM, CHARLEAN
FINLEY, RYBURN WALKES, JAMEL TOWE,
CHRISTIAN DUDLEY, JOCELEY FERDINAND,
GARY SHAW, MICHAEL BENNETT, CHANEL
MEAUSA, DAVID THOMPSON, JULIUS DIXON,
JOSEPH SARPONG, JEREMY THAMES, SEAN
PETTIGREW, LEANDER GRIFFIN, BRIAN MORRIS,
MICA ANCRUM, RICARDO JONES, VICTOR
BRELAND, LINDSEY RIDDICK and MICHAEL
RIDDICK, on Behalf of Themselves and Other Similarly
Situated,

**AMENDED CLASS ACTION**

**COMPLAINT**

**10 CV 4228**

Plaintiffs,

**JURY TRIAL DEMANDED**

**ECF CASE**

-against-

THE CITY OF NEW YORK, RAYMOND W. KELLY,
Commissioner of the New York City Police Department,
Individually and in his Official Capacity, and P.O.s
"JOHN DOE" #1-50, Individually and in their Official
Capacities, (the name John Doe being fictitious, as the
true names are presently unknown),

Defendants.

------------------------------------------------------------------X

Plaintiffs Sharif Stinson, Mariam Farnum, Charlean Finely, Ryburn Walkes, Jamel Towe,

Christian Dudley, Joceley Ferdinand, Gary Shaw, Michael Bennett, Chanel Meausa, David

Thomson, Julius Dixon, Joseph Sarpong, Jeremy Thames, Sean Pettigrew, Leander Griffin,

Brian Morris, Mica Ancrum, Ricardo Jones, Victor Breland, Lindsey Riddick and Michael

Riddick, on behalf of themselves and others similarly situated, by their attorneys, Jon Norinsberg

and Cohen & Fitch LLP, complaining of the defendants, respectfully alleges as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this action on behalf of themselves and others similarly situated seeking class certification compensatory damages, injunctive relief, and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of theirs and others similarly situated civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

2.      Under a pattern and practice set and enforced by city officials, the New York City Police Department ("NYPD"), and New York City Police Officers stop, search, seize, arrest and issue summonses to individuals without probable cause in response to a requirement and constant pressure to meet a summons quota, in violation of the U.S. Constitution.

3.      Further, officers are being explicitly instructed to issue summonses regardless of whether any crime or violation has occurred but instead in order to meet a minimum quota ("ACTIVITY") requirement set forth by the NYPD.

4.      To encourage and drive this unlawful pattern and practice, the NYPD consistently punishes officers who issue fewer summonses, and rewards police officers who issue more summonses, regardless of whether or not there is probable cause to issue such summonses.

**Proof of the Existence of The NYPD's Unlawful Quota Policy**

5.      Proof of the existence of the NYPD's illegal quota policy comes not from a single source, but rather, from multiple and varying sources.  Specifically,  the existence of such a policy may be inferred from, inter alia, the following evidence: (1) tape recordings of commanding officers at the 41st Precinct; (2) tape recordings of commanding officers at the 81st Precinct; (3) an arbitrator's ruling, dated January 14, 2006, which expressly found that the NYPD had an illegal quota policy which violated Labor Law § 215-a; (4) statistical evidence

from the New York State Office of Court Administration (:"OCA"), demonstrating that an overwhelming percentage of the summonses filed in Court by the NYPD – <u>over 50%</u> – are ultimately dismissed; and (5) empirical evidence from a study conducted by John Eterno, PhD., a retired captain from the NYPD and Chairperson of Graduate Studies in Criminal Justice at Molloy College and Eli Silverman, PhD.,  a Professor Emeritus at John Jay College of Criminal Justice and the Graduate Center of CUNY,  which confirm the NYPD's relentless obsession with crime "numbers" exerts enormous pressure on commanding officers and has resulted in the unethical manipulation of crime statistics by such officers, and in furtherance of that manipulation, officers constantly issue summonses to individuals in the absence of probable cause in order to artificially create the statistical appearance of increased "activity."

**Direct Evidence of an Illegal Quota: The Tape Recordings of P.O. Polanco and P.O. Schoolcraft**

6.      Over the past two years, several police officers have attempted to inform the public at large, as well policy-making officials within the NYPD, of this unlawful and illegal practice of constantly and relentlessly pressuring officers to maintain a summons quota that has resulted in numerous and continuing constitutional violations of the residents of New York City.

7.      At least two (2) police officers, P.O. Adrian Schoolcraft and P.O. Adhyl Polanco, publicly came forward to provide evidence of the aforementioned incentives and pressures to increase the number of summonses issued by NYPD officers.

8.      P.O. Schoolcraft and P.O. Polanco have provided evidence of their own experiences, as well as tape-recordings of supervising officers from the 81st and 41st Precincts continuously instructing and pressuring officers to meet quotas in order to secure their jobs and avoid punishment.

9.      These tape recordings made by P.O. Polanco and P.O. Adrian Schoolcraft

provide clear and overwhelming proof of the existence of the NYPD's illegal quota policy.

**Evidence of The NYPD's Quota Policy From Tape Recordings At The 41st Precinct**

10.      The tape recordings made by P.O. Polanco explicitly refer to the NYPD's quota

requirements. For example, in one such recording, a superior officer states as follows:   "I

SPOKE TO THE [COMMANDING OFFICER] FOR ABOUT AN HOUR AND HALF. THE

ACTIVITY [IS] **20 AND 1**. .....THEY WANT 20 [SUMMONSES] AND 1 [ARREST]. HOW? I

DON'T KNOW..... ALRIGHT, SO IT'S 20 AND 1."

11.      Similarly, another superior officer at the 41st Precinct was recorded as stating as

follows: "NEXT WEEK YOU COULD BE AT 25 (SUMMONSES) AND 1 (ARREST), YOU

COULD BE AT 35 (SUMMONSES) AND 1 (ARREST) AND GUESS WHAT? UNTIL YOU

DECIDE TO QUIT THIS JOB AND BECOME A PIZZA HUT DELIVERY MAN, THIS IS

WHAT YOU'RE GOING TO BE DOING UNTIL THEN."

12.      Further, another supervisor was heard threatening: "THINGS ARE NOT GOING

TO GET ANY BETTER, ITS GOING TO GET A LOT WORSE.   IF YOU THINK 1

(ARREST) AND 20 (SUMMONSES) IS BREAKING YOUR BALLS, GUESS WHAT? YOU

ARE GOING TO BE DOING? YOU'RE GOING TO BE DOING A LOT MORE, A LOT

MORE THAN WHAT YOU THINK."

13.      In fact, officers at the 41st Precinct were explicitly told that these quotas are

"NON-NEGOTIABLE," and it is not a sufficient excuse that an officer simply did not observe

sufficient summonsable and/or criminal activity to fulfill said quota.

14.      Specifically, DONALD MCHUGH, the Commanding Officer of the 41st Precinct,

stated about the quotas: "IT'S REALLY NON-NEGOTIABLE, 'CAUSE IF YOU DON'T DO

IT NOW, I'M GONNA HAVE YOU WORK WITH THE BOSS TO MAKE SURE IT HAPPENS."

**Evidence of the NYPD's Quota Policy from Tape Recordings at the 81st Precinct**

15.     Similar recordings were made by P.O. Adrian Schoolcraft at the 81st Precinct. These recordings further confirm the existence of the NYPD's unlawful quota policy.

16.     For example, a supervising officer at the 81st Precinct was recorded as stating the exact number – and specific type – of summonses that each officers is expected to delivery every month: "HE WANTS AT LEAST 3 SEATBELTS (SUMMONSES), 1 CELL PHONE SUMMONS) AND 11 OTHERS (SUMMONSES)"  per officer each month.

17.     On December 8, 2008, Deputy Inspector Mauriello, Commanding Officer of the 81st Precinct, berated his officers for not writing enough summonses per month: "I SEE EIGHT FUCKING SUMMONSES FOR A 20 DAY PERIOD OR A MONTH. IF YOU MESS UP, HOW THE HELL DO YOU WANT ME TO DO THE RIGHT THING BY YOU?"

18.     Another Supervising Officer issued the following warning, "I TOLD YOU LAST MONTH, *THEY'RE LOOKING AT THE NUMBERS*.  AIN'T ABOUT LOSING YOUR JOB, *[BUT] THEY CAN MAKE YOUR JOB REAL UNCOMFORTABLE*."

19.     Additionally, Chief of Transportation MICHAEL SCAGNELLI, a three star Chief in charge of TRAFFICSTAT, was quoted as saying: "HOW MANY SUPERSTARS AND HOW MANY LOSERS DO WE HAVE? HOW MANY SUMMONSES DOES THE SQUAD WRITE?  WE NEED MORE ACTIVITY. *IF YOUR PRODUCTIVITY FALLS BELOW PAR, EITHER YOU OR THE C.O. IS GOING TO HAVE TO ANSWER*."

20.     Similarly, another superior officer stated as follows: "WE NEED 250'S, WE NEED ARRESTS, QUALITY OF LIFE ENFORCEMENT (C-SUMMONSES), COMMUNITY VISITS, WE NEED, GET *2 OF THEM IN A CAR, 3 ON FOOT*."

21.     In fact, defendants were so obsessed with making their "numbers" that they literally instructed officers to issue summonses and make arrests when there was *no* evidence of any criminal activity whatsoever.

22.     Specifically, one supervisor instructed:  "GO THROUGH THE MOTIONS AND *GET YOUR NUMBERS ANYWAY*. DON'T BE THE ONE CAUGHT OUT THERE. MARINO'S YELLING AT EVERYONE ABOUT THE POINTS."

23.     Additionally, on October 31, 2008, Mauriello ordered his officers to arrest virtually *everybody* they came in contact with at 120 Chauncey Street in Brooklyn, with or without probable cause: "EVERYBODY GOES. I DON'T CARE. YOU'RE ON 120 CHAUNCEY AND THEY'RE POPPING CHAMPAGNE? YOKE EM.  PUT THEM THROUGH THE SYSTEM.  THEY GOT BANDANNAS ON, ARREST THEM.  *EVERYBODY GOES TONIGHT*.  THEY'RE UNDERAGE? FUCK IT."

24.     Similar orders were given by a Sergeant on November 23, 2008.  "IF THEY'RE ON A CORNER, MAKE 'EM MOVE.  IF THEY DON'T WANT TO MOVE, LOCK 'EM UP. DONE DEAL.  YOU CAN ALWAYS ARTICULATE [A CHARGE] LATER."

25.     Thus, in effectuating the NYPD's illegal quota policy, police officers throughout the City were being instructed to arrest and summons fully innocent people for crimes that never occurred – for nothing more than standing on a street corner in their neighborhoods – and then "articulate" or create a charge later.

**Further Proof of the NYPD's Illegal Quota Policy: Written Directives by Chief Marino**

26.     In a 2005 arbitration hearing, P.O. David Velez – who had been punished for failing to reach his monthly quota – presented evidence that the 75th Precinct had instituted and was enforcing a policy that officers must meet "a quota of 10 (ten) summons per month" and "that the police officers in squad A-1 received lower marks on their evaluations if the officers did not meet 'this minimum requirement.'" In the Matter of P.B.A. and City of New York, Case # A-10699-04, at 9 (Jan. 14, 2006)(emphasis added).

27.     Additionally, then Commanding Officer Michael Marino actually *reduced this directive to writing* and distributed it to all of the supervisors in the 75th Precinct.  (Id.)

28.     The aforementioned written directive ordered that supervising officers were required to evaluate officers based on their adherence to the minimum quota of summonses and arrests.  Id.

29.     Specifically, in a writing dated January 2004, C.O. Marino wrote the following directive to his supervisors for their use in evaluating the performance of police officers:

(1)     *35 or below* = 2.5 - unless you can show significant improvement in last quarter.

(2)     *Less than 11 collars* = low or less in Performance Area #2 (Apprehension/Intervention).

(3)     *Less than 33 movers* = low or less in performance Area #5 (Vehicular Offenses/Accidents).

(4)     *Less than 33 QOL [quality of life]* = low or less in Handling Specific Offenses (Performance Area #6).

(5)     Any two above = low or less in Behavioral Dimension #25 (Drive/Initiative) and/or Behavioral Dimension #18 (Problem Recognition).

30.     As a result of CHIEF MARINO's explicit directives, Sgt. Lurch issued a memo to all officers in the 75th Precinct "remind[ing] [officers] that a FAILURE TO WRITE THE *REQUIRED AMOUNT OF SUMMONSES* AND FAILURE TO MAKE THE REQUIRED NUMBER OF ARREST FOR EACH RATING PERIOD WILL RESULT IN SUBSTANDARD PERFORMANCE RATINGS." (Id at 10) (emphasis supplied).

**The NYPD's Quota Policy Is Struck Down As Illegal in January 2006**

31.     While the NYPD denied the existence of any quota policy, the arbitrator emphatically rejected defendants' claims

> The Arbitrator finds that C.O. Marino's writing and Sergeant Lurch's memo *could not have been clearer*: "failure to write the required amount of summonses ... will result in substandard performance ratings ..." Further, the asterisk in the goal column makes it clear that [these]  "goals" are monthly, quarterly and yearly.  The Arbitrator is *completely persuaded* that the "goals" column on this memo meets the definition in Labor Law Section 215-a for "quota" ... [Thus], the New York Police Department violated New York State Labor Law Section 215-a by establishing and maintaining a summons quota...
>
> In the Matter of P.B.A. and City of New York, Case # A-10699-04, at 11, 27 (Jan. 14, 2006)(emphasis added).

32.     Thus, notwithstanding defendants' claims to the contrary,  the NYPD was found to have a quota policy that was not only unconstitutional and illegal, but also,  violated New York State Labor Law Section 215-a.

**Notwithstanding The Arbitrator's Decision, The NYPD's Unlawful Quota Policy Continues To This Day.**

33.     Notwithstanding the Arbitrator's January 14, 2006 decision, to this day,

34.     Police officers throughout the City are constantly pressured to meet the required minimum quota of summonses on a daily, weekly, and monthly basis.

35.      The NYPD's unlawful quota policy is not limited to the 41st, 81st and 75th

36.     Precincts.  Rather, it exists in every precinct throughout the City of New York, and has continued in full force even after the arbitrator's decision of January 14, 2006.

37.     In fact, after filing the related action of <u>Schoolcraft v. City of New York</u>, 10 CV 06005 (RWS), plaintiffs' counsel have been contacted by a large number of additional police officers, who upon hearing of P.O. Schoolcraft's allegations, have also come forward and informed plaintiff's counsel  that this quota policy  is also vehemently enforced in the 42nd, 52nd, 75th , 90th, 23rd, 43rd, 105th, 79th, 103rd, 115th, 6th Precincts, Housing Borough IRT, PSA 8, Transit Bureau Bronx and Transit District 23, where officers are being pressured to meet these illegal quotas or receive adverse employment action when they refuse or fail to do so.

38.     Specifically, the aforementioned officers have provided plaintiffs' counsel with evidence of a rampant illegal policy of issuing summonses pursuant to a quota regardless of probable cause, the existence of a crime, the number of summonses actually filed or the number of summonses that are successfully prosecuted.

39.     As a result of the NYPD's continuation of this unlawful policy with the knowledge of its illegality, final and permanent injunctive and compensatory relief is appropriate for the putative class.

**The NYPD's Code Word for Quotas: "Activity"**

40.     While the NYPD continues to publicly deny the existence of any quotas – claiming that these are mere "productivity goals" –  there can be no doubt that the commands and pressures from supervising officers for subordinate officers to increase their "ACTIVITY" specifically refers to producing a predetermined minimum number of summonses, arrests and 250's.

41.     This is apparent from the title of the memo that was the subject of the 2006 arbitration decision, which was entitled "Squad Activity Expectations."

42.     The use of the word "activity" in that memo unequivocally refers to the requisite number of summonses needed to meet the quota, providing irrefutable evidence that any directives to increase "activity" correlate to a predetermined summons quota.

43.     Further, P.O. Schoolcraft's own low performance evaluation was based on his failure to adhere to NYPD's "activity" requirements, and upon every inquiry as to the NYPD's definition of "activity," he was repeatedly informed that activity was evaluated based on the number of summonses, arrests and UF 250 reports credited to an officer in a given month.

44.     For example, P.O. Schoolcraft specifically asked, "SO HOW CAN A POLICE OFFICER BRING UP HIS POINTS?," to which his sergeant responded "BY DOING ACTIVITY…SUMMONSES, COLLARS [ARRESTS]."

45.     Additionally, at one of the roll calls in the 81st Precinct, a supervising officer stated, "I WANT ACTIVITY. LISTEN. I WANT 250'S AND C SUMMONSES."

46.     Further another supervising officer issued the following order, "ANYBODY OVER THERE SELLING. HANGING OUT OVER THERE I DON'T CARE WHAT THEY'RE SELLING, THEY'RE GETTING SOMETHING. *I GOTTA GET A FEW SUMMONSES OVER THERE* BECAUSE QUALITY OF LIFE WENT OVER THERE AND TOOK SOME PICTURES OF SOME GUY SELLING, SELLING STUFF OVER THERE. *I HAVE TO HAVE SOME ACTIVITY* THAT WE HANDLED."

**Further Proof of the NYPD's Unlawful Quota Policy: Statistical Evidence from The OCA**

47.     The fact that the NYPD has an unlawful quota policy is further confirmed by statistical data from the New York State Office of Court Administration ("OCA"). As a result of the constant pressure to meet monthly quotas – which is causally connected to NYPD's obsession with COMPSTAT statistics (see §§ 115-131, 147-152, infra.) –  officers are driven to stop, seize, arrest and summons individuals in the absence of probable cause in order to meet the

minimum quota, resulting in an marked increase in the total numbers of  summonses issued by the NYPD.

48.       In fact, since 1994 – which was the inception of COMPSTAT – there has been a *five hundred percent* (500%) increase in the number of summonses issued.

49.       Further, according to the objective evidence contained in OCA's own records, the majority of summonses filed by the NYPD were issued without probable cause or any legitimate basis.

50.       In fact, of all the summonses adjudicated in the Criminal Court system – *more than half of them, or 50.5% – were dismissed* in the year 2005.

51.       This result is remarkably similar to the results from other years.  For example, in 2006, *51% of all filed summonses were dismissed.*  In 2007, *50.7% of all filed summonses were dismissed.*   In 2008, *50.5 % of all summonses filed were dismissed.*

52.       The utterly baseless nature of these summonses is further confirmed by the large number of summonses which are dismissed before they are even docketed.

53.       Specifically, according to the 2007 Annual Report from the Criminal Court, City of New York, there were approximately six hundred one thousand four hundred and fifty seven (601,457) summonses filed within New York City.

54.       Of the aforementioned summonses issued in 2007, thirty five thousand three hundred and four (35,304) of the summonses were dismissed *before even being docketed*.

55.       In addition, of the remaining summonses that were docketed in 2007, ninety three thousand one hundred and fifty nine (93,159) were *dismissed as insufficient as a matter of law before arraignment*.

56.     Additionally, according to the 2008 Annual Report from the Criminal Court, City of New York, there were approximately  five hundred sixty three thousand one hundred and fifty seven (563,157)  summonses filed within New York City.

57.     Of the aforementioned summonses issued in 2008, thirty seven thousand five hundred and one (37,501) of the summonses were dismissed *before even being docketed*.

58.     In addition, of the remaining summonses that were docketed in 2008, ninety nine thousand three hundred and seventeen (99,317) were dismissed as insufficient as a matter of law before arraignment.

**The "Disappearing" Summonses: Counted By The NYPD But Not By OCA.**

59.     Upon information and belief, the aforementioned number of summonses filed in 2007 and 2008 does not account for summonses recorded in COMPSTAT that are actually issued by the NYPD, but that are never filed in any criminal court in New York City.

60.     Additionally, COMPSTAT statistics would in fact contain the *total* number of summonses issued by a given precinct – whether or not they were ever filed with the court – which means that officers are still *credited with the statistic,* despite the fact that the summons was returned to the officer as defective before ever being sent to the court.

61.     As such, officers are motivated by this quota to stop, seize, arrest and summons individuals in the absence of probable cause knowing that they can meet their quota by issuing a summons for a non-existent crime or violation, which also corroborates the existence of "ghost summonses" (see §§ 101-108, infra).

62.     Further upon information and belief a comparison between COMPSTAT and OCA statistics will reveal that the actual number of summonses issued is far greater than is reflected in OCA statistics.

63.    Additionally, upon information and belief, the aforementioned number of summonses in 2007 and 2008 that were never docketed and or were dismissed prior to arraignment does not account for the number of summonses that were dismissed at arraignment as being insufficient.

64.    Such incredibly high dismissal rates prior to any court appearance is presumptive evidence that those summonses were either: i) issued in order to meet a quota for offenses that never occurred; or ii) that the NYPD has shown an utterly deliberate indifference to the proper training regarding the requisite level of probable cause required to stop, arrest and summons individuals.

65.    At a minimum, according to the data actually known regarding the amount of summonses filed and dismissed in 2007 and 2008, approximately twenty three percent (23%) of the total number of summonses filed were dismissed as legally insufficient.

66.    The Annual Report from the Criminal Court, City of New York in 2009 has not been published as of the date of this complaint; however, given the nearly identical statistics from the preceding two years, it is presumed that 2009 will produce similar statistics.

**Implementation of the Quota:  Relentless Pressure from Superior Officers**

67.    In order to enforce the quota system outlined above, it is a routine and widespread practice that officers are constantly reminded of these quotas during roll call and receive explicit threats of tour transfers, undesirable assignments, poor performance evaluations and other adverse consequences for failure to meet their monthly arrest and summons quotas.

68.    For example, one such admonishment from a commanding officer was: "IF YOU MESS UP, HOW THE HELL [DO] YOU WANT ME TO DO THE RIGHT THING BY YOU? YOU COME IN, 5 PARKERS, 3 A'S (SUMMONSES), NO C'S (SUMMONSES) AND THE ONLY 250 YOU DO IS WHEN I FORCE YOU TO DO OVERTIME.  I MEAN IT'S A TWO

WAY STREET HERE. I'M OLD SCHOOL.  I GOT 19, ALMOST 20 YEARS.  IF I
SCREWED UP, I HAD TO GIVE OUT 25 (SUMMONSES), IF I SCREWED UP I'D HAVE
TO GIVE OUT DOUBLE NUMBERS."

69.     Further, evidence of the pressure facing officers to meet the required amount of
summonses –  which in turn results in repeated constitutional violations of New York City
residents (see §§ 99-106; 107-114, infra) –  is apparent in another supervisor's statement: "I'M
KEEPING CHIEF [MARINO] AT BAY. WHEN HE PULLS ACTIVITY REPORTS GOES
BACK A WHOLE YEAR, SAYS THIS GUY, THIS GIRL IS NO GOOD.  BOUNCE
THEM…WHEN I TELL YOU TO GET YOUR ACTIVITY UP, IT'S FOR A REASON
BECAUSE *THEY ARE LOOKING TO MOVE PEOPLE AND HE'S SERIOUS.*"

**The Consequences for Officers Who Fail or Refuse to Meet Their Quota**

70.     If an officer does not meet the aforementioned quota for issuing summonses, he or
she could receive punishment in the form of poor performance evaluations, loss of overtime,
shift changes or denial of sick and/or vacation days.

71.      Additionally, if an officer fails to meet the quota requirement, he or she would be
personally "supervised" by their platoon commander during their tour, and would be told when,
where, to whom and for what a summonses

72.     Moreover, it is made abundantly clear that performance evaluations, which lead to
raises, promotions and desirable assignments, are entirely based on adherence to these quotas,
thereby driving officers to issue unconstitutional summonses to meet the quota rather than suffer
adverse employment consequences.

73.     Specific evidence of this fact can be found in the following supervisor's
statement: "YOU'RE JUST EXPECTED TO GO OUT, YOU DON'T HAVE TO ANSWER
JOBS, YOU JUST HAVE TO WRITE C'S (SUMMONSES).  YOU DON'T WRITE ANY

THAT NIGHT THEN YOU'LL BE BACK ON FOOT...THEY EXPECT AT LEAST TWO (2) FROM EACH, EACH OF YOU IN A CAR, TOTAL OF FOUR (4).  IF YOU DO MORE EVEN BETTER...IF YOU ARE ON QUALITY OF LIFE AUTO, YOUR ASSIGNMENT FOR THE DAY IS QUALITY OF LIFE SUMMONSES, AND 250'S ALSO.  LAST MONTH'S ACTIVITY REPORTS WERE GOOD BUT SOME, I STILL HAVE TO CHASE SOME OF YOU AROUND FOR 250'S AND C'S SO WERE GOING TO HAVE A LITTLE RESTRUCTURING IN JANUARY...ITS NOTHING PERSONAL ITS JUST THAT YOUR EVALUATIONS ARE BASED ON YOUR ACTIVITY, SO I CAN'T GIVE YOU A 4 OR 4.5 IF YOU DON'T HAVE ANY ACTIVITY."

74.    All of this constant and relentless pressure to adhere to this quota policy drives officers to stop, arrest, seize and issue summonses to individuals in the absence of probable cause for offenses never committed, which is apparent from the unconstitutional acts visited upon plaintiff's herein and others similarly situated.

75.    Aside from explicit threats of punishment, officers who do not meet their quota suffer severe adverse consequences, which in some instances even rise to the level of placing their personal safety in jeopardy.

76.    For instance, P.O. Edwin Valasquez had his tour reassigned when he did not meet his summons quota despite the fact that the officers who replaced him in his tour of duty had far less experience and seniority on the job.

77.    Additionally, another officer in the 41st Precinct was punished when he documented in his memobook the fact that he was commanded by his lieutenant to suborn perjury and issue a summons for activity that he did not observe.

78.    When the lieutenant discovered what he had documented, the officer was informed that if the officer wanted the lieutenant to "forget about it" in lieu of disciplinary or

other adverse action, the officer would be required him to write twenty five (25) summonses during his next tour of duty.

79.     Upon information and belief, the aforementioned officer did in fact write twenty-five (25) summonses on his next tour, which undoubtedly resulted in several constitutional violations.

80.     Further, another officer in the 42nd Precinct suffered harassment when he reported that Lieutenant Seda had commanded him to suborn perjury and write traffic and other summonses for offenses that he had not witnessed.

81.     Upon reporting the illegal directive, he found a mousetrap with his name on it and was transferred for his safety as Seda had disclosed his confidential complaint to the rest of the command and had classified him as a "fucking rat."

82.     Further, Adhyl Polanco met a similar fate when he made it known to the Internal Affairs Bureau that he had evidence of the NYPD's illegal enforcement of summons and arrest quotas.

83.     P.O. Polanco's gun and badge were removed when he attempted to accompany his sick partner to the hospital and refused to return to writing summonses at the behest of his sergeant.

84.     Further, his sergeant threatened to treat him as an EDP ("emotionally disturbed person") if he did not voluntarily surrender his gun and badge and was thereafter summarily suspended.

85.     Moreover, an officer from the 115th Precinct in Queens was actually fired for his refusal to issue summonses pursuant to an unconstitutional quota.

**Officers Who Fail To Meet Expected Quotas Are Placed Into "Performance Monitoring", Where They Face Severe Adverse Consequences.**

86.     In addition to punishing officers for failing to meet quotas, as detailed above, the NYPD routinely places officers who cannot meet their quotas into "performance monitoring."

87.     For example, an unidentified officer who joined the NYPD in 1998 at the 75th Precinct had always received above average performance evaluations until 2003, when Chief Marino was assigned as the Commanding Officer at the 75th Precinct.

88.     Following Marino's assignment, the officer began to receive poor performance evaluations when he was unable to meet the minimum monthly summons requirement, which was four (4) A summonses, three (3) B summonses and three (3) C summonses.

89.     Additionally, he was placed on "performance monitoring," for his failure to meet the required number of summonses.

90.     Performance monitoring has the following three levels of severity: 1) "Level One" is in-house monitoring (Precinct level only); 2) "Level Two" involves monitoring at Police Headquarters, and carries many adverse consequences, such as loss of "paid detail"[1] eligibility and home visits every time an officer takes sick leave; and, 3) "Level Three" performance monitoring is the most severe, and an officer can be fired if he or she receives three command disciplines within a six (6) month period.

91.     The subject officer was placed on "Level Two" monitoring.  Eventually, this officer sought promotion to sergeant and was required to appear before the Career Advancement Review Board ("CARB"), which is typically only required for officers who have serious disciplinary issues, which he did not.

---

[1] Paid details are private work assignments through the NYPD

92.     Notwithstanding this officer's exemplary record – he had no disciplinary issues in his entire time with NYPD - his application for promotion was denied due to his low "activity."

93.     Moreover Chief Gianelli actually advised the officer that CARB will only review their decision if he increases his "activity." However, the officer refused to issue illegal summonses merely to increase activity.

94.     As such Employee Management Division has since refused to review CARB's decision and he has been denied promotion for nineteen (19) months – despite having scored in the top 10% on the Sergeant's exam - all due to his failure to issue summonses pursuant to an illegal and unconstitutional quota.

95.     Instead, another officer who had identical qualifications but "high activity" was promoted to Sergeant first despite the fact that he had a criminal conviction for Drunk Driving *during* his career with NYPD.

**P.O. Schoolcraft's Harrowing Experience: Further Proof of The NYPD's Unlawful Policies**

96.     All of the aforementioned incidents notwithstanding, perhaps the most disturbing consequence for refusing to adhere to the NYPD's unconstitutional quota policy is the harrowing experience endured by P.O. Schoolcraft when he appealed his adverse performance evaluation, which was based entirely on his refusal to perpetuate this illegal quota policy.

97.     In response to his appeal, P.O. Schoolcraft was summoned to a meeting with *nine* commanding officers from his precinct, all of whom discouraged him from challenging his evaluation and admonished him that he could avoid all of this simply by bringing up his "activity."

98.     When P.O. Schoolcraft responded that he acts on every criminal or summonsable offense he observes, his superior officers suggested that he should ride with someone who has a

record of issuing the required number of summonses, so that said officer could "point out" times where summonses were to be issued.

99.     Additionally, at that meeting P.O. Schoolcraft repeatedly asked the reason for his poor evaluation and the response was repeatedly referring to the low number of summonses he had issued in a given month.

100.    Finally on October 31, 2009, in retaliation for the evidence that P.O. Schoolcraft had gathered over the course of the year regarding enforcement and encouragement of meeting summons and arrest quotas, several police officers and high-ranking NYPD officials invaded P.O. Schoolcraft's apartment and had him involuntarily committed to Jamaica Hospital in an attempt to silence P.O. Schoolcraft from disclosing the evidence he had obtained regarding illegal quotas and corruption within the NYPD.

**The Result of Relentless Quota Pressure: "Ghost Summonses" And Falsified Police Reports**

101.    As the above incidents make clear, the simple threat of such extreme consequences for failing or refusing to adhere to this illegal quota policy drives officers to simply conform to the policy, thereby resulting in hundreds of thousands of constitutional violations of New York City residents.

102.    Specifically, this blanket quota enforced on all officers is driving officers to issue summonses without probable cause for violations that never occurred, which is evidenced by information provided by both P.O. Polanco and P.O. Schoolcraft that it is widespread practice for officers to actually write "ghost summonses."

103.    The term "ghost summons" is NYPD slang for summonses issued without probable cause for crimes that did not occur, which are intentionally written defectively knowing that the individual will suffer "only" the inconvenience of being unlawfully seized during the

issuance of the summons, but will never suffer the threat of prosecution; however, the officer will nonetheless still be able to meet the quota.

104.    Moreover, while on duty, P.O. Schoolcraft, in a recorded conversation with Sgt. Devino, informed her of the existence of "ghost summonses": "ITS COMMON PRACTICE HERE, FAKE 250'S, FAKE SUMMONSES BEING HANDED IN BECAUSE THEY CAN'T KEEP UP WITH THE NUMBERS."

105.    Additionally, in that conversation he informed her that these "fake" summonses were condoned and that the pressure applied by supervising officers encouraged officers to engage in this illegal practice: "[THEY] WANT NUMBERS AND THERE ARE COPS GIVING THEM FAKE NUMBERS."

106.    Illustrative of the existence of the aforementioned NYPD practice of writing "ghost summonses" in response to the constant pressure to meet quotas was the scenario that unfolded for plaintiff VICTOR BRELAND when he was issued a summons for disorderly conduct in front of his mother's building, when he had in fact committed absolutely no crime or violation of law.

107.    In that situation, plaintiff VICTOR BRELAND – who was merely trying to visit his sick mother – asked for a reason why he was being issued the summons, to which the officer responded, in sum and substance: "DON'T WORRY, I AM NOT GOING TO USE YOUR REAL INFORMATION. ITS JUST THAT *IT'S THE END OF THE MONTH AND I NEED TO REACH MY QUOTA*."

108.    Further, both P.O. Polanco, P.O. Schoolcraft and other unidentified officers have provided information that on numerous occasions they had witnessed to NYPD officers being commanded and ordered by sergeants, lieutenants and captains to issue summonses to

individuals for offenses that they did not personally observe nor did they have any probable cause to believe had ever been committed.

**The NYPD's Unlawful Quota Policy: Selectively And Disproportionately Enforced In Minority Communities**

109.    All of the aforementioned evidence provided by P.O. Polanco and P.O. Schoolcraft – as well as the scores of other police officers who have come forward and contacted plaintiffs' counsel – also leads to the undeniable conclusion that this policy, pattern and practice is selectively and intentionally enforced in neighborhoods and areas which have a high composition of minority residents, which disparately impacts said individuals based on an impermissible classification under the Constitution of the United States.

110.    Additionally, upon information and belief, a partial basis being the racial composition of the named plaintiffs in this matter thus far, this policy, pattern and practice is purposely enforced in neighborhoods and areas which have a high composition of minority residents, which disparately impacts said individuals based on an impermissible classification under the Constitution of the United States.

111.    Further, officers are fully aware that they can effectively meet these quotas by issuing these unconstitutional summonses in neighborhoods comprised of predominantly minority residents because, as one unidentified officer noted: "THESE PEOPLE ARE HELPLESS AND HAVE NO RESOURCES OR THE IMPETUS TO FIGHT THIS."

112.    Additional evidence of the fact that these practices are carried out in a way that has a disparate impact on minority, African-American and Hispanic residents of New York City are statements in a meeting instructing officers that in Bedford Stuyvesant, practically "EVERYBODY HAS A WARRANT", and therefore, as to the manner of enforcing this quota policy: "TREAT EVERYBODY WITH RESPECT. BUT 'THEY,' AT 120, MALCOLM X

AND BAINBRIDGE, NO…I WOULDN'T GIVE TOO MUCH [RESPECT].  THE MORE WE GIVE SUMMONSES, 250, COLLAR THEM IN THEIR BUILDING, YOU'RE PUTTING A WRENCH IN."

113.    In addition, according to NYPD's own reports, since 2007, one million seven hundred twenty four thousand nine hundred and forty eight (1,724,948) individuals have been stopped by the NYPD and of those individuals, one million four hundred thirty nine thousand eight hundred and ninety six (1,439,896) were either African American or Hispanic.

114.    According to those statistics of the total number of individuals stopped by the NYPD since 2007, approximately eighty three percent (83%) were African American or Hispanic.

115.    Upon information and belief as well as data compiled by the NYACLU, a significant percentage of the total number of individuals stopped were issued a summons.

116.    This unconstitutional violation of the Equal Protection Clause of the Fourteenth Amendment can be inferred from all of the evidence provided by NYPD officers as well as the racial composition of all the named plaintiffs in this action (i.e. African American).

**COMPSTAT: The Driving Force Behind the NYPD's Unlawful Quota Policy**

117.    The origin of the NYPD's quota policy may be traced directly back to COMPSTAT, which was first implemented in 1994.

118.    While COMPSTAT was originally a useful law enforcement tool – helping police identify spikes of crime throughout the City – it has led the NYPD to develop an almost maniacal obsession with "numbers" that dominates their entire law enforcement philosophy.

119.    The NYPD's obsession with "numbers" begins at the precinct level.  Every time a summons is issued, the issuing officers drops a copy of the summons in "the box" in the

Precinct, after which it is reviewed by crime analysis in order to examine the summons for defects and/or the sufficiency of the allegations.

120.    Thereafter, the summonses that pass inspection are then sent to the court and the ones that are rejected are returned to the officers.

121.    All of the summonses issued by the officers, whether defective or sufficient, are recorded in their monthly performance reports and daily recap sheets, which are then submitted on a weekly and/or monthly basis to their sergeants and lieutenants, who thereafter submit them to the commanding officers of the Precinct.

122.    Additionally, records of those summonses are thereafter entered into the "bible," which is kept by the Commanding Officer of the Precinct.

123.    This "bible" kept by the commanding officers of every Precinct in New York City is a record of every officer's "activity," including but not limited to, the amount of summonses issued, whether defective or not.

124.    In addition to the "bible," the same statistics are recorded electronically in a computer database known as COGNOS, which is accessible to all Precincts in New York City and contains the "activity" (i.e. arrests, summonses, UF-250's) of each and every member of the NYPD.

125.    Further, the statistics that are recorded manually in the "bible" and electronically recorded in "COGNOS" are also electronically recorded in the NYPD COMPSTAT database, which is a statistical record of, among other things, all arrests, summonses, stop and frisks and reported "major" crime (i.e. murder, rape, robbery, burglary, felony assault, grand larceny and grand larceny auto) city wide and broken down Precinct by Precinct.

126.    Additionally, there is a similar database that records statistics regarding traffic tickets issued called TRAFFICSTAT, which is inextricably interwoven with the summons and

arrest quotas, which can also result in adverse consequences if the quota of traffic tickets are not met.

**COMPSTAT Meetings: Commanding Officers Are Berated And Disparaged, And Denied Extra Funding, Leading To Further Pressure For Summons "Activity"**

127.    Additionally, there are weekly and monthly COMPSTAT meetings, which are recorded on video and transcribed, and which are designed to statistically monitor arrests, summonses, 250's and reported major crime throughout the five boroughs and Precinct by Precinct.

128.    These meetings are organized, attended and directed by top ranking NYPD officials throughout the five boroughs at the behest and command of defendant RAYMOND KELLY.

129.    During these meetings commanding officers throughout the NYPD are berated and denied extra funding, resources and overtime if their Precinct's "activity" (i.e. summonses, arrests, 250's) is not in accordance with the level of "activity" required by defendant RAYMOND KELLY.

130.    Additionally, these commanding and supervising are relentlessly pressured to adhere to the required quota of C summonses (quality of life summonses) in accordance with the pre-ordained quota for each individual Precinct throughout the five boroughs.

131.    In response to this policy, commands within the five boroughs routinely set "special summons details" in order to artificially increase the number of summonses issued, resulting in the issuance of hundreds of thousands of unconstitutional summonses.

132.    Commanding officers who attend these meetings know in advance that they will get "ripped apart" by NYPD brass if there is a spike in crime in their precincts.

133.    Commanding Officers who attend these COMPSTAT meetings – which are viewed by other commanding officers on the NYPD's Intranet –  are well aware and understand that the NYPD's allocation of additional funding, resources, benefits and overtime are completely dictated by the statistics that appear in COMPSTAT which are ultimately reviewed by RAYMOND KELLY and the policy making officials at One Police Plaza.

**The NYPD's Response to COMPSTAT Pressure: Blatant Manipulation of Crime Statistics Resulting in an Unconstitutional Summons Quota.**

134.    Based on the above,  it is in the Commanding Officer's best interest –  career-wise and as far as their own Precinct's funding is concerned –  to make two very specific things appear in COMPSTAT statistics: 1) a *decrease* in reported "major" crime (i.e. murder, rape, robbery, burglary, felony assault, grand larceny, grand larceny auto), and 2) an *increase* in "activity" (i.e. arrests, summonses, 250's), in order to perpetuate an erroneous belief that the two categories are casually related, which has dictated the NYPD's allocation of funding and resources since the re-appointment of defendant KELLY in 2002.

135.    Additionally, it is equally in Defendant CITY OF NEW YORK's best interest to perpetuate the belief that statistics justify and prove the need to have an increased police force and increased amount of public funding for same.

136.    In furtherance of these policies and interests, the CITY has effectively created a situation where Precincts, if they are to be allocated additional resources and funding, need to artificially create the appearance of a causal relationship between theses statistical categories.

137.    In doing so, this policy has created intense pressure on officers and has driven them to meet a quota of high summons activity every month and as such has caused officers to consistently violate the constitutional right of hundreds of thousands of New York City residents

by arresting, detaining, seizing and issuing summonses to them in the absence of probable cause, when in fact no violation has ever occurred.

138.    Further P.O. Schoolcraft, P.O. Polanco and scores of other unidentified officers who have come forward, have provided evidence that in order to artificially create the appearance of the statistical correlation that, as a result of high "activity," "major" crime is therefore reduced, commanding and supervising officers routinely direct officers to discourage citizens from making reports of major crimes, refuse to take reports from citizens who desire to make them and/or downgrade major crime reports to reflect only petit or minor offenses (i.e. robbery report is manipulated to reflect only "lost property").

139.    Evidence of this can be seen in the following statement: "IF THE CV (COMPLAINING VICTIM) WANTS TO MAKE A REPORT OF A ROBBERY, BUT THEY DON'T WANT TO HELP US OUT, LOOK THROUGH PHOTOS, YOU DON'T NEED TO TAKE THAT REPORT."

140.    Additionally, in one instance in March of 2009, Deputy Inspector Mauriello refused to take a grand larceny automobile report, which would otherwise classify as a "major" crime for COMPSTAT, from an individual due to his prior criminal record, stating,

| | |
|---|---|
| Mauriello: | "WHAT DO YOU MEAN YOUR CAR WAS MISSING." |
| Victim: | "I PARKED IT THERE, WOKE UP TODAY, GONE." |
| Mauriello: | "EVER BEEN ARRESTED BEFORE?" |
| Victim: | "YEAH DID 6-8 YEARS FOR FELONY DRUGS AND A GUN." |
| Mauriello: | "SO MAYBE YOU THINK KARMA WOKE UP THIS AM AND TOOK YOUR CAR." |

141.    Further proof that the NYPD is consumed and utterly driven by numbers and statistics, much of which is false, is apparent from statements of supervising officers, such as,

"YOU CAN BE THE BEST COP IN THE WORLD, YOU DON'T WRITE IT DOWN ON A PIECE OF PAPER, YOU DIDN'T DO IT.  OPPOSITE, YOU COULD BE THE WORST COP IN THE WORLD; YOU'RE A WRITER, BEST COP IN THE WORLD. IT'S ALL PAPERWORK."

142.    In fact all of NYPD's funding and incentives are based entirely on statistics, creating a driving force to manufacture or create statistics for offenses that never happened, as one supervisor stated: "JUST KEEP THE HOUNDS OFF. A PARKER [PARKING VIOLATION]. A 250 [STOP AND FRISK].  SOMEONE WALKING DOWN THE STREET. YOU KNOW WHAT, I STOPPED AN ASSHOLE, I DID A 250, LET HIM GO.  HE DIDN'T HAVE ANY INFORMATION. WHO CARES? IT'S STILL A 250.  YOU KNOW WHAT, THAT KEEPS A SMILE ON THE [SUPERVISOR'S] FACE."

143.    Further evidence can be found in statements like the one a Sergeant made in October 18, 2009: "AGAIN, IT'S ALL ABOUT THE NUMBERS."

144.    Additionally, impact overtime, which is supplementary overtime allotted to certain Precincts, is only given to officers with the requirement that they issue a minimum number of summonses and/or arrests during said overtime shift.

145.    Moreover, any officers who failed to meet the overtime summons/arrest quota during their overtime shifts would not be given overtime in the future.

146.    Further evidence of this deliberate manipulation and creation of artificial statistics, which leads to repeated constitutional violations, can be gleaned from the fact that officers are instructed to increase their activity in furtherance of this policy in response to major crimes being reported to again create the artificial appearance of a causal relationship between high activity and low reported major crime.

147.    An example of this can been seen in this statement: "A SHOOTING [AT] MIDNIGHT ON CHAUNCEY, SO DO SOME 250'S COMMUNITY VISITS, C SUMMONSES…THE USUAL *BULLSHIT*."

148.    As such, the NYPD's policy of distributing resources based on this false statistical correlation with COMPSTAT data has been the driving force behind officers manufacturing or creating "activity" that does not exist resulting in the issuance of hundreds of thousands of unconstitutional summonses in the absence of probable cause.

**Further Proof of the NYPD's Manipulation of Crime Statistics: a Survey of Retired High-Ranking NYPD Officials**

149.    The NYPD's obsession with "numbers" – and their consequent manipulation of crime statistics – is further confirmed by a recent survey conducted by John A Eterno, PhD ("Eterno"), a retired captain from the NYPD and chairperson of graduate studies in criminal justice at Molloy College, and Eli Silverman, PhD ("Silverman"), a Professor Emeritus at John Jay College of Criminal Justice and the Graduate Center of CUNY.

150.    In this survey, Eterno and Silverman interviewed nearly 500 former high-ranking police officials to determine if the pressures created by Compstat might result in unethical crime reporting by the NYPD.

151.    The results of this survey were published in the International Journal of Police Science and Management, Volume 12 Number 3 (April 6, 2010), in an article entitled "The NYPD's Compstat: Compare Statistics or Compose Statistics."

152.    150.    According to Eterno and Silverman, "*a large subset of respondents* who were active in the Compstat era *reported being aware of crime reports being changed in an unethical way*." (Id. at 13) (emphasis supplied).

153.    As the authors explained, "the pressure to downgrade index crime is a key variable explaining [the] unethical distortion of crime reports – as pressure increases, unethical changing of reports also increases ... " (Id. at 15).

154.    152.    Based on the survey results, Eterno and Silverman concluded that, as a result of Compstat pressure, [c]learly, the evidence thus far suggests that members of the NYPD have, at times, *unethically altered complaint reports*." (Id. at 13) (emphasis supplied).

**The Necessity of This Class Action: Putting an End to The NYPD's Unlawful Quota Policy.**

155.    From the aforementioned evidence, it is apparent that the NYPD's myopic obsession with "numbers" has resulted in an unlawful and unconstitutional quota policy, which has resulted in summonses that are issued regardless of probable cause, legal merit or whether a successful prosecution can be had.

156.    The statistical data in connection with the documented evidence of high-ranking officials within the NYPD explicitly instructing officers to adhere to these quotas, is representative of an explicit and/or tacit policy, pattern and practice of issuing summonses regardless of probable cause or any legitimate legal basis for their issuance in order to adhere to summons quotas set out by the NYPD.

157.    The statistical data in connection with the documented evidence of high-ranking officials within the NYPD explicitly instructing officers to adhere to these quotas, is representative that the aforementioned practices are not confined to isolated Precincts but are instead part of a city-wide policy pattern and practice of forcing officers to meet a summons quota thereby resulting in the constitutional violations of hundreds of thousands of New York City residents.

158.    These unconstitutional and illegal acts degrade, humiliate, and cause harm to their victims. Individuals who are arrested and issued summonses suffer unwarranted deprivation of personal liberty. In many cases they are subjected to the degradation of searches and seizures in plain view of the general public, and, in many cases, handcuffing and prolonged detention within NYPD Precincts before being released. They are detained, sometimes for hours or days at a time, in filthy, overcrowded conditions. Then, in most instances are forced to take time from their jobs, families and lives in order to appear in court before the summonses are dismissed.

159.    Despite the patently unconstitutional and illegal nature of this conduct and its detrimental effects on the New York City residents whom the laws are supposed to protect, city officials have refused to reform their practices and in fact, as has been documented, continue to instruct NYPD officers to increase this practice. The time has come to rein in this abuse of power and stop these unconstitutional and illegal acts.

160.    This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

161.    Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343(a) and 1367.

## **VENUE**

162.    Venue is properly laid in the Southern District of New York under U.S.C. § 1391(b), in that this is the District in which a substantial part of the events or omissions giving rise to the claim occurred.

## **JURY DEMAND**

163.    Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

164.    Plaintiff SHARIF STINSON is an African American male and at all relevant times a resident of the City and State of New York.

165.    Plaintiff MARIAM FARNUM is an African American female and at all relevant times a resident of the City and State of New York.

166.    Plaintiff CHARLEAN FINLEY is an African American female and at all relevant times a resident of the City and State of New York.

167.    Plaintiff RYBURN WALKES is an African American male and at all relevant times a resident of the City and State of New York.

168.    Plaintiff JAMEL TOWE is an African American male and at all relevant times a resident of the City and State of New York.

169.    Plaintiff CHRISTIAN DUDLEY is an African American male and at all relevant times a resident of the City and State of New York.

170.    Plaintiff JOCELEY FERDINAND is an African American male and at all relevant times a resident of the City and State of New York.

171.    Plaintiff GARY SHAW is an African American male and at all relevant times a resident of the City and State of New York.

172.    Plaintiff MICHAEL BENNETT is an African American male and at all relevant times a resident of the City and State of New York.

173.    Plaintiff CHANEL MEAUSA is an African American female and at all relevant times a resident of the City and State of New York.

174.    Plaintiff DAVID THOMPSON is an African American male and at all relevant times a resident of the City and State of New York.

175.    Plaintiff JULIUS DIXON is an African American male and at all relevant times a resident of the City and State of New York.

176.    Plaintiff JOSEPH SARPONG is an African American male and at all relevant times a resident of the City and State of New York.

177.    Plaintiff JEREMY THAMES is an African American male and at all relevant times a resident of the City and State of New York.

178.    Plaintiff SEAN PETTIGREW is an African American male and at all relevant times a resident of the City and State of New York.

179.    Plaintiff LEANDER GRIFFIN is an African American male and at all relevant times a resident of the City and State of New York.

180.    Plaintiff BRIAN MORRIS is an African American male and at all relevant times a resident of the City and State of New York.

181.    Plaintiff MICA ANCRUM is an African American male and at all relevant times a resident of the City and State of New York.

182.    Plaintiff RICARDO JONES is an African American male and at all relevant times a resident of the City and State of New York.

183.    Plaintiff VICTOR BRELAND is an African American male and at all relevant times a resident of the City and State of New York.

184.    Plaintiff LINDSEY RIDDICK is an African American male and at all relevant times a resident of the City and State of New York.

185.    Plaintiff MICHAEL RIDDICK is an African American male and at all relevant times a resident of the City and State of New York.

186.    Defendant CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

187.    Defendant CITY OF NEW YORK maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform

all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York, who was responsible for the policy, practice, supervision, implementation and conduct of all NYPD matters and was responsible for the appointment, training, supervision, and conduct of all NYPD personnel, including the defendants referenced herein.  In addition, at all relevant times, Defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that NYPD personnel obey the laws of the United States and of the State of New York.

188.   That at all times hereinafter mentioned P.O.s JOHN DOE #1-50 were personnel within the NYPD who implemented, enforced, perpetuated and/or allowed the unconscionable and unconstitutional quota system for summonses that is the subject of this action, acting in the capacity of agents, servants and employees of defendant City and within the scope of their employment as such.   Plaintiffs are unable to determine the names of these NYPD defendants at this time and thus sue them under a fictitious designation.

189.   At all relevant times defendant RAYMOND KELLY was the Police Commissioner of the City of New York and, as such, was a "policymaker" who made and enforced the policies of the NYPD, and who acted in his capacity as agent, servant, and employee of defendant City, within the scope of his employment as such, and under color of state law.

190.   That at all times hereinafter mentioned the defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York and/or New York, Bronx, Kings, Queens and Richmond Counties.

191.    During all times mentioned in this complaint, the defendants and each of them separately and in concert, engaged in acts and/or omissions which constituted deprivations of plaintiffs' constitutional rights, equal protections and the privileges and immunities of the plaintiffs, and while these acts were carried out under color of law, they had no justification or excuse, and were instead illegal, improper, and unrelated to any activity in which law enforcement officers may appropriately and legally engage in the course of protecting persons and/or ensuring civil order.

### CLASS ACTION ALLEGATIONS

192.    Plaintiffs SHARIF STINSON, MARIAM FARNUM, CHARLEAN FINLEY, RYBURN WALKES, JAMEL TOWE, CHRISTIAN DUDLEY, JOCELEY FERDINAND, GARY SHAW, MICHAEL BENNETT, CHANEL MEAUSA, DAVID THOMPSON, JULIUS DIXON, JOSEPH SARPONG, JEREMY THAMES, SEAN PETTIGREW, LEANDER GRIFFIN, BRIAN MORRIS, MICA ANCRUM, RICARDO, VICTOR BRELAND, LINDSEY RIDDICK and MICHAEL RIDDICK bring this action as a class action under Fed. R. Civ. P. 23(b)(2) for violations of their constitutional rights. The Rule (b)(2) Class is comprised of all persons who were or will be wrongfully issued summonses pursuant to a policy pattern and practice of issuing summonses regardless of probable cause or any legal/legitimate basis in order to meet quotas established by the New York City Police Department in violation of their constitutional rights, and accordingly, who are threatened with future unlawful enforcement of this unconstitutional policy.  The class is comprised of all persons issued summonses pursuant to this policy who had committed no crime or violation of law and thereafter had their summons dismissed during the fullest period permitted by the applicable statute of limitations.

193.    Defendants have acted, or failed to act, on grounds generally applicable to the Rule (b)(2) Class, thereby making appropriate final injunctive relief with respect to the Rule (b)(2) Class as a whole.

194.    On information and belief, the Rule (b)(2) class includes hundreds of thousands of members.  They are so numerous that joinder of all Class members is impracticable.

195.    Plaintiffs SHARIF STINSON, MARIAM FARNUM, CHARLEAN FINLEY, RYBURN WALKES, JAMEL TOWE, CHRISTIAN DUDLEY, JOCELEY FERDINAND, GARY SHAW MICHAEL BENNETT, CHANEL MEAUSA, DAVID THOMPSON, JULIUS DIXON, JOSEPH SARPONG, JEREMY THAMES, SEAN PETTIGREW, LEANDER GRIFFIN, BRIAN MORRIS, MICA ANCRUM, RICARDO JONES, VICTOR BRELAND, LINDSEY RIDDICK and MICHAEL RIDDICK bring this action as a class action under Fed. R. Civ. P. 23(b)(3) for violations of their constitutional rights.

196.    The Rule (b)(3) Class is comprised of all persons on who have been wrongfully issued summonses pursuant to a policy pattern and practice of issuing summonses regardless of probable cause or any legal/legitimate basis in order to meet quotas established by the New York City Police Department in violation of their constitutional rights.  The class is comprised of all persons issued summonses pursuant to this policy who had committed no crime or violation of law and thereafter had their summons dismissed during the fullest period permitted by the applicable statute of limitations.

197.    All members of the Rule (b)(3) class were injured as a result of defendants conduct.

198.    Upon information and belief, the Rule (b) (3) class includes hundreds of thousands of individuals and is so numerous that joinder of all class members is impracticable.

199.    The questions of law and fact presented by plaintiffs SHARIF STINSON, MARIAM FARNUM, CHARLEAN FINLEY, RYBURN WALKES, JAMEL TOWE, CHRISTIAN DUDLEY, JOCELEY FERDINAND, GARY SHAW, MICHAEL BENNETT, CHANEL MEAUSA, DAVID THOMPSON, JULIUS DIXON, JOSEPH SARPONG, JEREMY THAMES, SEAN PETTIGREW, LEANDER GRIFFIN, BRIAN MORRIS, MICA ANCRUM, RICARDO JONES, VICTOR BRELAND, LINDSEY RIDDICK and MICHAEL RIDDICK are common to other members of the class.  Among others, the questions of law and fact common to the class are: (i) that the NYPD had a policy, pattern and practice, explicit and/or tacit, of rewarding officers for issuing more summonses; (ii) that the NYPD had a policy, pattern and practice, explicit and/or tacit, of punishing officers for issuing fewer summonses; (iii) that the NYPD had a policy, pattern and practice, explicit or tacit of establishing quotas for the issuance of summonses; (iv) that the NYPD has shown deliberate indifference to the training and supervision of officers regarding the requisite level of probable cause required to seize, detain and issue an individual a summons; (v) that this policy resulted in the issuance of summonses regardless of probable cause in violation of plaintiffs' constitutional rights; (vi) that enforcement of this policy knowingly created a disparate impact on minorities in violation of their constitutional rights; and (vii) that the appropriate injunctive and compensatory remedies that will be needed to ensure (a) that this unconstitutional quota system for issuance of summonses, regardless of probable cause, is terminated in each and every respect, and (b) that its harmful effects are nullified.

200.    Common issues of law and fact such as those set forth above (and many others) predominate over any individual issues.

201.    This unconstitutional policy, pattern and practice has resulted in the wrongful detention, charging, handcuffing, confinement, deprivation of liberty, prosecution,

psychological, physical and emotional injury of citizens who have committed no crime or violation of law.  The claims and practices alleged in this complaint are common to all members of the class.

202.    The violations suffered by plaintiffs SHARIF STINSON, MARIAM FARNUM, CHARLEAN FINLEY, RYBURN WALKES, JAMEL TOWE, CHRISTIAN DUDLEY, JOCELEY FERDINAND, GARY SHAW, MICHAEL BENNETT CHANEL MEAUSA, DAVID THOMPSON, JULIUS DIXON, KEITH MURPHY, BICELL BRIDGES, JOSEPH SARPONG, JEREMY THAMES, TYESHA WILLIAMS, MARLON FRANCIS, SEAN PETTIGREW, LEANDER GRIFFIN, BRIAN MORRIS, MICA ANRUM, RICARDO JONES, VICTOR BRELAND, LINDSEY RIDDICK and MICHAEL RIDDICK are typical of those suffered by the class.  The entire class will benefit from the remedial and monetary relief sought.

203.    Plaintiffs SHARIF STINSON, MARIAM FARNUM, CHARLEAN FINLEY, RYBURN WALKES, JAMEL TOWE, CHRISTIAN DUDLEY, JOCELEY FERDINAND, GARY SHAW, MICHAEL BENNETT, CHANEL MEAUSA, DAVID THOMPSON, JULIUS DIXON, KEITH MURPHY, BICELL BRIDGES, JOSEPH SARPONG, JEREMY THAMES, TYESHA WILLIAMS, MARLON FRANCIS, SEAN PETTIGREW, LEANDER GRIFFIN, BRIAN MORRIS, MICA ANCRUM, RICARDO JONES, VICTOR BRELAND, LINDSEY RIDDICK and MICHAEL RIDDICK have no conflict of interest with any class members, and will fairly and adequately protect the interests of the class.  Counsel that is competent and experienced in federal class action and federal civil rights litigation has been retained to represent the class.  Jon Norinsberg, Esq. is a law firm with an office in New York City almost twenty (20) years of civil litigation experience.  Further, Mr. Norinsberg has extensive experience in civil rights litigation against state and local governments, and the NYPD, and also has experience in class action lawsuits.  Cohen & Fitch LLP is a law firm with offices in New

York City with extensive experience in civil rights litigation against the City of New York and the NYPD.  Further Cohen & Fitch LLP is also experienced in police, prosecutorial and court practices in the criminal courts throughout New York City given the fact that the partners of Cohen & Fitch LLP were both former prosecutors and have also maintained a significant criminal defense practice.  Additionally, the partners of Cohen & Fitch LLP have spent hundreds of hours in the Summons Parts within the Criminal Courts throughout the City of New York and are personally familiar with the large volume of summonses prosecuted on any given day, as well as the large volume that are dismissed for lack of filing or for insufficiency.  Collectively, the two firms have litigated thousands of civil rights claims against the City of New York and the NYPD and have an intimate knowledge of the criminal process from arrest through prosecution, as well as the issuance and the prosecution of summonses.

204.    This action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible given the volume and continuing nature of the violations as well as the transient nature of the members of the class.  The damages suffered by certain members of the Class, although substantial, are small in relation to the extraordinary expense and burden of individual litigation and therefore it is highly impractical for such Class members to attempt redress for damages incurred due to their wrongful issuance of summons and subsequent prosecution.

205.    There will be no extraordinary difficulty in the management of the Class action.

## FACTS

206.    Plaintiff SHARIF STINSON is a nineteen (19) year old man.

207.    Plaintiff MARIAM FARNUM is a twenty-seven (27) year old woman.

208.    Plaintiff CHARLEAN FINLEY is a forty (40) year old woman.

209.    Plaintiff RYBURN WALKES is a thirty-nine (39) year old man.

210.    Plaintiff JAMEL TOWE is a nineteen (19) year old man.

211.    Plaintiff CHRISTIAN DUDLEY is a nineteen (19) year old man.

212.    Plaintiff JOCELEY FERDINAND is a twenty-six (26) year old man.

213.    Plaintiff GARY SHAW is a thirty-three (33) year old man.

214.    Plaintiff MICHAEL BENNETT is a thirty-three (33) year old man.

215.    Plaintiff CHANEL MEAUSA is an eighteen (18) year old female.

216.    Plaintiff DAVID THOMPSON is thirty-one (31) year old male.

217.    Plaintiff JULIUS DIXON is a thirty (30) year old male.

218.    Plaintiff JOSEPH SARPONG is a twenty-nine (29) year old male.

219.    Plaintiff JEREMY THAMES is a twenty-three (23) year old male.

220.    Plaintiff SEAN PETTIGREW is a forty-four (44) year old male.

221.    Plaintiff LEANDER GRIFFIN is a thirty-one (31) year old male.

222.    Plaintiff BRIAN MORRIS is a thirty-three (33) year old male.

223.    Plaintiff MICA ANCRUM is a thirty-six (36) year old male.

224.    Plaintiff RICARDO JONES is a thirty three (33) year old male.

225.    Plaintiff VICTOR BRELAND is a thirty-two (32) year old male.

226.    Plaintiff LINDSEY RIDDICK is a thirty six (36) year old male.

227.    Plaintiff MICHAEL RIDDICK is a thirty three (33) year old male.

### *The Constitutional Violations against Sharif Stinson*

228.    On December 31, 2009, plaintiff SHARIF STINSON was walking out of his aunt's apartment building located at 994 East 179 Street, New York, New York when several members of the NYPD stopped, detained and searched plaintiff without probable cause.

229.    At the aforesaid time and place defendant officers approached plaintiff, ordered him against the wall and began to search him.

230.   Plaintiff was then transported to the Precinct where he was held in a cell for approximately four (4) hours, where plaintiff was not free to leave until the officers released him.

231.   Thereafter the members of the NYPD issued plaintiff with a summons for Disorderly Conduct without probable cause and released plaintiff.

232.   Mr. Stinson was verbally and mentally abused by the officers although he had committed no crime or violation of law.

233.   On March 3, 2010, the summons issued to plaintiff SHARIF STINSON was dismissed.

234.   On March 26, 2010, plaintiff SHARIF STINSON was walking out of his aunt's apartment building located at inside of 994 East 179 Street, Bronx, New York going into the building where his aunt lived when several members of the NYPD stopped, detained and searched plaintiff without probable cause.

235.   At the aforesaid time and place, defendant officers approached plaintiff, ordered him against the wall and began to search plaintiff.

236.   Plaintiff was then transported to the Precinct where he was detained for several hours where plaintiff knew he was not free to leave until the officers released him.

237.   Thereafter, plaintiff was issued summonses for Disorderly Conduct and for Trespass without probable cause.

238.   Mr. Stinson was verbally and mentally abused by the officers although he had committed no crime or violation of law.

239.   On May 24, 2010, the summonses issued to plaintiff were dismissed.

### *The Constitutional Violation Against Mariam Farnum*

240.    On November 10, 2009, plaintiff MARIAM FARNUM was lawfully traveling inside of her vehicle in the vicinity of Bedford and Atlantic Avenue, Brooklyn, New York when she was pulled over by several members of the NYPD without probable cause.

241.    Immediately thereafter, plaintiff was handcuffed, searched and detained for several hours at the police Precinct where she knew that she was not free to leave until the officers released her.

242.    Thereafter, plaintiff was issued two (2) summonses for Disorderly Conduct without probable cause.

243.    Ms. Farnum was verbally and mentally abused by the officers although she had committed no crime or violation of law.

244.    On February 19, 2010, the summonses issued to plaintiff were dismissed.

### *The Constitutional Violation Against Charlean Finley*

245.    On October 22, 2009, plaintiff CHARLEAN FINLEY was lawfully traveling inside of her vehicle in the vicinity of 1285 Washington Avenue, Bronx, New York, which is a four lane thoroughfare waiting for a parking space when several members of the NYPD approached plaintiff's vehicle without probable cause.

246.    Immediately thereafter, plaintiff was detained without probable cause and was not free to leave while until the officers allowed her to leave.

247.    Thereafter, the defendant officers wrote plaintiff a summons for Disorderly Conduct without probable cause and allowed her to drive away.

248.    Ms. Finley was verbally and mentally abused by the officers although she had committed no crime or violation of law.

249.    On December 18, 2009, the summons issued to plaintiff was dismissed.

### The Constitutional Violation Against Ryburn Walkes

250.    On February 13, 2010, plaintiff RYBURN WALKES was walking on the sidewalk in the vicinity of Ryer and Burnside Avenue, Bronx, New York when several members of the NYPD stopped, detained, handcuffed and strip searched plaintiff without probable cause.

251.    Plaintiff was detained for several hours at the Precinct where he knew he was not free to leave until being released by the officers.

252.    Thereafter, defendant officers issued plaintiff with a summons for Disorderly Conduct without probable cause and released him.

253.    Mr. Walkes was verbally and mentally abused by the officers although he had committed no crime or violation of law.

254.    On April 14, 2010, the summons issued to plaintiff was dismissed.

### The Constitutional Violation Against Jamel Towe

255.    On April 10, 2010, plaintiff JAMEL TOWE was walking out of his friend's apartment building located at 965 Tinton Avenue, Bronx, New York when several members of the NYPD detained, searched without probable cause.

256.    Following his search defendant officers began to write plaintiff a summons, at which time plaintiff knew he was not free to leave until the officer finished writing the summons and allowed plaintiff to leave.

257.    Thereafter, plaintiff was issued a summons for Disorderly Conduct and allowed to leave.

258.    Mr. Towe was verbally and mentally abused by the officers although he had committed no crime or violation of law.

259.    On June 9, 2010, the summons issued to plaintiff was dismissed.

*The Constitutional Violations Against Christian Dudley*

260.    On January 3, 2010, plaintiff CHRISTIAN DUDLEY was lawfully present on a public sidewalk in the vicinity of 1611 Saint Nicholas Avenue, New York, New York waiting for his friend when several members of the NYPD stopped and detained plaintiff without probable cause.

261.    Defendant officers commanded plaintiff to provide his identification and told him to wait there, to which plaintiff complied.

262.    Plaintiff understood that he was not free to leave on his own until the defendant officers returned his identification and allowed him to leave.

263.    Thereafter, the police officers returned plaintiff's identification and issued plaintiff with a summons for Disorderly Conduct without probable cause.

264.    Mr. Dudley was verbally and mentally abused by the officers although he had committed no crime or violation of law.

265.    On March 29, 2010, the summons issued to plaintiff was dismissed.

266.    On April 19, 2010, plaintiff CHRISTIAN DUDLEY was lawfully present on a public sidewalk in the vicinity of 1630 Saint Nicholas Avenue, New York, New York waiting for his friend when several members of the NYPD stopped and detained plaintiff without probable cause.

267.    At the aforesaid time and place defendant officers commanded plaintiff to provide his identification and told him to wait there, to which plaintiff complied.

268.    Plaintiff understood that he was not free to leave on his own until the defendant officers returned his identification and allowed him to leave.

269.    Thereafter, the police officers issued plaintiff two (2) summonses for Disorderly Conduct without probable cause.

270.    Mr. Dudley was verbally and mentally abused by the officers although he had committed no crime or violation of law.

271.    On June 17, 2010, the summonses issued to plaintiff were dismissed.

### *The Constitutional Violation Against Joceley Ferdinand*

272.    On May 14, 2010, plaintiff JOCELEY FERDINAND was lawfully present standing at a crosswalk in the vicinity of Howard and Pitkin Avenue, Brooklyn, New York when he was approached by several members of the NYPD and stopped, searched, and handcuffed without probable cause.

273.    Thereafter the plaintiff was transported to the Precinct where he knew that he was not free to leave until being released by the officers.

274.    At that time plaintiff was issued a summons for Disorderly Conduct without probable cause.

275.    Mr. Ferdinand was verbally and mentally abused by the officers although he had committed no crime or violation of law.

276.    On July 15, 2010, the summons issued to plaintiff was dismissed.

### *The Constitutional Violations Against Gary Shaw*

277.    On February 23, 2009, plaintiff GARY SHAW was lawfully parked in front of his building located at 730 East 223 Street, Bronx, New York unloading groceries when several members of the NYPD stopped and detained.

278.    During his detention plaintiff understood he was not free to leave until the officers allowed him to do so.

279.    Thereafter, defendant officers issued plaintiff a summons for leaving his vehicle unattended without probable cause as he was standing right in front of the vehicle.

280.     Mr. Shaw was verbally and mentally abused by the officers although he had committed no crime or violation of law.

281.     On April 24, 2009, the summons issued to plaintiff was dismissed.

282.     On May 4, 2009, plaintiff GARY SHAW was lawfully traveling in his vehicle in the vicinity of Barnes Avenue and 233rd Street, Bronx, New York when he was pulled over by several members of the NYPD without probable cause.

283.     Plaintiff understood he was not free to leave during the course of the stop until defendant officers returned his license and registration and allowed him to leave.

284.     Thereafter the members of the NYPD *informed* plaintiff that he was being issued a summons for tinted windows when his windows were not tinted, but thereafter issued plaintiff with a summons instead for Open Container without probable cause as there was no such open container.

285.     Plaintiff understood he was not free to leave until the officers issued him a summons and allowed him to leave.

286.     Mr. Shaw was verbally and mentally abused by the officers although he had committed no crime or violation of law.

287.     On June 23, 2009, the summons issued to plaintiff was dismissed.

### *The Constitutional Violation Against Michael Bennett*

288.     On January 6, 2010, plaintiff MICHAEL BENNETT was lawfully traveling inside of his vehicle in the vicinity of Gun Hill and White Plains Road, Bronx, New York when he was pulled over by several members of the NYPD without probable cause.

289.     Immediately thereafter plaintiff's vehicle was searched without probable cause, at which time plaintiff understood that he was not free to leave until the officers finished the search of his vehicle and returned his license and registration.

290.   Thereafter, plaintiff was issued a summons for Disorderly Conduct without probable cause.

291.   Mr. Bennett was verbally and mentally abused by the officers although he had committed no crime or violation of law.

292.   On June 10, 2010, the summons issued to plaintiff was dismissed.

### *The Constitutional Violation Against Jamel Towe*

293.   On April 10, 2010, plaintiff JAMEL TOWE was walking out of his friend's apartment building located at 965 Tinton Avenue, Bronx, New York when several members of the NYPD detained, searched without probable cause.

294.   Following his search defendant officers began to write plaintiff a summons, at which time plaintiff knew he was not free to leave until the officer finished writing the summons and allowed plaintiff to leave.

295.   Thereafter, plaintiff was issued a summons for Disorderly Conduct and allowed to leave.

296.   Mr. Towe was verbally and mentally abused by the officers although he had committed no crime or violation of law.

297.   On June 9, 2010, the summons issued to plaintiff was dismissed.

### *The Constitutional Violation Against Chanel Meausa*

298.   On May 27, 2010, plaintiff CHANEL MEAUSA left her mother's apartment, located at 1420 East 95th Street, Brooklyn, New York, to take a walk when several members of the NYPD stopped, handcuffed and detained plaintiff without probable cause.

299.   At the aforesaid time and place, defendant officers approached plaintiff and commanded her to provide identification; however, since plaintiff did not have any identification with her, she offered to go get it from her home.

300.     Plaintiff was then handcuffed with her arms behind her back and transported to the Precinct where she was held in a cell for approximately three (3) hours at which time plaintiff knew she was not free to leave until the officers released her.

301.     Thereafter, plaintiff was issued a summons for Trespassing and allowed to leave.

302.     Ms. Meausa was verbally and mentally abused by the officers although she had committed no crime or violation of law.

303.     On July 27, 2010, the summons issued to plaintiff was dismissed.

### *The Constitutional Violation Against David Thompson*

304.     On June 8, 2008, plaintiff DAVID THOMPSON was lawfully present on the corner of Creston Avenue and East Fordham Road, Bronx, New York, when several members of the NYPD stopped, detained and searched plaintiff without probable cause.

305.     At the aforesaid time and place, defendant officers commanded plaintiff to provide his identification, to which he complied, and then handcuffed plaintiff with his arms behind his back and aggressively placed him in a police vehicle.

306.     Plaintiff was placed in a cell, at which point plaintiff knew he was not free to leave until the officers returned his identification and released him.

307.     Thereafter, plaintiff was issued two separate summonses for Disorderly Conduct, alleging a violation of the same subsection of the statute.

308.     Mr. Thompson was verbally and mentally abused by the officers although he had committed no crime or violation of law.

309.     On August 6, 2008, the summonses issued to plaintiff were dismissed.

### *The Constitutional Violation Against Julius Dixon*

310.    On December 18, 2009, plaintiff JULIUS DIXON was lawfully traveling inside of his vehicle in the vicinity of 219th Street and White Plains Road, Bronx, New York when he was pulled over by several members of the NYPD without probable cause.

311.    Soon thereafter plaintiff and his vehicle were searched without probable cause, at which time plaintiff understood that he was not free to leave until the officers finished the searches.

312.    Thereafter, plaintiff was issued a summons for unreasonable noise in an automobile without probable cause.

313.    Mr. Dixon was verbally and mentally abused by the officers although he had committed no crime or violation of law.

314.    On May 26, 2010, the summons issued to plaintiff was dismissed.

### *The Constitutional Violation Against Joseph Sarpong*

315.    On April 27, 2010, plaintiff JOSEPH SARPONG was lawfully present in the vicinity of 247 West 42nd Street, New York, New York, when several members of the NYPD stopped, handcuffed and detained plaintiff without probable cause.

316.    At the aforesaid time and place, defendant officers handcuffed plaintiff with his arms behind his back and transported him to the Precinct where he was held in a cell, at which time plaintiff knew he was not free to leave until the officers released him.

317.    Plaintiff was issued a Disorderly Conduct summons for failure to disperse without probable cause.

318.    Mr. Sarpong was verbally and mentally abused by the officers although he had committed no crime or violation of law.

319.    On June 18, 2010, the summons issued to plaintiff was dismissed.

### *The Constitutional Violation Against Jeremy Thames*

320.    On March 5, 2009, plaintiff JEREMY THAMES was lawfully present across the street from his apartment, located at 1010 East 178th Street, Bronx, New York, when several members of the NYPD stopped, detained, handcuffed and searched plaintiff without probable cause.

321.    At the aforesaid time and place, defendant officers commanded plaintiff to provide his identification, to which plaintiff complied, and then proceeded to search inside plaintiff's underwear.

322.    Thereafter, defendant was handcuffed with his arms behind his back and transported to the Precinct where he was he was held in a cell, at which time plaintiff knew he was not free to leave until the officers released him.

323.    Plaintiff was issued a summons for Disorderly Conduct without probable cause.

324.    Mr. Thames was verbally and mentally abused by the officers although he had committed no crime or violation of law.

325.    On April 28, 2009, the summons issued to plaintiff was dismissed.

### *The Constitutional Violations Against Sean Pettigrew*

326.    On November 3, 2009, plaintiff SEAN PETTIGREW was lawfully present in the vicinity of 89 Christopher Avenue, Brooklyn, New York and walking home from voting when several members of the NYPD stopped and detained plaintiff without probable cause.

327.    Defendant officers commanded plaintiff to provide his identification, to which plaintiff complied.

328.    Plaintiff understood that he was not free to leave on his own until defendant officers returned his identification and allowed him to leave.

329.    Thereafter, the police officers returned plaintiff's identification and issued plaintiff two (2) summonses for Disorderly Conduct and for Littering without probable cause.

330.    Mr. Pettigrew was verbally and mentally abused by the officers although he had committed no crime or violation of law.

331.    On January 6, 2010, the summonses issued to plaintiff were dismissed.

### The Constitutional Violations Against Leander Griffin

332.    On August 5, 2009, plaintiff LEANDER GRIFFIN was lawfully present in front of 1055 Rosedale Avenue, Bronx, New York, when several members of the NYPD stopped and detained plaintiff without probable cause.

333.    Defendant officers pushed plaintiff up against a wall and commanded him to provide his identification, to which plaintiff complied.

334.    Plaintiff understood that he was not free to leave on his own until defendant officers returned his identification and allowed him to leave.

335.    Thereafter, the police officers returned plaintiff's identification and issued plaintiff a summons for Disorderly Conduct without probable cause.

336.    Mr. Griffin was verbally and mentally abused by the officers although he had committed no crime or violation of law.

337.    On September 23, 2009, the summons issued to plaintiff was dismissed.

### The Constitutional Violations Against Brian Morris

338.    On November 20, 2009, plaintiff BRIAN MORRIS was lawfully present in the vicinity of 1055 Rosedale Avenue, Bronx, New York, when several members of the NYPD stopped and detained plaintiff without probable cause.

339.    Defendant officers commanded plaintiff to provide his identification, to which plaintiff complied.

340.    Plaintiff understood that he was not free to leave on his own until defendant officers returned his identification and allowed him to leave.

341.    Thereafter, the police officers returned plaintiff's identification and issued plaintiff a summons for Disorderly Conduct without probable cause.

342.    Mr. Morris was verbally and mentally abused by the officers although he had committed no crime or violation of law.

343.    On January 15, 2010, the summons issued to plaintiff was dismissed.

### The Constitutional Violations Against Mica Ancrum

344.    On April 12, 2009, plaintiff MICA ANCRUM was standing in front of his building, located at 1055 Rosedale Avenue, Bronx, New York, after his nephew's funeral when several members of the NYPD stopped and detained plaintiff without probable cause.

345.    Defendant officers commanded plaintiff to provide his identification, to which plaintiff complied.

346.    Plaintiff understood that he was not free to leave on his own until defendant officers returned his identification and allowed him to leave.

347.    Thereafter, the police officers returned plaintiff's identification and issued plaintiff two (2) summonses for Disorderly Conduct without probable cause.

348.    Mr. Ancrum was verbally and mentally abused by the officers although he had committed no crime or violation of law.

349.    On June 2, 2009, and June 5, 2009, the summonses issued to plaintiff were dismissed.

*The Constitutional Violations Against Victor Breland*

350.    On May 10, 2009, plaintiff VICTOR BRELAND was lawfully present on a public sidewalk in the vicinity of 267 Osborn, Brooklyn, New York when several members of the NYPD stopped, detained and searched plaintiff without probable cause.

351.    At the aforesaid time and place defendant officers approached plaintiff, told him not to move and asked for plaintiff's identification, which plaintiff provided.

352.    Plaintiff was then held in that location for several minutes at which time plaintiff knew he was not free to leave while the officers wrote plaintiff a summons.

353.    Thereafter the members of the NYPD issued plaintiff with a summons for Disorderly Conduct without probable cause and released plaintiff.

354.    On July 13, 2009, the summons issued to plaintiff was dismissed.

355.    On April 15, 2010, plaintiff VICTOR BRELAND was lawfully present on a public sidewalk on the corner of Sheffield and Sutter Avenue, Brooklyn, New York when several members of the NYPD stopped, detained and searched plaintiff without probable cause.

356.    At the aforesaid time and place, defendant officers approached plaintiff, told him not to move and asked for plaintiff's identification, which plaintiff provided.

357.    Plaintiff was then held in that location for several minutes at which time plaintiff knew he was not free to leave while the officers wrote plaintiff a summons.

358.    Thereafter the members of the NYPD issued plaintiff with a summons for Disorderly Conduct without probable cause and released plaintiff.

359.    On June 15, 2010, the summons issued to plaintiff was dismissed.

360.    On or about May 2010, plaintiff VICTOR BRELAND was lawfully present in front of his mother's residence at 1069 Nostrand Avenue, Brooklyn, New York when several members of the NYPD stopped, detained and searched plaintiff without probable cause.

361.    At the aforesaid time and place defendant officers approached plaintiff, told him not to move and asked for plaintiff's identification, which plaintiff provided.

362.    Plaintiff was then held in that location for several minutes at which time plaintiff knew he was not free to leave while the officers wrote plaintiff a summons.

363.    Thereafter plaintiff requested the reason he was being issued a summons, to which the officer responded that the end of the month was approaching and the officer needed to meet his quota.

364.    Thereafter the members of the NYPD issued plaintiff with a summons for Disorderly Conduct without probable cause and released plaintiff.

365.    When he appeared in court for the summons he was informed by the court that they had no record of any summons.

### *The Constitutional Violation Against Ricardo Jones*

366.    On January 15, 2010, plaintiff RICARDO JONES was lawfully seated in the passenger seat of his friend's vehicle parked in front of his mothers' apartment located at 225-02 133rd Avenue, Queens, New York when they were approached by several members of the NYPD without probable cause.

367.    Immediately thereafter plaintiff and his friend were asked to provide identification without any reasonable suspicion to do so.

368.    Thereafter both plaintiff and his friend requested the reason they were being asked to provide identification and if they had done something wrong.

369.    In response to their inquiry the officer sprayed mace into the vehicle and ordered plaintiff out of the vehicle, to which plaintiff complied and at which time he was immediately handcuffed on the ground and was not free to leave.

370.   Plaintiff's mother, hearing the commotion exited the house and informed the officer that plaintiff was her son and lived there.

371.   Thereafter, plaintiff was issued summonses for Disorderly Conduct without probable cause and released from handcuffs.

372.   Plaintiff was verbally and mentally abused by the officers although she had committed no crime or violation of law.

373.   On March 16, 2010, the summons issued to plaintiff was dismissed.

### _The Constitutional Violations Against Lindsey Riddick and Michael Riddick_

374.   On August 18, 2010, plaintiff LINDSEY RIDDICK was lawfully standing outside of his apartment building at 325 East 21st Street, Brooklyn, New York, and conversing with his brother MICHAEL RIDDICK, when a member of the NYPD stopped and detained plaintiffs without probable cause.

375.   At the aforesaid time and place, defendant officer commanded plaintiff to provide his identification, to which plaintiff complied.

376.   The defendant officer then commanded plaintiff to show the officer where he lived, to which plaintiff complied.

377.   The defendant officer then commanded plaintiff to show proof that he actually lived in this apartment building by using his key and opening the door, to which plaintiff complied.

378.   Notwithstanding plaintiff's full compliance with each and every (unlawful) order of the defendant officer, plaintiff Lindsey Riddick was _still_ issued several summonses when he refused to "go inside", as ordered by the officer.

379.   When plaintiff protested that he _lived_ at this building, and had a right to stand outside, the defendant officer responded by saying, in sum and substance, "YOU DON"T OWN

THE STREET.  YOU DON'T OWN THE SIDEWALK.  YOU DON'T OWN THE BUILDING.

YOU HAVE NO RIGHT TO STAND HERE."

380.    Thereafter, the defendant officer issued multiple summonses to both Lindsey

Riddick and Michael Riddick, without any legal basis whatsoever for doing so.

381.    While these summonses were being issued, both Lindsey and Michael Riddick

fully knew and understood that they were not free to leave on their own until the defendant

officer finished writing the summonses and allowed them to leave.

382.    While the aforesaid summonses have not yet been adjudicated, plaintiffs fully

expect that each and every one of these utterly baseless summonses will eventually be dismissed

in court.

### *The Unconstitutional Custom, Policy and Practice of the NYPD*

383.    At all relevant times, the City, acting through the NYPD, maintained an express

and *de facto* policy, custom and practice of issuing summonses without probable cause in order

to meet quotas requiring a certain volume of summonses be issued throughout New York City.

384.    Upon information and belief a high percentage of those summonses issued were

not based upon probable cause or any legitimate basis under the law, but were pursuant to the

NYPD's policy pattern and practice of having subordinate officers issue summonses in order to

meet quotas established by the City of New York, the NYPD, RAYMOND KELLY and the

NYPD defendants.

385.    Upon information and belief this pattern and practice has a knowingly disparate

impact on plaintiffs and members of the class, specifically other African American and Hispanic

individuals, in violation of their Constitutional rights as secured by the Fourth and Fifth

Amendments and the Equal Protection Clause of the Fourteenth Amendment.

386.    Upon information and belief, the issuance of summonses regardless of probable cause or any legitimate basis under the law in order to meet quotas and goals given to the officers is well known and in fact encouraged throughout the NYPD.  Nevertheless, the NYPD Defendants, including RAYMOND KELLY continue to allow police officers to continue the practice, tolerate and encourage these unconstitutional practices.

387.    The conduct of the NYPD's policy-making defendants, including RAYMOND KELLY, has been a substantial factor in the continuance of the issuance of these summonses in the absence of probable cause or any legitimate basis under the law only to meet quota requirements set forth by the NYPD has been a substantial factor in the continuance of such arrests and summonses and a proximate cause of the constitutional violations alleged in this complaint.

### NYPD's Deliberate Indifference to Training and Supervision of Officers

388.    In light of the hundreds of thousands of summonses that are dismissed in a calendar year that are actually documented as being dismissed - in addition to the summonses that were never filed or were dismissed at or after arraignment - is representative of the fact that defendants either knew or should have known, that many police officers and supervisory personnel were engaging in the lawless and unconstitutional practice of issuing individuals summonses regardless of probable cause or any legitimate basis under the law; yet defendant have repeatedly failed to take any action to end this conduct, and in fact expressly and/or tacitly encourage the lawless and unconstitutional actions.

389.    The NYPD's failure to train, discipline or supervise officers regarding their obligation not to issue summonses unless based upon probable cause or some legitimate basis under the law, exhibited gross and wanton deliberate indifference to the constitutional rights of plaintiffs and members of the Class.

390.     Defendants' persistent failure to take measures to curb this unconstitutional practice constitutes acquiescence in the known unlawful behavior of their subordinates.  The prevalence and general knowledge of these summonses and the rate of their dismissal, and the failure of supervisory defendants to take remedial action, constitute deliberate indifference to the rights of plaintiffs and the Class.

391.     Because the pattern and practice of arresting individuals and issuing summonses absent probable cause in furtherance of meeting quotas and requirements, as set forth by RAYMOND KELLY and implemented by the NYPD, has existed for many years, the aforementioned defendants knew and encouraged this unconstitutional behavior and repeatedly failed to take action to end this conduct by subordinate officers.

392.     Because this explicit and/or tacit pattern and practice existed of arresting individuals and issuing summonses absent probable cause in furtherance of the quota policy, defendants knew or should have known that police officers assigned to Precincts within New York City required training, supervision, and discipline regarding their obligations not to issue summonses absent probable cause or any legitimate basis under the law.

393.     The NYPD and the City of New York, through its agents and employees has failed or refused to hold accountable high-ranking supervisors, commanding officers and subordinate officers, notwithstanding the existence of widespread misconduct over a period of many years.  This failure is the proximate cause of the injuries sustained by plaintiffs and those of other Class members.

## FIRST CLAIM FOR RELIEF FOR DEPRIVATION OF <u>FEDERAL RIGHTS NDER 42 U.S.C. § 1983</u>

394.     Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "393 with the same force and effect as if fully set forth herein.

395.    All of the aforementioned acts of defendants, their agents, servants and employees, were carried out under the color of state law.

396.    All of the aforementioned acts deprived plaintiffs and the members of the Class of the rights, equal protections, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

397.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

398.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

399.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

**SECOND CLAIM FOR RELIEF**
**FALSE ARREST UNDER 42 U.S.C. § 1983**

400.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "399" with the same force and effect as if fully set forth herein.

401.    As a result of defendants' aforementioned conduct, plaintiffs and other members of the Class were subjected to an illegal, improper and false arrest in the form of detention and the issuance of summonses by the defendants and prosecuted by the defendants in criminal

proceedings, without any probable cause, privilege, consent or any legitimate basis under the law.

402.    As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiffs sustained the damages hereinbefore alleges.

403.    As a result of the foregoing, plaintiffs' and members of the Class' liberty was restricted for an extended period of time, and they were put in fear for their safety, were humiliated and subjected to handcuffing, and other physical restraints, without probable cause.

### THIRD CLAIM FOR RELIEF VIOLATION OF
### FIRST AMENDMENT RIGHTS UNDER 42 U.S.C. § 1983

404.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "403" with the same force and effect as if fully set forth herein.

405.    The actions taken by defendants violated plaintiff's first amendment right to peaceably assemble.

406.    Defendants' unlawful and constitutional conduct constituted a restraint on plaintiffs' ability to peaceably assemble in their own neighborhoods, public sidewalks and in areas open and freely accessible to the general public.

407.    Defendants' policy is intentionally enforced to prohibit the peaceable gathering of minority residents of New York City in their own neighborhoods.

408.    Defendants' policy is designed and to keep said residents inside of their homes thereby preventing them from exercising their rights to peaceably assemble on public streets and areas in violation of their rights as secured by the First Amendment.

409.    Evidence of this intent to deprive plaintiffs of their rights to peaceably assemble in public areas is apparent from the following directives from supervising officers in the NYPD: "LISTEN I WANT 250'S AND C SUMMONSES.  IF I GET CALL FROM A PIZZERIA, 20

GUYS OUT THERE, IF HE'S CALLING ME THAT MEANS SOMETHING'S GOING ON OVER THERE, NO ONE HANGS OUT THERE.  NOBODY, I WANT A GHOST TOWN.  I WANT TO HEAR THE ECHO FROM ONE END OF THE STREET TO THE OTHER."

410.    "SHAKE EVERYBODY UP. ANYBODY MOVING, ANYBODY CLIMBING IN THAT BUILDING, 250…C SUMMONS, C SUMMONS YEAH…EVERYBODY WALKING AROUND, SHAKE THEM UP, STOP THEM, 250 THEM, NOT MATTER WHAT THE EXPLANATION…IF THEY'RE WALKING, IT DOESN'T MATTER."

411.    "YOU WANT TO BE AN ASSHOLE OR WHATEVER YOU CALL IT, MAKE EM' MOVE.  IF THEY WON'T MOVE, CALL ME OVER AND LOCK EM' UP, DISCON, NO BIG DEAL…IF YOU STOP THEM, 250 THEM. HOW HARD IS A 250? I'M NOT SAYING MAKE IT UP BUT YOU CAN ALWAYS ARTICULATE – ROBBERY BURGLARY, WHATEVER THE CASE MAY BE…THOSE KIDS ON THE STEP.  YOU GONNA KEEP WALKING?"

412.    "GETTING BACK TO THE 250'S AND C'S, IF YOU STOP SOMEONE FOR A C AND YOU DISCON THEM, CHANCES ARE THEY ARE JUST HANGING AROUND, MOPING AROUND."

413.    "BE A LOTTA KIDS OUT THERE. YOU KNOW MY DEAL, I'M GOING TO CUFF EM' UP AND BRING EM IN.  WAIT TIL 7, LET THEM GO AT 7:30 WHEN EVERYBODY COMES IN.  THEY HANG OUT IN THE PARK, I'LL TELL EM ONCE, IF THEY DON'T MOVE THEY'RE COMING."

414.    "AND SUMMONSES. SHAME ON YOU, YOU DRIVE BY AND THEY'RE PLAYING DICE, YOU DON'T GIVE A SUMMONS."

415.    All of the aforementioned statements make it abundantly clear that this summonses quotas has been implanted and executed in a manner that essentially prevents minority residents in low-income neighborhoods from exercising their rights to assemble whatsoever in their own neighborhoods in areas that are and should be accessible to the public at large in violation of their rights under the First Amendment.

416.    Additionally,  plaintiff LINDSEY RIDDICK was standing in front of the building *where he lived* when he was issued a summons without probable cause and then the officer informed him, *a thirty six (36) year old man*, that he could not stand outside his *own* building, threatening to arrest him unless he went inside of his apartment and remained there.

417.    As such, defendants conduct in having an implementing said policy is in direct violation of plaintiff's right to freedom of assembly as secured by the First and Fourteenth Amendments.

418.    As a result of the foregoing, plaintiff's liberty was restricted for an extended period of time, and he was put in fear for his safety, was humiliated and subjected to handcuffing, and other physical restraints.

## FOURTH CLAIM FOR RELIEF FOR
## MUNICIPAL LIABILITYUNDER 42 U.S.C. § 1983

419.    Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "418" as if the same were more fully set forth at length herein.

420.    Defendants caused plaintiffs and members of the Class to be issued summonses in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that said summonses were not based on probable cause or any legitimate basis under the law in violation of the constitutional rights of plaintiffs and members of the Class.

421.    Defendants caused plaintiffs and members of the Class to be issued summonses in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that said summonses were not based on probable cause or any legitimate basis under the law and knowing that plaintiffs and members of the class would be required to appear in court to be prosecuted under the aforementioned unconstitutionally issued summonses in violation of the constitutional rights of plaintiffs and members of the Class.

422.    The acts complained of were carried out by the aforementioned individual defendants and subordinate officers of the NYPD in their capacities as police officers and officials, with all the actual and/or apparent authority attendant thereto.

423.    The acts complained of were carried out by the aforementioned individual defendants and subordinate NYPD officers in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department, all under the supervision of RAYMOND KELLY and other ranking officers of said department.

424.    The pattern of unconstitutional issuance of summonses pursuant to quotas established by policy-making officials within the NYPD and the City of New York, the failure to train staff regarding the requisite level of probable cause required for the issuance, and the failure to supervise and/or discipline staff responsible for the unconstitutional issuance of summonses are so institutionalized as to represent a policy or custom of unconstitutional summonses under a quota system that caused the deprivation of plaintiffs' rights and those of other Class members.

425.    The aforementioned customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department include, but are not limited to, the following unconstitutional practices:

i.      Creating a quotas system for NYPD subordinate officers requiring the officers to issue a certain number of summonses per month and year regardless of probable cause;

ii.     Creating a policy of awarding incentives to officers who meet or exceed the required number of summonses to be issued according to NYPD's quota;

iii.    Creating a policy of punishing officers who fail to meet the required number of summonses established by NYPD's quota;

iv.     Allocating NYPD funding and resources entirely based on a manufactured correlation between low reported crime and high summons and arrest activity for quality of life offenses causing officers to "create" activity and downgrade reported major crime;

v.      Issuing summonses regardless of probable cause or any legal basis in order to meet the requirements of the quota established by the NYPD;

vi.     Disproportionately issuing summonses to black and Hispanic individuals in violation their rights under the Equal Protection Clause pursuant to the quota established by the NYPD;

vii.    Having a policy of violating minority residents right to peaceably assembly in areas open to the public in violation of their rights under the First Amendment;

viii.   Showing deliberate indifference to whether the summonses issued pursuant to that quota established by the NYPD were issued based on probable cause or any legal basis;

ix.     Showing deliberate indifference to the training of subordinate officers to not issue summonses unless they are issued upon probable cause or a basis under the law;

x.      Showing deliberate indifference to the supervision of subordinate officers in enforcing the quotas system established by the NYPD for the issuance of summonses in determining whether they were legitimately issued;

426.    The existence of the aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct as is the case with the twenty-two (22) plaintiffs in this matter as well as the Annual Reports from the Criminal Courts of the City of New York, NYPD's own statistics and statistics and reports maintained by the NYACLU and other City Agencies.

427.    The foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department constituted a deliberate indifference to the safety, well-being and constitutional rights of plaintiffs and members of the Class.

428.    The foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department were the direct and proximate cause of the constitutional violations suffered by plaintiffs and members of the Class as alleged herein.

429.    The foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department were the moving force behind the constitutional violations suffered by plaintiffs and the members of the Class as alleged herein.

430.    As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department, plaintiffs and members of the Class were issued summonses without probable cause or any legal basis and in many instances were subjected to detention, search, restraints, handcuffing and verbal and mental abuse in violation of their constitutional rights.

431.    As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department, plaintiffs and members of the Class were caused to appear in court to be prosecuted on these unconstitutionally issued summonses and in many instances causing them to lose time from work or school in violation of their constitutional rights.

432.    As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department, plaintiffs and members of the Class were targeted, stopped and issued unconstitutional summonses based on an

impermissible classification under the Equal Protection Clause of the Fourteenth Amendment, their race.

433.    Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating the constitutional rights of plaintiffs and members of the Class.

434.    Defendants, collectively and individually, while acting under color of state law, acquiesced in and encouraged a pattern of unconstitutional conduct by subordinate police officers, and were directly responsible for the violation of the constitutional rights of plaintiffs and members of the class.

435.    All of the foregoing acts by defendants deprived plaintiffs and members of the Class of federally protected rights, including, but not limited to, the right:

ii.    Not to be deprived of liberty without due process of law;

iii.    To be free from search, seizure and arrest not based upon probable cause; and,

iv.    To receive equal protection under the law;

v.    To peaceably assemble and express free speech.

**WHEREFORE**, plaintiffs and members of the Class request the following relief jointly and severally as against all of the defendants:

1.    A judgment declaring that defendants have committed the violations of law alleged in this action;

2.    An order preliminarily and permanently enjoining and directing defendants to cease enforcement of this quota system for the issuance of summonses;

3.    Directing that immediate remedial training on the proper and legal grounds for the issuance of summonses be provided to all current members of the NYPD (in the Precincts and the police academy);

4.    Directing defendants to put in place a system for monitoring the summonses issued and the legal basis for their issuance so that

baseless summonses that have been issued can be immediately dismissed;

5.  Compensatory damages against all defendants in an amount to be proven at trial;

6.  Punitive damages against all defendants, except the City, in an amount to be proven at trial;

7.  An order awarding disbursements, costs, and attorneys' fees pursuant to 42 U.S.C. § 1988; and

8.  Such other further relief that the court may deem just and proper.

Dated: New York, New York
          August 31, 2010

BY:_____/S_____
          JON L. NORINSBERG (JN-2133)
          225 Broadway, Suite 2700
          New York, N.Y. 10007
          (212) 791-5396
          norinsberg@aol.com


BY:_____/S_____
          COHEN & FITCH LLP
          JOSHUA P. FITCH (JF-2813)
          GERALD M. COHEN (GC-0414)
          225 Broadway, Suite 2700
          New York, N.Y. 10007
          (212) 374-9115
          jfitch@cohenfitch.com
          gcohen@cohenfitch.com

*Attorneys for Plaintiffs and the Putative Class*