UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

SHARIF STINSON, et al.,

               Plaintiffs,

    - against -

CITY OF NEW YORK, et al.,

               Defendants.

----------------------------------------X

10 Civ. 4228 (RWS)

OPINION

A P P E A R A N C E S:

    Attorneys for the Plaintiff

    COHEN & FITCH LLP
    225 Broadway, Suite 2700
    New York, NY 10007
    By:  Joshua P. Fitch, Esq.
         Gerald M. Cohen, Esq.

    THE LAW OFFICES OF JON L. NORINSBERG, ESQ.
    225 Broadway, Suite 2700
    New York, NY 10007
    By:  Jon L. Norinsberg, Esq.


    Attorneys for the Defendants

    MICHAEL A. CARDOZO
    CORPORATION COUNSEL OF THE CITY OF NEW YORK
    100 Church Street
    New York, NY 10007
    By:  Qiana C. Smith-Williams, Esq.

**Sweet, D.J.**

Plaintiffs Sharif Stinson, Mariam Farnum, Charlean Finley, Ryburn Walkes, Jamel Towe, Christian Dudley, Joceley Ferdinand, Gary Shaw, Michael Bennett, Chanel Meausa, David Thompson, Julius Dixon, Joseph Sarpong, Jeremy Thames, Sean Pettigrew, Leander Griffin, Brian Morris, Mica Ancrum, Ricardo Jones, Victor Breland, Lindsey Riddick and Michael Riddick (collectively, "Plaintiffs"), bring this putative class action against the City of New York, Raymond Kelly, the Commissioner of the New York Police Department ("NYPD"), and unnamed New York City Police Officers (collectively, "Defendants"), alleging that Defendants have implemented and sanctioned a policy, practice and custom of issuing unconstitutional summonses, in violation of 42 U.S.C. § 1983, and the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

Plaintiffs allege that the NYPD is engaged in a widespread pattern and practice of issuing summonses to individuals without probable cause and that NYPD officers are explicitly instructed to issue summonses regardless of whether any crime or violation has occurred in order to meet a minimum quota requirement set forth by the NYPD.  Plaintiffs contend that the NYPD consistently punishes officers who issue fewer

1

summonses and rewards police officers who issue more summonses, irrespective of whether probable cause existed for the summonses' issuance.

Plaintiffs seek equitable relief in the form of (1) a declaration that Defendants' policies, practices and customs violate the law and Constitution as alleged, (2) a class-wide injunction enjoining Defendants from enforcing a quota system for the issuance of summonses, (3) an order directing that immediate remedial training on the proper legal grounds for the issuance of summonses be provided to all current members of the NYPD (in the precincts and the police academy) and (4) an order directing Defendants to put in place a system for monitoring the summonses issued and the legal basis for their issuance such that baseless summons can be dismissed.  Additionally, Plaintiffs seek compensatory and punitive damages and, pursuant to 42 U.S.C. § 1988, attorneys' fees.

Plaintiffs now move for class certification, approval of class representatives and appointment of class counsel pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

2

Based on the facts and conclusions set forth below,
Plaintiffs' motion is granted, a class is certified under both
Rules 23(b)(2) and 23(b)(3) and class representatives and class
counsel are appointed.  The class is defined to include
individuals who were issued summonses that were later dismissed
upon a judicial finding of facial insufficiency and who were
ticketed without probable cause.  Individuals who were issued
summonses that survived the New York City Citywide Summons
Operations' defect review but were dismissed during the second-
round review process upon a judicial finding of facial
insufficiency are presumptive members of the class, but
Defendants can challenge any presumptive class member on grounds
that the summons at issue was dismissed for reasons other than a
lack of probable cause.  The class is entitled to seek
declaratory and injunctive relief, pursuant to its certification
under Rule 23(b)(2), as well as money damages, pursuant to its
certification under Rule 23(b)(3).  Plaintiffs Sharif Stinson,
Ryburn Walkes, Gary Shaw, Michael Bennett, Chanel Meausa, David
Thompson, Julius Dixon, Jeremy Thames, Leander Griffin, Ricardo
Jones, Victor Breland and Lindsey Riddick[1] will serve as class

---

[1]     Pursuant to the Joint Consent Order, endorsed by the Court
on June 24, 2011, Plaintiffs Joceley Ferdinand, Jamel Towe,
Joseph Sarpong, Sean Pettigrew and Michael Riddick were removed
as class representatives.  Additionally, pursuant to the Order,
any proposed class representative who failed to appear for

representatives, and Cohen & Fitch LLP and Jon L. Norinsberg, Esq. shall serve as class counsel.

## Prior Proceedings

This action was initiated on May 25, 2010.  Plaintiffs filed an amended complaint on August 31, 2010 (the "Amended Class Action Complaint").  Plaintiffs filed the instant motion for class certification on February 4, 2011.  Following the resolution of various motions regarding pre-certification discovery, the parties entered a stipulation as to the scope of depositions to be conducted prior to the briefing of the instant motion.  Following that discovery period and further briefing, the class certification motion was marked fully submitted and heard on November 16, 2011.

## The Facts

The following facts are drawn from the Amended Class Action Complaint and the declarations, exhibits and affidavits

---

deposition by July 15, 2011, would withdraw as a class representative.  Accordingly, Plaintiffs Mariam Farnum, Charlean Finley, Christian Dudley, Brian Morris and Mica Ancrum are no longer proposed class representatives since they failed to timely appear for deposition.

4

submitted with respect to Plaintiffs' motion for class certification.  These facts are not in dispute except as noted below.


**A. The Plaintiffs**


According to the Amended Class Action Complaint, Plaintiffs are twenty-two men and women between the ages of 18 and 44 years old.  Each Plaintiff alleges that he or she has been issued one or more summonses by police officers without probable cause, in Manhattan, Queens, the Bronx or Brooklyn and that such summonses were subsequently dismissed.  Each claims to have sustained injuries as a result of these encounters including, but not limited to, fear of the possibility of receiving summonses without probable cause in the future.


**B. The Citywide Summons Operation**


Accompanying their opposition to Plaintiffs' motion for class certification, Defendants have submitted excerpts from the Annual Reports of the Criminal Court of the City of New York for the years 2004, 2005, 2006, 2007, 2008 and 2009.  These reports provide a description of the Citywide Summons Operation.

According to the reports, summonses can be issued from over forty certified agencies, including the NYPD, Metropolitan Transportation Authority and the New York City Fire Department, among others. These authorized agencies deliver summonses to the Criminal Court's Central Receiving Unit. Once the summonses are received, the Central Receiving Unit looks for "serious defects" that would prohibit the summons from being docketed. Such serious defects include a missing signature or narrative or an improper return date. Following this review, the summonses are then scanned into the Criminal Court's Summons Automated Management System. After data entry staff log the information and create a docket, the summonses are then forwarded to the appropriate county's summons office where the Associate Court Clerk in charge coordinates with the Supervising Judge's office to ensure that, in the words of the Annual Reports, "a timely review for legal sufficiency takes place." In Bronx, Kings, New York and Queens Counties, this review for "legal sufficiency" takes place prior to the scheduled arraignment date. Summonses that survive this judicial review are then calendared for arraignment. In Richmond County, summonses are reviewed for legal sufficiency at the scheduled arraignment session. As such, the Citywide Summons Operation involves two stages of

review: an initial defect review performed by the Central

Receiving Unit, and then a review for "legal sufficiency"

performed by a judicial officer.


        The charts accompanying the statistics in the Annual

Reports describe the two rounds of review as "Defect Review" and

"Facial Sufficiency Review," and the Annual Reports'

presentation of the data equates the "timely review for legal

sufficiency" with "Facial Sufficiency Review."  See N.Y.C. Crim.

Ct. Annual Rept. 2009 at 33-35 (describing summons review

process and presenting data, noting "Dism. Insuff." term

"represents the number of summonses dismissed as part of the

pre-arraignment review" and presenting the number of summonses

filed surviving defect review minus the numbered dismissed as

insufficient to represent those "Summonses Surviving Facial

Sufficiency Review."); see also N.Y.C. Crim. Ct. Annual Rept.

2008 at 37-39; N.Y.C. Crim. Ct. Annual Rept. 2007 at 35-37;

N.Y.C. Crim. Ct. Annual Rept. 2006 at 46-48.  As such, the terms

"legal sufficiency" as used in the Annual Reports and "facial

sufficiency" appear to be synonymous.


        The Citywide Summons Operation can thus be described

7

as follows.[2]  When an NYPD officer observes illegal conduct, he
issues a summons and, before the return date, files an
accusatory instrument with the New York City Criminal Court.
Once this accusatory instrument is filed and delivered to the
Court's Central Receiving Unit, it is screened for defects, such
as a missing signature or narrative, or improper return date.
Summonses that survive this defect review are then forwarded to
the appropriate county's summons office, where the Associate
Court Clerk and Supervising Judge's office ensure that a timely
review for legal sufficiency takes place.  Legal sufficiency is
synonymous with facial sufficiency, a term that is defined in
the New York Criminal Procedure Law.

### C. Reports Generated by the Office of Court Administration

        In addition to a description of New York City's
Citywide Summons Operation, the parties have also submitted
statistics obtained from the Office of Court Administration
(OCA).  These reports, entitled "Caseload Activity Report –

---

[2]     The applicable New York State statutes empowering NYPD
officers to issue summonses, requiring NYPD officers to file an
accusatory instrument with the Criminal Court for the City of
New York subsequent to issuing a summons and outlining the
guidelines by which courts review summonses for facial
sufficiency are described more fully in the section discussing
ascertainability.

Summons Cases," contain data for the years 2004, 2005, 2006,
2007, 2008 and 2009 and provide detail by geographic area of the
number of new summonses calendared, the total number of
dispositions and the means by which the disposition was reached,
i.e. dismissed, adjourned in contemplation of dismissal, found
guilty, pled guilty, acquitted or other disposition.

The OCA data reveals that, in total, over the period
from 2004 through 2009, there were 3,597,964 summonses filed.
Of those, 223,716 were dismissed during the first-round defect
review, and 620,149 were dismissed during the second-round
facial sufficiency review.  In percentage terms, between 2004
and 2009, 6.2% of summonses filed were dismissed prior to
arraignment as defective and 17.2% of summonses filed were
dismissed prior to arraignment as facially insufficient.  The
percentages have remained fairly constant from 2004 through
2009.  In 2004, 5.8% of summonses filed were dismissed as
defective, 16.7% of summonses filed were dismissed as facially
insufficient.  In 2005, it was 6.2% and 18.2%; in 2006, it was
6.0% and 19.4%; in 2007, it was 5.9% and 15.5%; in 2008, 6.7%
and 17.6%; and in 2009, it was 6.8% and 16.0%.

Plaintiffs note that, between 2004 and 2009, 2,291,425

summonses were adjudicated in the New York City Criminal Courts, and 1,185,412 of those summonses (51.7% of the total adjudicated) were dismissed.  Plaintiffs also highlight that of the number of summonses that are adjudicated annually, the number that are dismissed prior to trial is consistently over 50%: in 2004, it was 53.6%; in 2005, 53.5%; in 2006, 51.3%; in 2007, 50.7%; in 2008, 50.5%; and in 2009, 50.1%.  According to Plaintiffs, the fact that this percentage has consistently remained above 50% demonstrates the existence of a pattern or practice.  Defendants dispute Plaintiffs' conclusions concerning the OCA statistics.

Of the summonses that were dismissed, 1,945 (less than .1%) resulted in an acquittal, which Plaintiffs interpret as meaning these summonses were dismissed after trial.  According to Plaintiffs, this reveals that over 99% (99.9%) of all dismissals, numbering some 1,183,467, occurred prior to trial as the result of a judicial finding that those summonses were legally insufficient to support the charges alleged.  Again, Defendants dispute the conclusions Plaintiffs have reached concerning this data.

**D. Tape Recordings of NYPD Roll Call Meetings**

10

In addition to the OCA data, Plaintiffs have submitted tape recordings obtained from NYPD Officers Adhyl Polanco ("Polanco") and Adrian Schoolcraft ("Schoolcraft"), as well as accompanying affidavits of authenticity.  The recordings provided have also been presented to the Honorable Shira A. Scheindlin in the case of Floyd v. City of New York, 813 F. Supp. 2d 417 (S.D.N.Y. 2011), a case in which African-American suspects brought a putative class action, under 42 U.S.C. § 1983, against the City of New York, the Police Commissioner, the Mayor and police officers, alleging a policy of stops and frisks by the NYPD on the basis of race or national origin, in violation of Title VI and the Fourth and Fourteenth Amendments.

According to his affidavit, Polanco has been a member of the NYPD since 2005 and, from 2006 to December 2009, served as a patrol officer in the 41st Precinct in the Bronx.  Polanco is currently suspended.  In September and October 2009, Polanco made audio recordings of precinct roll call meetings during which officers would receive oral instructions from trainings sergeants, patrol squad supervisors and platoon commanders, among others.  Schoolcraft, according to his affidavit, is also a suspended member of the NYPD.  From September 2003 through

11

October 2009, Schoolcraft worked as a patrol officer in the 81st
Precinct in Brooklyn, and, between April 2008 and October 2009,
he made audio recordings of roll call meetings.

According to the excerpted portions cited in the Class
Action Amended Complaint, Polanco's tape recordings from the 41st
Precinct include the following comments from Polanco's superior
officers: "I spoke to the [commanding officer] for about an hour
and half.  The activity [is] 20 and 1. . . . They want 20
[summonses] and 1 [arrest].  How?  I don't know. . . . Alright,
so it's 20 and 1."  "Next week you could be at 25 [summonses]
and 1 [arrest], you could be at 35 [summonses] and 1 [arrest]
and guess what?  Until you decide to quit this job and become a
pizza hut delivery man, this is what you're going to be doing
until then."  "Things are not going to get any better, it's
going to get a lot worse.  If you think 1 [arrest] and 20
[summonses] is breaking your balls, guess what you are going to
be doing?  You're going to be doing a lot more, a lot more than
what you think."  "It's really non-negotiable, 'cause if you
don't do it now, I'm gonna have you work with the boss to make
sure it happens."

Schoolcraft's recordings from the 81st Precinct reveal

the following comments from supervising officers: "He wants at
least 3 seatbelts [summonses], 1 cell phone [summons] and 11
others [summonses]." "I see 8 fucking summonses for a 20 day
period or a month. If you mess up, how the hell do you want me
to do the right thing by you?" "I told you last month, they're
looking at the numbers. Ain't about losing your job, [but] they
can make your job real uncomfortable." "How many superstars and
how many losers do we have? How many summonses does the squad
write? We need more activity. If your productivity falls below
par, either you or the C.O. is going to have to answer." "We
need 250's [a type of summons], we need arrests, quality of life
enforcement [C-summonses], community visits, we need, get 2 of
them in a car, 3 on foot." "Go through the motions and get your
numbers anyway. Don't be the one caught out there. Marino's
yelling at everyone about the points." "If they're on a corner,
make 'em move. If they don't want to move, lock 'em up. Done
deal. You can always articulate [a charge] later."


**E. January 14, 2006 Ruling Of Arbitrator Bonnie Siber
Weinstock**


In addition to the audio recordings, Plaintiffs have
submitted a January 14, 2006 decision from Arbitrator Bonnie
Siber Weinstock addressing the 75th Precinct's alleged

13

enforcement of a traffic summons quota.  While the Arbitrator
received evidence regarding quotas for a variety of alleged
quotas, including moving violations, parking tickets, quality of
life summonses and arrests, the arbitrator addressed only the
alleged quota for traffic violations.  In the decision, the
Arbitrator framed the issue in the proceeding to be: "Did the
New York City Police Department violate New York State Labor Law
Section 215-a by establishing and maintaining a summons quota
for traffic violations in the 75th Precinct and by penalizing
officers for failing to meet the stated number of traffic
violations, including parking, standing and stopping?  If so,
what shall be the remedy?"

        Citing testimony from NYPD officers and various
documents describing how a police officer's failure to issue the
required number of summonses would result in a substandard
performance rating, the Arbitrator found that the 75th Precinct
had instituted and enforced a traffic summons quota in violation
of New York State Labor Law Section 215-a:

    The claim raised in this proceeding is sustained in
    accordance with the Opinion herein.  The New York City
    Police Department violated New York State Labor Law Section
    215-a by establishing and maintaining a summons quota for
    traffic violations in the 75th Precinct and by penalizing
    officers for failing to meet the stated number of traffic

14

violations, including parking, standing and stopping.  The
City shall cease and desist from maintaining a vehicular
ticket quota.  The City shall, upon request, revise the
performance evaluation of any employee whose marks were
reflective of a failure to meet the illegal ticket quota.
Employees in the 75th Precinct shall have ninety calendar
(90) days from the date of this Award within which to
contact the Employer and express a desire to have their
performance evaluation(s) reviewed and revised.


**The Standard For Class Certification**


          Class certification is appropriate where the proposed
class meets, by a preponderance of the evidence following a
court's "rigorous analysis," the requirements of Rule 23(a) and
the proposed class constitutes one of the types of classes
enumerated in Rule 23(b).  See Wal-Mart Stores, Inc. v. Dukes,
131 S.Ct. 2541, 2551-52, 180 L.Ed.2d 374 (2011); In re Salomon
Analyst Metromedia Litig., 544 F.3d 474, 478 (2d Cir. 2008);
Teamsters Local 445 Freight Div. Pension Fund v. Bombardier
Inc., 546 F.3d 196, 202 (2d Cir. 2008); In re Initial Pub.
Offerings Secs. Litig., 471 F.3d 24, 29 (2d Cir. 2006).
"Frequently that 'rigorous analysis' will entail some overlap
with the merits of the plaintiff's underlying claim."  Dukes,
131 S.Ct. at 2551; accord Bombardier, 546 F.3d at 202.  However,
"in making such determinations, a district judge should not
assess any aspect of the merits unrelated to a Rule 23

15

requirement." <u>In re IPO</u>, 471 F.3d at 41.  The Court has

discretion on questions of class certification because "the

district court is often in the best position to assess the

propriety of the class and has the ability . . . to alter or

modify the class, create subclasses, and decertify the class

whenever warranted." <u>Sumitomo Copper Litig. V. Credit Lyonnais

Rouse, Ltd.</u>, 262 F.3d 134, 139 (2d Cir. 2001).


        The four prerequisites of Rule 23(a) are as follows:


        (1) the class is so numerous that joinder of all members is
        impracticable; (2) there are questions of law or fact
        common to the class; (3) the claims or defenses of the
        representative parties are typical of the claims or
        defenses of the class; and (4) the representative parties
        will fairly and adequately protect the interests of the
        class.


Fed. R. Civ. P. 23(a).  Plaintiffs must also show the class

definition is ascertainable.  <u>In re IPO</u>, 471 F.3d at 44-45.  "An

identifiable class exists if its members can be ascertained by

reference to objective criteria." <u>In re Fosamax Prods. Liab.

Litig.</u>, 248 F.R.D. 389, 395 (S.D.N.Y. 2008) (quoting <u>In re

Methyl Tertiary Butyl Ether Prods. Liab. Litig.</u>, 209 F.R.D. 323,

337 (S.D.N.Y. 2002)).


16

In addition to meeting the requirements of Rule 23(a), the proposed class must constitute one of the types of classes enumerated in Rule 23(b).  Plaintiffs have moved for class certification under both Rule 23(b)(2) and Rule 23(b)(3).  Rule 23(b)(2) provides for class certification if the requirements of Rule 23(a) are met and:

> the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]

Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(3) provides for class certification if the requirements of Rule 23(a) are met and:

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

17

The Second Circuit has described the standard of proof governing class certification as follows:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for partial trial of the merits.

In re IPO, 471 F.3d at 41.  "'[T]he standard of proof applicable to evidence proffered to meet' the requirements of Rule 23 [is] a 'preponderance of the evidence.'"  In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009) (quoting Bombardier, 546 F.3d at 202).

**The Plaintiffs Have Satisfied The Rule 23(a) Requirements For**

**Class Certification**

As noted above, a class may be certified only if it satisfies the following prerequisites: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a); see also In re Pfizer Inc. Sec. Litig., No. 04 Civ. 9866(LTS)(HBP), 2012 WL 1059671, at *2 (S.D.N.Y. Mar. 29, 2012).  Courts have also found an implied requirement of ascertainability to the express requirements set forth in Rule 23(a).  See In re Sadia, S.A. Sec. Litig., 269 F.R.D. 298, 305 (S.D.N.Y. 2010) (citing In re IPO, 471 F.3d at 30).  For the reasons set forth below, the class satisfies the four requirements of Rule 23(a) as well as the additional requirement of ascertainability.

**1. Numerosity**

For class certification to be appropriate, the proposed class must be so numerous that joinder of all of its

19

individual members would be impracticable.  See Fed. R. Civ. P.
23(a)(1); In re NYSE Specialists Sec. Litig., 260 F.R.D. 55, 69-
70 (S.D.N.Y. 2009).  "The numerosity requirement in Rule
23(a)(1) does not mandate that joinder of all parties be
impossible – only that the difficulty or inconvenience of
joining all members of the class make use of the class action
appropriate."  Cent. States Se. & Sw. Areas Health & Welfare
Fund v. Merck-Medco Managed Care, LLC, 504 F.3d 229, 244-45 (2d
Cir. 2007); see also In re NASDAQ Market-Makers Antitrust
Litig., 169 F.R.D. 493, 508 (S.D.N.Y. 1996).  "Numerosity is
presumed when a class consists of forty members or more."  NYSE
Specialists, 260 F.R.D. at 70 (citing Consol. Rail Corp. v. Town
of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995)); see also In re
Sadia, 269 F.R.D. at 304 ("Sufficient numerosity can be presumed
at a level of forty members or more.").

    Here, the proposed class like exceeds forty members.
Given the figures included in the OCA data, the number of
individuals in the proposed class could number in the hundreds
of thousands.[3]  Accordingly, Plaintiffs have satisfied their

---

[3]     Because of the three year statute of limitations applicable
to 42 U.S.C. § 1983, the applicable class period begins in May
2007.  The Criminal Court of the City of New York Annual Reports
establish that the number of summonses issued to putative
plaintiffs in the class, as the class is defined below, number

burden of establishing numerosity.

## 2. Commonality

"The commonality requirement is met if plaintiffs'
grievances share a common question of law or fact." Marisol A.
v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) (citing In re
Agent Orange Prod. Liab. Litig., 818 F.2d 145, 166-67 (2d Cir.
1987)).  However, "[c]ommonality does not mandate that all class
members make identical claims and arguments, only that common
issues of fact or law affect all class members." Trief v. Dun &
Bradstreet Corp., 144 F.R.D. 193, 198 (S.D.N.Y. 1992) (citing
Port Auth. Police Benevolent Ass'n v. Port Auth., 698 F.2d 150,
153-54 (2d Cir. 1983)).  "A court may find a common issue of law
even though there exists some factual variation among class
members' specific grievances." Dupler v. Costco Wholesale
Corp., 249 F.R.D. 29, 37 (E.D.N.Y. 2008) (citation omitted).

---

some 99,317 in 2008 and 96,100 in 2009.  Data for 2010 is not
part of the evidentiary record before the Court, and statistics
for 2007 include summonses from the January through May 2007
period that are outside the class period.  However, even when
only the 2008 and 2009 figures are considered, the number of
summonses at issue is at least 195,417.  Although putative
plaintiffs may have received more than one summons, the large
quantity of summonses at issue in this litigation assures that
the numerosity requirement of Rule 23(a) is satisfied.

Here, Plaintiffs have alleged that they were victims of a pattern and practice set and enforced by city officials, the NYPD and New York City Police Officers to stop, search, seize, arrest and issue summonses to individuals without probable cause in response to a requirement and constant pressure to meet a summons quota. The class these Plaintiffs seek to represent includes those who suffered similar injury pursuant to the same pattern and practice. "The fact that the claims of the proposed class stem from the same alleged unconstitutional conduct of the defendants proves the existence of common questions of law or fact." Daniels v. City of New York, 198 F.R.D. 409, 417 (S.D.N.Y. 2001).

In addressing Rule 23(a)'s commonality requirement, particular attention must be paid to the Supreme Court's recent decision in Wal-Mart Stores, Inc. v. Dukes. In the Dukes case, the named plaintiffs were three current and former female employees of Wal-Mart, each of whom alleged that she suffered unlawful sexual discrimination in pay and promotion. In seeking class certification to bring Title VII claims on behalf of all current and former female Wal-Mart employees, the named plaintiffs did not allege an "express corporate policy against the advancement of women," Dukes, 131 S.Ct. at 2548, or a

22

"uniform employment practice" that violated the law, id. at 2554. Instead, the named plaintiffs alleged that Wal-Mart's general corporate policy was to allow local managers discretion over their employees' pay and promotion and that this policy of allowing discretion, coupled with a "corporate culture" of sexual stereotyping caused women to be disfavored in the workplace. Id. at 2548. The District Court for the Northern District of California certified the class, basing its finding of commonality on three types of evidence: statistics showing pay and promotion disparities between men and women, anecdotal evidence from some 120 women and expert testimony from a sociologist to the effect that Wal-Mart's corporate culture rendered it vulnerable to discrimination in discretionary pay and promotion decision-making. Dukes, 131 S.Ct. at 2549. The Ninth Circuit affirmed certification, finding that the named plaintiffs' evidence established commonality by raising the issue "whether Wal-Mart's female employees nationwide were subjected to a single set of corporate policies (not merely a number of independent discriminatory acts) that may have worked to unlawfully discriminate against them in violation of Title VII." Id. at 2549.

Rejecting the Ninth Circuit's conclusion, the Supreme

23

Court summarized the commonality requirement as follows:

> Commonality requires the plaintiff to demonstrate that the
> class members "have suffered the same injury," (citation
> omitted).  This does not mean merely that they have all
> suffered a violation of the same provision of law.  Title
> VII, for example, can be violated in many ways—by
> intentional discrimination, or by hiring and promotion
> criteria that result in disparate impact, and by the use of
> these practices on the part of many different superiors in
> a single company.  Quite obviously, the mere claim by
> employees of the same company that they have suffered a
> Title VII injury, or even a disparate-impact Title VII
> injury, gives no cause to believe that all their claims can
> productively be litigated at once.  Their claims must
> depend on upon a common contention—for example, the
> assertion of discriminatory bias on the part of the same
> supervisor.  That common contention, moreover, must be of
> such a nature that it is capable of classwide resolution—
> which means that determination of its truth or falsity will
> resolve an issue that is central to the validity of each
> one of the claims in one stroke.

Dukes, 131 S.Ct. at 2551.  The Supreme Court held that such a

"common connection" was lacking in Dukes because the basis for

liability was not merely disfavor in pay and promotion, but the

reason why each class member was disfavored.  The five-justice

majority noted: "The only corporate policy that plaintiffs'

evidence convincingly establishes is Wal-Mart's 'policy' of

allowing discretion by local supervisors over employment

matters.  On its face, of course, that is just the opposite of a

uniform employment practice that would provide the commonality

needed for a class action; it is a policy against having uniform

24

employment practices." Id. at 2554.  Because plaintiffs had not
identified a corporate policy that led to the local managers'
discretion being exercised in a uniformly discriminatory way,
the Supreme Court held commonality to be lacking.  See id. at
2556-57 ("Because respondents provide no convincing proof of a
companywide discriminatory pay and promotion policy, we have
concluded that they have not established the existence of any
common question.").

        Unlike in Dukes where the plaintiffs alleged a
corporate policy of discretion to local managers and a corporate
culture hostile to the advancement of women, Plaintiffs here
have alleged a specific policy promulgated by Defendants,
namely, that Defendants have established a practice by which
NYPD officers issue summonses without probable cause in order to
meet a summons quota.  As such, the Supreme Court's holding in
Dukes supports a finding that Rule 23(a)'s commonality element
has been established in this case.

### 3. Typicality

        Rule 23(a)(3) requires that the class representatives
have claims typical of those shared by the class members.  "To

establish typicality under Rule 23(a)(3), the party seeking
certification must show that 'each class member's claim arises
from the same course of events and each class member makes
similar legal arguments to prove the defendant's liability.'"
See In re Flag Telecom, 574 F.3d at 35 (quoting Robidoux v.
Celani, 987 F.2d 931, 936 (2d Cir. 1993)).  "Rule 23(a)(3) is
satisfied when each class member's claim arises from the same
course of events, and each class member makes similar arguments
to prove the defendant's liability."  In re Drexel, 960 F.2d at
291.  When the same unlawful conduct was directed at or affected
both the named plaintiffs and the prospective class, typicality
is usually met.  See Robidoux, 987 F.2d at 936-37; see also
Robinson v. Metro-N. Commuter R.R. Co., 267 F.3d 147, 155 (2d
Cir. 2001) (the typicality requirement "is satisfied when each
class member's claim arises from the same course of events, and
each class member makes similar legal arguments to prove the
defendant's liability.").  Typicality may be found to fail in
cases where the named plaintiff was not harmed by the conduct
alleged to have injured the class.  Newman v. RCN Telecom Servs.,
Inc., 238 F.R.D. 57, 64 (S.D.N.Y. 2006).


        Here, the proposed class representatives are New
Yorkers who have all allegedly been issued at least one summons

without probable cause and suffered injury as a result of an alleged unconstitutional NYPD practice.  The sole theory of liability in this case is that Defendants have a pattern and practice of issuing summonses without probable cause for behavior that did not occur or that does not constitute a summonsable offense.  As such, the claims here "arise[] from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  Cent. States, 504 F.3d at 245 (quotation marks and citation omitted).


### 4. Adequacy


The adequacy of representation inquiry under Rule 23(a) considers "whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct litigation."  Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000); see also NYSE Specialists, 260 F.R.D. at 73.  In order to defeat class certification, there must be "a showing of a genuine conflict" between the proposed class representative's interests and those of the other members of the class, In re Drexel, 960 F.2d at 291, and "only a conflict that goes to the very subject matter

of the litigation will defeat a party's claim of representative status." Hirschfeld v. Stone, 193 F.R.D. 175, 183 (S.D.N.Y. 2000). Differences in the amount of recoverable damages generally do not give rise to a conflict. See, e.g., In re NASDAQ, 169 F.R.D. at 513.

In this case, Plaintiffs have demonstrated both the first and second prongs of the test outlined in the Second Circuit's Baffa decision to be fulfilled. Plaintiffs' interests are identical to those of the putative class, as all plaintiffs have been allegedly injured by the same unconstitutional actions on the part of Defendants. See Darquea v. Jarden Corp., No. 06 Civ. 722(CLB), 2008 WL 622811, at *3 (S.D.N.Y. Mar. 6, 2008) ("All claims alleged arise from the same wrongful conduct, and thus, Plaintiff's interests, recouping money invested, are similar to those of the proposed class. As such, named Plaintiffs will fairly and adequately protect the interests of the class.").

With respect to the second prong of the Baffa test concerning adequacy, Plaintiffs have retained Jon L. Norisberg, Esq. and the law firm of Cohen & Fitch LLP. These attorneys are competent and experienced in federal class action and federal

28

civil rights litigation.  Jon L. Norinsberg is a civil rights
attorney with nearly twenty years of civil litigation
experience, including civil rights litigation against state and
local governments.  See, e.g., Betuglia v. City of New York, No.
11 Civ. 2141(JGK), 2012 WL 906958 (S.D.N.Y. Mar. 19, 2012);
Morse v. Spitzer, No. 07-CV-4793(CBA)(RML), 2011 WL 4625996
(E.D.N.Y. Sept. 30, 2011); Stamile v. County of Nassau, No. CV
10-2632(SJF)(AKT), 2011 WL 1754125 (E.D.N.Y. Jan. 31, 2011);
Brandon v. City of New York, 705 F. Supp. 2d 261 (S.D.N.Y.
2010); McCoy v. City of New York, No. CV 07-4143(RJD)(JO), 2008
WL 3884388 (E.D.N.Y. Aug. 13, 2008); Richardson v. City of New
York, No. 02 CV 3651(JG), 2006 WL 2792768 (E.D.N.Y. Sept. 27,
2006).  Similarly, Cohen & Fitch LLP has previously litigated
civil rights actions against the City of New York.  See, e.g.,
Nibbs v. City of New York, 800 F. Supp. 2d 574 (S.D.N.Y. 2011).
Plaintiffs' counsel claim that collectively, the two firms have
litigated thousands of civil rights claims against the City of
New York.  Plaintiffs also represent that the partners of Cohen
& Fitch LLP maintain a significant criminal defense practice
and, in that capacity, have spent hundreds of hours in the New
York City Criminal Court's Summons Parts.  As such, Jon L.
Norisberg, Esq. and Cohen & Fitch LLP are qualified to represent
the proposed class and, along with Plaintiffs, will protect the

class members' interests.  Accordingly, the adequacy requirement of Rule 23(a)(4) has been satisfied.

Defendants contend that Plaintiffs' deposition testimony reveals a lack of competence and is indicative of a lack of responsibility toward the absent class members.  In particular, Defendants highlight the testimony of Stinson, who according to Defendants, testified that he was in a daze when he met with his attorneys, was distracted by a Yankee game and at the end of his deposition stated that he did not understand some of the terms used in the deposition even when he was initially instructed to inform opposing counsel if he did not fully understand the questions.  Defendants also contend that other Plaintiffs demonstrated incompetency concerning basic issues such as the number of class representatives in the case, the advantages of pursuing the putative plaintiffs' as a class, Plaintiffs' duties as class representatives, the procedural posture and goals of the litigation and the general facts of the case.  Notwithstanding Defendants' contentions, a review of Plaintiffs' deposition testimony demonstrates that Plaintiffs have a working knowledge of the litigation and their

responsibilities of class representatives.[4]

_____

[4]   See, e.g., Bennett Dep. at 28:23-30:21 ("Q. What is your
understanding about your role in this lawsuit? A. It's to give
testimony on what has happened to me at the hands of the NYPD.
Q. What is the Fourth Amendment? A. It's the right that protects
me against illegal search and seizure for no probable cause. Q.
Do you understand you are a class representative? A. Yes. Q. As
you sit here today, what is your understanding of what it means
to be a class representative? A. It means that I'm representing
all the people that this has happened to in the City of New
York. Q. Do you understand that as a class representative you
have duties and responsibilities to the class? A. Yes. Q. What
is your understanding of what those duties and responsibilities
are? A. It's to show up, to participate, to give testimony when
you need me, to be in court when I'm needed. . . . Q. Are there
other class representatives. A. Yes. There are. Q. What is your
understanding about how many other class representatives there
are? A. Roughly 20."); Meausa Dep. at 29:20-30:23 ("Q. What is
your understanding of your claims in the complaint? A. You'll
understand one of my claims is basically I know what I've been
through and I want to let my story be heard. So I'm going to
tell my side of the story. Even though, you know, it's people
behind me that has their side of the story too, along with the
class act. Q. What is the story you're referring to? A. That the
cops, they feel that they could stop people, innocent people and
do whatever they want and treat them how they want and give them
summonses and walk away and it's okay. . . . Q. What do you
believe that the people are doing illegally? A. I believe the
people are stopped - - innocent people - - and is giving out
summonses for no apparent reason."); Shaw Dep. at 53:18-54:1
("Q. Do you understand the allegations in the complaint? A. Yes.
Q. Tell me what your understanding is? A. Well basically, the
complaint, we're complaining about officers who are pulling over
people in their cars, writing them tickets, taking away their
liberties, that's a violation of our civil rights."); Dixon Dep.
at 38:10-25 ("Q. You said you understand the legal bases for the
claims. Can you explain to me the legal bases? A. I just
explained to you that my Fourth Amendment was being violated.
More than a hundred thousand people's Fourth Amendments are
being violated as far as illegal search and procedures, people
being pulled over or you just getting a BS summons. All right.
Here's a ticket for this. Go to court. . . . Q. What rights does
the Fourth Amendment guarantee to you that you feel were

Defendants also contend that Plaintiffs are inadequate
as class representatives because of their lack of understanding
of the fee structure in the litigation.  Courts have repeatedly
held that the financial resources of the proposed class
representatives are relevant in determining adequacy, and class
certification may be denied where the named plaintiffs fail to
assume the responsibility for costs of litigation.  See Weber v.
Goodman, 9 F. Supp. 2d 163, 172 (E.D.N.Y. 1998).  Here,
according to Defendants, Plaintiffs' deposition testimony
displays their lack of knowledge concerning the fee arrangement
with counsel, most Plaintiffs testified that class counsel were
responsible for the costs of the litigation, and Plaintiffs were
unaware that class counsel could later bill Plaintiffs for the
cost of the suit.  Defendants claim that none of the Plaintiffs
appear to have the financial resources necessary to pay attorney
fees and costs if Plaintiffs' claims are unsuccessful.

Defendants' argument concerning Plaintiffs' financial
ability to pay defendants' costs is unavailing, as it is
"irrelevant that [the] named plaintiffs were unaware of
potential liability for defendants' fees and costs, particularly

violated? A. That I can't just unlawfully be stopped and you
just unlawfully search me. You have to have probable cause.").

as plaintiffs' counsel are likely paying the costs of this
action." <u>Casale v. Kelly</u>, 257 F.R.D. 396, 412 (S.D.N.Y. 2009).
With respect to the contention that Plaintiffs' deposition
testimony suggested a lack of understanding concerning their
ultimate responsibility for fees, the deposition testimony, in
several instances, reveals Plaintiffs' understanding that they
are responsible for the fees associated with the litigation.
See, e.g., Meausa Dep. 36:1-7 ("Q. Are you aware that you could
potentially be liable for costs if this case loses? A. Yes. Q.
What do you understand that to mean? A. If everybody in the
class act drops out, I'm the only one there, that I will be
responsible for the costs."); Thames Dep. 52:3-12 ("Q. Are you
aware of your potential liability if you lose this case? A. Yes.
Q. What is your liability if you - - what is your potential
liability if you lose this case? A. I think I have to pay some
fees or something like that, if I'm not mistaken. Q. You're
aware that if you do not win, you may be liable for attorneys'
fees and cost? A. Yes.").

        Defendants also criticize the adequacy of the proposed
class representatives, criticizing Plaintiffs' reliability,
competency and credibility.  Defendants note that certain
Plaintiffs' backgrounds contain criminal arrests and

33

convictions, a failure to pay taxes and examples of conduct demonstrating a proclivity for untruthfulness. However, as this Court has observed, "According to the leading commentator on class actions, most courts have rejected challenges to adequacy based on allegations that plaintiffs backgrounds were alleged to include 'unrelated unsavory, unethical or even illegal conduct.' As set forth above, a proposed class representative's interest may only be said to be in conflict with those other class members where the class representative is vulnerable to unique defenses and sharp attacks relevant to the issues in the litigation." German v. Federal Home Mortg. Corp., 168 F.R.D. 145, 155 (S.D.N.Y. 1996) (citing 1 H. Newberg & A. Conte, Newberg on Class Actions, § 3.36 (2d ed. 1992)). Other courts in this district have rejected similar attempts to use the named plaintiffs' background or credibility as a basis for challenging the adequacy of class representatives. See, e.g., Casale, 257 F.R.D. at 412 ("Frankly put, defendants' assault on named plaintiffs' capability to represent the interests of similarly situated individuals is disrespectful and blatantly self-serving."); Cromer Fin. Ltd. v. Berger, 205 F.R.D. 113, 125 (S.D.N.Y. 2001) (refusing to bar class representatives on the grounds of credibility where it was not clear that plaintiffs fabricated testimony).

Accordingly, Plaintiffs have established their burden of demonstrating the adequacy of both class counsel and the class representatives.

### 5. Ascertainability

Although not expressly stated in the Rule, courts have found an implied requirement of ascertainability to the express requirements set forth in Rule 23(a).  See In re Sadia, 269 F.R.D. at 305 (citing In re IPO, 471 F.3d at 30).  As noted above, "[a]n identifiable class exists if its members can be ascertained by reference to objective criteria."  In re Fosamax, 248 F.R.D. at 395 (quoting In re MTBE, 209 F.R.D. 337).  Put another way, the ascertainability requirement means that "the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." Casale, 257 F.R.D. at 406; see also In re Amaranth Natural Gas Commodities Litigation, 269 F.R.D. 366, 376-77 (S.D.N.Y. 2010) ("[T]he requirement that there be a class will not be deemed satisfied unless the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a

35

particular individual is a member."). The standard for ascertainability "is not demanding." Gortat v. Capala Bros., Inc., No. 07-CV-3629(ILG), 2010 WL 1423018, at *2, (E.D.N.Y. Apr 9, 2010). "It is designed only to prevent the certification of a class whose membership is truly indeterminable." Id.

In their motion for class certification, Plaintiffs seek to define the class "consisting of all persons who have been or will be issued a summons in the absence of probable cause for offenses that were never committed and whose summonses were ultimately dismissed prior to trial." Plaintiffs, subsequent to limiting the applicable class period to all summonses dismissed from May 2007 to the present based on the three year statute of limitations, assert that "the class is readily ascertainable by the identification of those individuals who had their summonses dismissed prior to trial." However, Plaintiffs' effort to demarcate cleanly the boundaries of the class fail, as Plaintiffs cannot ascertain which summonses were issued without probable cause merely by reference to the number of summonses dismissed.

Dismissal of a summons does not, by itself, indicate that the summons was issued without probable cause. As

36

described above, the Citywide Summons Operation involves a two-
step review process: first, the Central Receiving Unit conducts
a defect review, dismissing those summonses that include a
serious defect such as a missing signature or narrative or
improper return date; second, the Associate Court Clerk and
Supervising Judge in each county coordinates a process where the
summonses are reviewed for facial sufficiency.

A review of relevant New York statutes is necessary to
precisely describe what is meant by the term "facial
sufficiency."  The first issue concerns the colloquial use of
the term "summons" to describe the notice served upon an
individual by a police officer who observes illegal activity.
The Criminal Court of the City of New York Annual Reports
describe these notices as "summonses," and many New York State
statutes also use that term.  However, comparing the Criminal
Procedure Law's definition of "appearance ticket" and "summons"
reveals that the notices at issue in this present action are
more accurately described as "appearance tickets," as that term
is defined in the CPL:

**§ 150.10 Appearance ticket; definition, form and content**

1. An appearance ticket is a written notice issued and
subscribed by a police officer or other public servant

authorized by state law or local law enacted pursuant to
the provisions of the municipal home rule law to issue the
same, directing a designated person to appear in a
designated local criminal court at a designated future time
in connection with his alleged commission of a designated
offense.  A notice conforming to such definition
constitutes an appearance ticket regardless of whether it
is referred to in some other provision of law as a summons
or by any other name or title.

### § 130.10 Summons; definition, function, form and content

1. A summons is a process issued by a local criminal court
directing a defendant designated in an information, a
prosecutor's information, a felony complaint or a
misdemeanor complaint filed with such court, or by a
superior court directing a defendant designated in an
indictment filed with such court, to appear before it at a
designated future time in connection with such accusatory
instrument.  The sole function of a summons is to achieve a
defendant's court appearance in a criminal action for the
purpose of arraignment upon the accusatory instrument by
which such action was commenced.

2. A summons must be subscribed by the issuing judge and
must state or contain (a) the name of the issuing court,
and (b) the name of the defendant to whom it is addressed,
and (c) the name or title of an offense charged in the
underlying accusatory instrument, and (d) the date of
issuance of the summons, and (e) the date and time when it
is returnable, and (f) a direction that the defendant
appear before the issuing court at such time.


N.Y. C.P.L. §§ 150.10, 130.10.  The "Practice Commentaries"

accompanying N.Y. C.P.L. § 150.10 assist in demarcating the

boundary between an appearance ticket and a summons:


Due to the fact that an appearance ticket may be referred
to as a summons or a traffic ticket or, as the statute

38

says, "by any other name or title", this section defines
the appearance ticket in terms of a concept that embraces
all notices that fall within the description, as
distinguished from defining a specific, designated
document.  For example, an instrument designated by the
statute as a "summons" may or may not be an appearance
ticket.  If the summons is issued pursuant to CPL Article
130, it obviously is not an appearance ticket, as quickly
can be determined by comparing the definition in CPL §
130.10 with the definition in the present section.  But
another type of summons may well be an appearance ticket -
e.g., the traffic summons (see Vehicle & Traffic Law, §
207).  Thus the question of whether an instrument labeled
"summons", for example, is for CPL purposes a summons or an
appearance ticket depends upon the statute that describes
it and authorizes its issuance.

Preiser, Practice Commentaries, N.Y. C.P.L. § 150.10 (McKinney's

2012).  Although an "appearance ticket" and a "summons" are both

methods of requiring a defendant's appearance in local criminal

court for arraignment, an appearance ticket is available when

"no criminal action against a person has been commenced in any

court," while a summons is available only "[a]fter a criminal

action has been commenced in a local criminal court by the

filing of an accusatory instrument therewith."  N.Y. C.P.L. §

110.10.  Because the notices served on Plaintiffs in this action

represent instances where a police officer has observed illegal

conduct, written a citation and served an individual, these

notices are more accurately described as "appearance tickets"

39

rather than "summonses."[5]  Police officers are authorized to
serve an appearance ticket, in lieu of making an arrest, for any
offense other than a Class A, B, C or D felony or in violation
of certain sexual offenses or offenses related to escape or bail
jumping.  See N.Y. C.P.L. § 150.20(1).


        "At or prior to the court date, the officer or other
public servant who issued the appearance ticket will file an
accusatory instrument - typically an information - in local
criminal court."  Preiser, Practice Commentaries, N.Y. C.P.L. §
150.10.  The police officer issuing the appearance ticket files
the accusatory instrument pursuant to N.Y. C.P.L. § 150.50:

> **§ 150.50 Appearance ticket; filing a local criminal court
> accusatory instrument; dismissal of insufficient instrument**
>
> 1. A police officer or other public servant who has issued
> and served an appearance ticket must, at or before the time
> such appearance ticket is returnable, file or cause to be
> filed with the local criminal court in which it is
> returnable a local criminal court accusatory instrument
> charging the person named in such appearance ticket with
> the offense specified therein.  Nothing herein contained
> shall authorize the use of a simplified information when
> not authorized by law.
>
> 2. If such accusatory instrument is not sufficient on its
> face, as prescribed in section 100.40, and if the court is

---

[5]    This distinction in terminology is relevant in terms of
describing how these notices are reviewed for facial
sufficiency.  Elsewhere in this opinion, the colloquial term
"summons" is used.

satisfied that on the basis of the available facts or
evidence it would be impossible to draw and file an
accusatory instrument which is sufficient on its face, it
must dismiss such accusatory instrument.

N.Y. C.P.L. § 150.50.  Accordingly, once the NYPD officer or

other authorized official issues the citation, the officer then

files an accusatory instrument in the Criminal Court of the City

of New York.  This accusatory instrument must be sufficient on

its face, as mandated in N.Y. C.P.L. § 100.40, which itself

refers to N.Y. C.P.L. § 100.15:

### § 100.40 Local criminal court accusatory instruments; sufficiency on face

1. An information, or a count thereof, is sufficient on its
face when:

(a) It substantially conforms to the requirements
prescribed in section 100.15; and

(b) The allegations of the factual part of the
information, together with those of any supporting
depositions which may accompany it, provide reasonable
cause to believe that the defendant committed the
offense charged in the accusatory part of the
information; and

(c) Non-hearsay allegations of the factual part of the
information and/or of any supporting depositions
establish, if true, every element of the offense
charged and the defendant's commission thereof.

### § 100.15 Information, misdemeanor complaint and felony complaint; form and content

41

1. An information, a misdemeanor complaint and a felony complaint must each specify the name of the court with which it is filed and the title of the action, and must be subscribed and verified by a person known as the "complainant."  The complainant may be any person having knowledge, whether personal or upon information and belief, of the commission of the offense or offenses charged.  Each instrument must contain an accusatory part and a factual part.  The complainant's verification of the instrument is deemed to apply only to the factual part thereof and not to the accusatory part.

2. The accusatory part of each such instrument must designate the offense or offenses charged.  As in the case of an indictment, and subject to the rules of joinder applicable to indictments, two or more offenses may be charged in separate counts.  Also as in the case of an indictment, such instrument may charge two or more defendants provided that all such defendants are jointly charged with every offense alleged therein.

3. The factual part of such instrument must contain a statement of the complainant alleging facts of an evidentiary character supporting or tending to support the charges.  Where more than one offense is charged, the factual part should consist of a single factual account applicable to all the counts of the accusatory part.  The factual allegations may be based either upon personal knowledge of the complainant or upon information and belief.  Nothing contained in this section, however, limits or affects the requirement, prescribed in subdivision one of section 100.40, that in order for an information or a count thereof to be sufficient on its face, every element of the offense charged and the defendant's commission thereof must be supported by non-hearsay allegations of such information and/or any supporting depositions.

N.Y. C.P.L. §§ 100.40, 100.15.

A review of these statutes reveals that the facial
sufficiency review conducted as part of the Citywide Summons
Operation involves a judicial determination of whether the
summons issued lacked probable cause.  As noted above, N.Y.
C.P.L. § 100.40(1)(b) requires the reviewing court to determine
whether "reasonable cause" existed for the issuance of the
summons.  The term "reasonable cause" is synonymous with
"probable cause."  See Raysor v. Port Auth., 768 F.2d 34, 40 (2d
Cir. 1985) ("'[R]easonable cause,' [is] the equivalent of
probable cause."); Hahn v. County of Otsego, 820 F. Supp. 54, 58
(N.D.N.Y. 1993) ("Reasonable cause is defined substantially the
same as probable cause under the Fourth Amendment.").

Although other reasons for dismissal at the facial
sufficiency review stage are possible, it is unlikely that these
alternative rationales apply to the summonses at issue in this
litigation.  As noted above, N.Y. C.P.L. § 100.15 requires
dismissal of a summons that fails to state the court in which it
is filed, the title of the action, the name of the subscribing
complainant, the offense charged or a sufficiently descriptive
factual statement, and § 100.40(1)(c) requires non-hearsay
allegations to establish each element of the offense.  Under the
summons review process described above, the technical errors

43

enumerated in N.Y. C.P.L. § 100.15 are addressed in the defect
review conducted prior to the judicial determination of facial
sufficiency.  With respect to N.Y. C.P.L. § 100.40(1)(c), the
offenses for which the summonses in this case are being issued
establish lack of non-hearsay allegations to be an improbable
reason for dismissal.  According to the OCA statistics, the
offenses for which the most summonses were issued include
consumption of alcohol on the street, disorderly conduct,
violations of motor vehicle safety rules, bicycle on the
sidewalk, trespass, offensive matter in the street/public place,
failure to comply with signs/parking offenses, reckless driving,
littering, unlawfully being the park after hours, unlawful
possession of marijuana, unreasonable noise, unlicensed
operation of a vehicle, unlicensed vending and operation of a
motor vehicle with a suspended registration.  Given the nature
of these offenses, and Plaintiffs' deposition testimony
describing how summonses were issued on the basis of NYPD
officers' personal observations, an overwhelming number of the
summonses found to be facially sufficient would not be dismissed
on hearsay grounds pursuant to N.Y. C.P.L. § 100.40(1)(c).
Thus, the Citywide Summons Operation's two-step review process
and the nature of the offenses involved establish the vast
majority of those summonses failing to survive judicial review

44

for facial sufficiency to have been dismissed for want of
probable cause.

If, as Plaintiffs propose, the class were defined to
include all summonses that were dismissed, this class would
include those summonses dismissed at the defect review stage,
thereby including individuals who had their summonses dismissed
for reasons such as a missing signature or invalid return date.
It is not necessarily the case that these summonses that are
dismissed as defective were issued without probable cause.  The
common theory binding together the putative plaintiffs' claims
is that the NYPD and other city officials have engaged in a
pattern and practice of issuing summonses to individuals without
probable cause in response to a requirement and constant
pressure to meet a summons quota.  Certifying a class that
includes individuals whose summonses were dismissed as
defective, without any judgment rendered as to whether those
individuals' summonses were issued without probable cause, fails
to capture the group of putative plaintiffs who have been harmed
by the wrong Plaintiffs allege.  Accordingly, Plaintiffs'
definition of the class is modified to capture only those
summonses dismissed for want of probable cause.

In order to ensure that the class is not overly-inclusive, the class certified will be defined to include individuals who were issued summonses that were later dismissed upon a judicial finding of facial insufficiency and who were ticketed without probable cause. This judicial finding of facial insufficiency is understood to occur at the Citywide Summons Operation's second stage of review, after the first stage defect review has been conducted. Merely being issued a ticket that was later dismissed is not, by itself, considered tantamount to having been ticketed without probable cause. Individuals who were issued summonses that survived the defect review process but were dismissed upon a judicial finding of facial insufficiency are presumptive members of the class, but Defendants can challenge any of these presumptive class members on grounds that their summonses were dismissed for reasons other than a lack of probable cause.[6]

---

[6]    Defendants, in their opposition brief, highlight various aspects of Plaintiffs' deposition testimony suggesting that at least some of the summonses Plaintiffs received were issued with probable cause and object to the Court "rubber-stamping a proposed class to include anyone who has had a summons dismissed." For this reason, the boundaries of the class have been narrowed to include only those putative plaintiffs whose summonses were dismissed during the second-step, facial sufficiency review process, where the applicable statutes suggest the reason for dismissal to be a lack of probable cause. Additionally, affording Defendants the ability to challenge any putative plaintiff's membership in the class will ensure that the class is not overly-inclusive.

Defendants contend that, without some evidence linking the rates of dismissal with a judicial determination concerning the probable cause for the underlying issuance of the summonses, the Court would be required to engage in tens of thousands of individualized inquiries on the merits of each putative plaintiff's case in order to determine who is in the class. However, an argument similar to that raised by Defendants in the present action was addressed by the Second Circuit in Brown v. Kelley, 609 F.3d 467 (2d Cir. 2010) and by this Court in Casale v. Kelley, 257 F.R.D. 396 (S.D.N.Y. 2009).  Although both Brown and Casale addressed the ascertainability of a class in the context of a Rule 23(b)(3) inquiry, the legal conclusions in these cases are equally applicable to class ascertainability in a Rule 23(a) context.  See Brown, 609 F.3d at 483 n.17.

In Brown, an arrestee brought a putative class action against various city defendants, including Police Commissioner Kelly, alleging that these defendants engaged in the unlawful enforcement of a statute, which had been declared unconstitutional on First Amendment grounds, prohibiting loitering with the purpose of begging.  After the district court certified the class, the defendants appealed.  Although the

47

Circuit rejected the district court's decision to certify a
statewide plaintiff class, the district court's decision to
certify a citywide plaintiff class was affirmed.  In reaching
its conclusion, the Second Circuit addressed the defendant's
argument that "certification is inappropriate because the claims
at issue in this case require individualized inquiries to
establish liability."  Brown, 609 F.3d at 483.  In rejecting
this argument, the Circuit held, first, that several common
questions of law and fact were shared by the plaintiffs,
including whether New York City had a policy of enforcing the
loitering statute, whether the City failed to train its officers
regarding the statute's unconstitutionality and whether
Commissioner Kelly had knowledge of the unlawful acts of his
subordinates, among other common issues.  See id. at 483-84.
Second, the Circuit noted that the claims of the plaintiffs in
the citywide class all arose from the same core allegation,
namely that the defendants had continued to enforce the
loitering statute notwithstanding the Second Circuit's ruling
that doing so violated the First Amendment.  See id. at 484.
Although the Circuit recognized that some of the claims in the
complaint, particularly those for false arrest, may require
individualized factual inquiries into the issue of whether
probable cause existed, "the fact that some defendants may have

48

a probable cause defense in some cases does not render
certification inappropriate in light of the common central
issues in this action." Brown, 609 F.3d at 484.


Similarly, in Casale, the district court addressed an
argument raised by the defendants that certifying a class would
require a "parade of mini-trials."  The Court rejected this
contention, noting that "[t]he Second Circuit recently held in a
similar Fourth Amendment class action that, '[i]n light of the
pervasive character of the common liability issues and the
admitted de minimis nature of individualized liability issues,'
a district court had abused its discretion by finding that
individual issues predominated.  This Court will not repeat that
mistake."  Casale, 257 F.R.D. at 414 (citing In re Nassau County
Strip Search Cases, 461 F.3d 219, 225 (2d Cir. 2006)).  The
district court in Casale also rejected another argument that
Defendants, citing Devenpeck v. Alford, 543 U.S. 146, 125 S.Ct.
588, 160 L.Ed.2d 537 (2004), raise, namely that mini-trials
would be required because probable cause may have existed for
another crime at the time the summons was issued.  See Casale,
257 F.R.D. at 411 ("[T]his does not demand the denial of class
certification.  It is implausible that in more than a de minimis
number of cases did police officers have probable cause to

49

arrest a plaintiff for another crime but chose solely to charge violations of an unconstitutional provision.  Nor have defendants presented evidence to that effect.").

Defendants object to the applicability of Casale on the basis that membership in the class in that case was easily ascertainable because the claim was limited solely to the criteria of whether an individual was arrested or summonsed in connection with the specific unconstitutional statutes at issue, while in this case, membership in the class is not so easily determined as Plaintiffs do not claim that the members of the putative class were all summonsed for violating a specific unconstitutional statute nor that putative plaintiffs were all issued summonses at a specific event.  The Court's modification of the proposed class definition to include only those putative plaintiffs who were issued summonses without probable cause serves to address Defendants' concerns.

As described above, Plaintiffs in this action present a common theory of liability, namely that they were victims of a pattern and practice set and enforced by city officials, the NYPD and New York City Police Officers to issue summonses to individuals without probable cause in response to a requirement

50

and constant pressure to meet a summons quota.  As in <u>Brown</u>, common questions are applicable to Plaintiffs' claims, and each individual plaintiff's allegations are linked by a single theory.  Accordingly, Defendants' contention that mini-trials are required to ascertain which individuals belong in the class is insufficient to defeat class certification.  To the extent any individualized issues arise affecting the manageability of the class, it is within the Court's capability to address them. See <u>Brown</u>, 609 F.3d at 486 ("The district court, of course, possesses tools with which to manage the individualized inquiries that this action may require, including creating subclasses, decertifying the class with respect to claims where individualized inquiries become too burdensome, and holding separate trials for plaintiffs subject to individual defenses that remain after the common questions of law and fact are resolved.  We leave the management of these issues to the sound discretion of the court.").

**The Plaintiffs Have Satisfied The Rule 23(b) Requirements For Class Certification**

In addition to meeting the requirements of Rule 23(a), a proposed class must also constitute one of the types of classes enumerated in Rule 23(b).  Plaintiffs have moved for

class certification under both Rule 23(b)(2) and Rule 23(b)(3),
and, for the reasons discussed below, Plaintiffs have carried
their burden of establishing by a preponderance of the evidence
that class certification is appropriate under each of these
Rules.

### 1. The Class Is Certified Pursuant To Rule 23(b)(2) For Purposes Of Adjudicating Declaratory and Injunctive Relief

To certify a class seeking prospective declaratory or
injunctive relief, Plaintiffs must show that Defendants "acted
or refused to act on grounds generally applicable to the class,
thereby making appropriate final injunctive relief or
corresponding declaratory relief with respect to the class as a
whole."  Fed. R. Civ. P. 23(b)(2).  "Rule 23(b)(2) is designed
to assist and is most commonly relied upon by litigants seeking
institutional reform in the form of injunctive relief."  Marisol
A. v. Giuliani, 929 F. Supp. 662, 692 (S.D.N.Y. 1996), aff'd,
126 F.3d 372 (2d Cir. 1997).  Class certification under Rule
23(b)(2) is particularly appropriate in civil rights litigation.
See Loper v. New York City Police Dep't, 135 F.R.D. 81, 83
(S.D.N.Y. 1991) ("Without class certification, their case - as
its requested relief with respect to all similarly situated

persons – could fail on technicality.  Indeed, it is in part for
concerns such as these that civil rights actions are
paradigmatic 23(b)(2) class suits.").  In this case, Plaintiffs
seek declaratory and injunctive relief in the form of a
declaration that Defendants' policies, practices and customs
violate the law and Constitution as alleged, a class-wide
injunction enjoining Defendants from enforcing a quota system
for the issuance of summonses, an order directing that immediate
remedial training on the proper legal grounds for the issuance
of summonses be provided all current members of the NYPD and an
order directing Defendants to put in place a system for
monitoring the summonses issued and the legal basis for their
issuance such that baseless summons can be dismissed.

Class certification under Rule 23(b)(2) is appropriate
in this case, as the class includes those individuals who have
been issued summonses without probable cause pursuant to an
alleged unconstitutional practice whereby NYPD officers are
instructed to issue summonses regardless of whether any
violation has occurred in order to meet a minimum quota
requirement.  The Amended Class Action Complaint includes
instances where Plaintiffs have been repeatedly issued
summonses, suggesting declaratory and injunctive relief in the

form requested by Plaintiffs to be appropriate.  Plaintiffs have
thus established that Defendants "acted . . . on grounds
generally applicable to the class, thereby making appropriate
final injunctive relief or corresponding declaratory relief with
respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2).

As was the case in evaluating the commonality
requirement under Rule 23(a), addressing whether this class can
be certified under Rule 23(b)(2) requires particular attention
to be paid to the Supreme Court's <u>Dukes</u> decision.  In <u>Dukes</u>, the
Supreme Court's second holding concerned the effect of claims
for monetary relief on the district court's decision to certify
an injunction class pursuant to Rule 23(b)(2).  In a unanimous
holding, the Supreme Court noted:

> Rule 23(b)(2) allows class treatment when "the party
> opposing the class has acted or refused to act on grounds
> that apply generally to the class, so that final injunctive
> relief or corresponding declaratory relief is appropriate
> respecting the class as a whole."  One possible reading of
> this provision is that it applies only to requests for such
> injunctive or declaratory relief and does not authorize the
> class certification of monetary claims at all.  We need not
> reach that broader question in this case, because we think
> that, at a minimum, claims for individualized relief (like
> the backpay at issue here) do not satisfy the Rule.  The
> key to the (b)(2) class is "the indivisible nature of the
> injunctive or declaratory remedy warranted—the notion that
> the conduct is such that it can be enjoined or declared
> unlawful only as to all of the class members or as to none
> of them." (citation omitted).  In other words, Rule

54

> 23(b)(2) applies only when a single injunction or
> declaratory judgment would provide relief to each member of
> the class.  It does not authorize class certification when
> each individual class member would be entitled to a
> different injunction or declaratory judgment against the
> defendant.  Similarly, it does not authorize class
> certification when each class member would be entitled to
> an individualized award of monetary damages.

Dukes, 131 S.Ct. at 2557.  The Supreme Court concluded that "the

combination of individualized and classwide relief in a (b)(2)

class" is inconsistent with the history and structure of the

rule, and claims for monetary relief may not be certified under

Rule 23(b)(2) where "the monetary relief is not incidental to

the injunctive or declaratory relief."  Id. at 2557.

"[I]ncidental damage should not require additional hearings to

resolve the disparate merits of each individual's case; it

should neither introduce new substantial legal or factual

issues, nor entail complex individualized determinations."  Id.

at 2560 (citing Allison v. Citgo Petroleum Corp., 151 F.3d 402,

415 (5th Cir. 1998)).  In reaching this holding, the Court

rejected precedent relied upon by the Court of Appeals for the

Ninth Circuit that permitted combination (b)(2) classes so long

as the individualized monetary relief does not "predominate"

over injunctive relief.  See id. at 2557; see also Dukes v. Wal-

Mart Stores, Inc., 603 F.3d 571, 616 (9th Cir. 2010).

Both the Second Circuit and this Court have followed the "predominates" approach the Supreme Court rejected in Dukes. See Robinson, 267 F.3d at 164; MacNamara v. City of New York, 275 F.R.D. 125, 139 (S.D.N.Y. 2011). Plaintiffs, in seeking certification pursuant to Rule 23(b)(2), cite the Robinson holding and the "predominates" approach as precedent supporting their position. Relying on such precedent in the aftermath of the Supreme Court's opinion would be inappropriate. On its face, the holding in Dukes would appear to defeat Plaintiffs efforts to certify a class under Rule 23(b)(2), as declaratory and injunctive relief as well as money damages are both being sought. However, it must be recognized that the class before the Supreme Court in the Dukes case was certified only under Rule 23(b)(2). Recent precedent from this Court establishes that when a district court engages in the analysis required under Rule 23(b)(2) and Rule 23(b)(3), a class can be certified seeking both declaratory and injunctive relief as well as money damages.

In Jermyn v. Best Buy Stores, L.P., 276 F.R.D. 167 (S.D.N.Y. 2011), the Honorable Colleen McMahon addressed defendant Best Buy's motion for class decertification, which the defendant filed following the Dukes decision. The plaintiffs in

56

Jermyn were New York customers of defendant Best Buy who were

refused a "price match" at the defendant's store.  Best Buy

advertised that it would meet any competitors price on products

it sells, subject to various conditions.  In a ruling prior to

the Dukes opinion, this Court certified as a class New York

customers of Best Buy who were denied valid price matches, under

both Rule 23(b)(2) and Rule 23(b)(3).  In certifying the class,

Judge McMahon identified as a common question whether, as

alleged by plaintiffs, Best Buy maintained and communicated to

local branches a corporate policy of denying valid price

matches.  If Best Buy did engage in this conduct, then Best Buy

would be liable under New York's General Business Law for

misleading consumers.


        In addressing Best Buy's contention that the Dukes

decision mandated that the class be decertified, Judge McMahon

noted:


        Dukes, like Robinson, was concerned with Rule 23(b)(2)
        classes that sought both injunctive and monetary relief.
        In this case, by contrast, I have certified a class both
        under Rule 23(b)(2) and under Rule 23(b)(3), after finding
        that the additional requirements of (b)(3)—"predominance"
        of common questions over individualized questions and
        "superiority" of class resolution—are satisfied here.  In
        this case, unlike Dukes, a (b)(2) class is not seeking
        monetary relief, but only an injunction against further
        statutory violations.  It is a separately certified (b)(3)

> class that seeks money damages.  Because violation of the
> [New York General Business Law] entitles both classes to
> relief, only one liability trial will need to be held to
> determine the existence <u>vel</u> <u>non</u> of the Anti-Matching
> Policy.

<u>Jermyn</u>, 276 F.R.D. at 173-74 (citations omitted).  Judge

McMahon's reasoning in <u>Jermyn</u> applies equally to the present

action.  Just as New York's General Business Law afforded the

<u>Jermyn</u> plaintiffs both injunctive relief and money damages, so

too does 42 U.S.C. § 1983, the statute under which Plaintiffs

seek relief in this action.  So long as the Court here engages

in the analysis necessary under Rule 23(b)(2) and Rule 23(b)(3),

just as Judge McMahon did in <u>Jermyn</u>, the <u>Dukes</u> decision does not

preclude certification of a class under Rule 23(b)(2) for

purposes of injunctive relief and under Rule 23(b)(3) for

purposes of money damages.


          Defendants, in addition to opposing certification

pursuant to Rule 23(b)(2) on the basis of <u>Dukes</u>, contend that

Rule 23(b)(2) certification should be denied because Plaintiffs'

individualized compensatory damages, rather than injunctive

relief, is the predominant form of relief sought.  However,

Defendants' alleged unconstitutional practice of issuing

summonses without probable cause represents a threat to personal

58

liberty, and the Amended Class Action Complaint includes
allegations that some Plaintiffs have been subject to repeated
harassment.  Although the size of the class is large, the
Amended Class Action Complaint reveals Plaintiffs to have each
suffered a small amount of quantifiable damage, thereby
suggesting that receipt of monetary damages is not the
motivation behind this suit, but rather "incidental to requested
injunctive or declaratory relief."  Dukes, 131 S.Ct. at 2560;
see also Jermyn v. Best Buy Stores, L.P., 256 F.R.D. 418, 434
(S.D.N.Y. 2009) ("Such damages are insufficient to incent a
plaintiff to bring suit; they are exceeded by the filing fee.
However, a reasonable plaintiff aggrieved by Best Buy's policy
would want to prevent Best Buy from committing wrongful acts in
the future.  Accordingly, the class meets the requirements of
Rule 23(b)(2).").  Although the class does seek money damages,
Defendants' contention that money damages are the predominant
form of relief sought is unsupported.

        Defendants also attack Plaintiffs' standing to seek
injunctive relief.  "To qualify for standing, a claimant must
present an injury that is concrete, particularized, and actual
or imminent; fairly traceable to the defendant's challenged
behavior; and likely to be redressed by a favorable ruling."

Davis v. Fed. Election Comm'n, 554 U.S. 724, 733, 128 S.Ct.
2759, 171 L.Ed.2d 737 (2008).  Moreover,

> [p]laintiffs seeking injunctive relief must establish a
> fourth element to have standing, namely a "real and
> immediate threat of repeated injury" demonstrated by more
> than "past exposure to illegal conduct."  City of Los
> Angeles v. Lyons, 461 U.S. 95, 102, 103 S.Ct. 1660, 75
> L.Ed.2d 675 (1983) (quoting O'Shea v. Littleton, 414 U.S.
> 488, 495-96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)).  In
> other words, plaintiffs asserting an injunction claim must
> allege the probability of a future encounter with the
> defendant which is likely to lead to a similar violation of
> some protected right.  See Lyons, 461 U.S. at 105-06.

Roe v. City of New York, 151 F. Supp. 2d 495, 501-02 (S.D.N.Y.
2001).  In other words, it must be "likely, as opposed to merely
speculative, that the injury will be redressed by a favorable
decision."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560,
112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted).  In
support of their standing argument, Defendants cite to this
Court's holding in MacNamara v. City of New York, in which
individuals arrested during the Republican National Convention
sought injunctive relief relating to alleged NYPD practices of
detaining protestors, but the Court held that the plaintiffs'
alleged future harm, namely that they faced potential arrest
since several class representatives "plan to attend demonstrates
in New York in the future," was "too speculative and conjectural

60

to supply a predicate for prospective injunctive relief." 275
F.R.D. at 140-141.  However, the fact that several Plaintiffs in
this case have received multiple summonses alleged to have been
issued without probable cause suggests the potential for future
harm to rise above the speculative level.

          Finally, according to Defendants, certification
pursuant to Rule 23(b)(2) is also inappropriate because
Plaintiffs have not established Defendants to have "acted . . .
on grounds generally applicable to the class," as Plaintiffs'
allegation of a citywide practice of issuing summonses without
probable cause cannot be reasonably inferred from tape
recordings taken at two police precincts.  Defendants also
contend that Plaintiffs have failed to identify an official
policy or its equivalent.  However, notwithstanding Defendants'
contentions, the OCA data reveals that a large number of
summonses are dismissed upon a judicial finding of facial
insufficiency and that these dismissals occur throughout the
City of New York.

          Because Plaintiffs have alleged the existence of a
citywide policy that poses a legitimate, non-speculative threat
to the putative plaintiffs' constitutionally protected

                              61

liberties, a class seeking declaratory and injunctive relief is certified pursuant to Rule 23(b)(2).

## 2. The Class Is Certified Pursuant To Rule 23(b)(3) For Purposes Of Adjudicating Claims For Money Damages

In addition to certifying a Rule 23(b)(2) class for purposes of adjudicating declaratory and injunctive relief, Plaintiffs have established the need to certify the class pursuant to Rule 23(b)(3) for purposes of adjudicating claims for money damages.  Rule 23(b)(3) provides that a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### i.  Predominance

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized

62

proof." Moore v. PainWebber, Inc., 306 F.3d 1247, 1252 (2d Cir.
2002). To determine whether Plaintiffs have met this burden,
the Court turns to the elements of the underlying causes of
action. Erica P. John Fund, Inc. v. Halliburton Co., 131 S.Ct.
2179, 2184-87, 180 L.Ed.2d 24 (2011) ("Considering whether
'questions of law or fact common to class members predominate'
begins, of course, with the elements of the underlying cause of
action."). Although predominance is a more stringent inquiry,
"satisfaction of the typicality requirement of Rule 23(a) . . .
goes a long way toward satisfying the Rule 23(b)(3) requirement
of commonality." Rossini v. Ogilvy & Mather, Inc., 798 F.2d
590, 598 (2d Cir. 1986).

        In the present case, common questions of fact and law
apply to the claims of each potential plaintiff, including
whether Defendants engaged in a pattern and practice of issuing
summonses in the absence of probable cause, whether that
practice has been motivated by a quota, whether that practice
has been perpetuated by inadequate training and whether
potential plaintiffs' constitutional rights have been infringed
upon as a result of the NYPD's alleged summonsing practices.
See Brown, 609 F.3d at 483-84 (upholding certification of Rule
23(b)(3) citywide class because several common questions of law

and fact were shared by all plaintiffs including whether City had a policy of enforcing an unconstitutional statute, whether the City failed to adequately train officers and whether Commissioner Kelly had knowledge of the unlawful acts of his subordinates, among others).

Defendants, in arguing that common issues of law and fact do not predominate, attack Plaintiffs' interpretation of the OCA data and raise the possibility that individual mini-trials will be required to ascertain whether probable cause was lacking in each instance a summons was issued.  However, as described above in the discussion of ascertainability, these contentions do not preclude certification of the proposed class. Plaintiffs in this action present a common theory of liability involving an NYPD policy of issuing summonses to individuals without probable cause in response to a quota requirement. Because the potential plaintiffs' claims brought under this theory involve sufficient common issues of law and fact subject to generalized proof, the predominance requirement of Rule 23(b)(3) is fulfilled.

### ii.  Superiority

64

The second prong of Rule 23(b)(3) requires that
Plaintiffs demonstrate that a class action is "superior to other
available methods for fairly and efficiently adjudicating the
controversy." Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) provides
a list of factors that courts should consider when analyzing
superiority.  These include: (1) "the class members' interests
in individually controlling the prosecution or defense of
separate actions;" (2) "the extent and nature of any litigation
concerning the controversy already begun by or against class
members;" (3) "the desirability or undesirability of
concentrating the litigation of the claims in the particular
forum;" and (4) "the likely difficulties in managing a class
action."  Id.  "Class actions are the superior method for
resolving controversies when the main objectives of Rule 23 are
served, namely the efficient resolution of the claims or
liabilities of many individuals in a single action, as well as
the elimination of repetitious litigation and possibly
inconsistent adjudications."  Rodolico v. Unisys Corp., 199
F.R.D. 468, 479 (E.D.N.Y. 2001) (citing Califano v. Yamasaki,
442 U.S. 682, 700-01, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)).

     Given the large number of potential class members, a
class action represents a superior method for adjudicating this

dispute. Consolidating a class involving so many potential plaintiffs would promote judicial economy, and individual lawsuits could lead to inconsistent results. Furthermore, without class certification, it is likely that the constitutional violations Plaintiffs allege would go unadjudicated, as many of the potential class members do not possess the knowledge or resources to prosecute a lawsuit, and the relatively small amount of damages suffered by each individual plaintiff decreases the possibility of individual lawsuits being filed. See Rios v. Marshall, 100 F.R.D. 395, 409 (S.D.N.Y. 1983) ("[T]he relatively small amount likely in any individual recovery, the availability of treble damages notwithstanding, renders certification of a plaintiff class in this action particularly appropriate."). Plaintiffs' claims allege a single unconstitutional practice, making class certification especially appropriate. See Brown, 609 F.3d at 484 ("[W]here plaintiffs were allegedly aggrieved by a single policy of the defendants, and there is strong commonality of the violation of the harm, this is precisely the type of situation for which the class action device is suited.") (citations omitted). As such, a class action represents a superior means of adjudicating Plaintiffs' claims.

66

By establishing, by a preponderance of the evidence, the predominance of common legal and factual issues as well as the superiority of a class action approach, Plaintiffs have demonstrated certification of a class under Rule 23(b)(3) to be appropriate.

**Conclusion**

For the reasons set forth above, Plaintiffs' motion for class certification is granted.  The class certified is defined to include individuals who were issued summonses that were later dismissed upon a judicial finding of facial insufficiency and who were ticketed without probable cause. Individuals who were issued summonses that survived the defect review process but were dismissed upon a judicial finding of facial insufficiency are presumptive members of the class, but Defendants can challenge any presumptive class members on grounds that the summons at issue was dismissed for reasons other than a lack of probable cause.  The applicable class period is May 25, 2007 to the present, pursuant to the three year statute of limitations governing actions brought pursuant to 42 U.S.C. § 1983.  The class is certified under both Rules 23(b)(2) and 23(b)(3), with the Rule 23(b)(2) class seeking

67

declaratory and injunctive relief and the Rule 23(b)(3) class
seeking money damages.  Plaintiffs Sharif Stinson, Ryburn
Walkes, Gary Shaw, Michael Bennett, Chanel Meausa, David
Thompson, Julius Dixon, Jeremy Thames, Leander Griffin, Ricardo
Jones, Victor Breland and Lindsey Riddick will serve as class
representatives, and Jon Norinsberg, Esq. and Cohen & Fitch LLP
will serve as class counsel.

        It is so ordered.

New York, NY
April 23, 2012

                                    ROBERT W. SWEET
                                        U.S.D.J.

68