**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 | FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7325**

WRITER'S INTERNET ADDRESS
**elinorsutton@quinnemanuel.com**

May 21, 2015

<u>VIA E-FILE AND FAX</u>

Honorable Robert W. Sweet
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re:**  *Stinson v. City of New York*, **10-cv-4228 (RWS)**

Dear Judge Sweet:

I write in further support of Plaintiffs' motion to compel the City's production of certain electronically stored information ("ESI") (Dkt. 214) ("Motion" or "Mot."), and in response to the City's letter dated May 19, 2015 (Dkt. 218) ("Opposition" or "Opp."), opposing the Motion.

The City devotes a significant portion of its Opposition to mischaracterizing Plaintiffs' position with inaccurate hyperbole, such as the false claim that Plaintiffs have requested that the City conduct "a review of <u>all</u> NYPD e-mail accounts." Opp. 2. Indeed, according to the City, Plaintiffs are seeking discovery about "virtually every facet of the day-to-day workings of the NYPD—for <u>all</u> NYPD employees" and are demanding "every shred of paper, every e-mail or electronic document, and every backup tape." *Id.* These statements deliberately misrepresent Plaintiffs' requests and are emblematic of the City's approach to its entire Opposition—use overblown rhetoric to try to hide its failure to comply with even the most basic, established protocol for producing ESI.

Plaintiffs are simply requesting that the City search custodial sources that are likely to have relevant ESI. The City does not actually dispute the relevance of most of the custodian categories identified by Plaintiffs. Instead, the City's main objection appears to be that it is somehow Plaintiffs' burden to identify the "*specific* custodians" that it must search. Opp. 2. Notwithstanding that this is false, and that it is most certainly the City's obligation to identify and search custodians likely to hold relevant evidence (*see infra* Section I), Plaintiffs are willing to assist the City in its discovery obligations by providing the Court with a specific list of

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

custodians the City should search for relevant ESI.[1]  Plaintiffs will provide this list by Tuesday, May 26, 2015.  Plaintiffs address the remainder of the City's arguments below.

**I.      The City Failed to Meet Its Discovery Obligations and Must Produce Relevant ESI**

Parties must identify "employees likely to have relevant information," *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("*Zubulake IV*"), communicate with those employees to determine where relevant ESI is stored, *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (2004) ("*Zubulake V*"), and instruct them "to produce electronic copies of their relevant active files," *id.* at 434.  Indeed, courts have sanctioned a party for failing to identify a custodian likely to have relevant ESI and for not searching an "obvious[] repository"—that custodian's laptop.  *Nycomed U.S. Inc. v. Glenmark Generics Ltd.*, 2010 WL 3173785, at *8 (E.D.N.Y. August 11, 2010).  In this very case, the Court has ruled that requests for ESI trigger an "obligation to conduct a diligent search" in "good faith," and "mandate[] that [the responding party and its attorneys] work together to ensure that both understand how and where electronic documents, records and emails are maintained and to determine how best to locate, review and produce responsive documents."  *Stinson v. City of New York*, 2014 WL 4741803, at *2 (S.D.N.Y. Sept. 23, 2014) (quoting *Nycomed*, 2010 WL 3173785, at *3).

The City, however, improperly asserts that the burden for generating a list of custodians lies with *both* parties.[2]  Opp. 2.  The City largely relies on the *Zubalake* cases, which is puzzling because the *Zubalake* court held that counsel for the defendant "must identify sources of discoverable information," and imposed sanctions on the defendant for failing to preserve and produce relevant information.  *Zubalake V*, 229 F.R.D. at 439.[3]  The *Zubalake* court never holds that the requesting party must identify relevant ESI custodians for the responding party.

Further turning *Zubulake* on its head, the City repeatedly argues that it has no duty to search likely custodians because Plaintiffs provide no evidence that those individuals sent or received relevant emails, or generated any other relevant electronic document.  Opp. 4-5.

---

[1] Plaintiffs would have readily provided such a list months ago if the City had chosen to actually respond to Plaintiffs' correspondence concerning this issue and requested that Plaintiffs assist them in identifying custodians.  For example, Plaintiffs sent a letter dated February 19, 2015 to the City on these issues and never received a response.  *See* Ex. D to Mot. (2/19/15 E. Sutton Ltr.).

[2] The City's cited cases in support of a shared burden do not exempt it from the duty to identify custodians and search ESI repositories.  For example, in *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99 (S.D.N.Y. 2013), the defendant had created an original list of 42 custodians that it selected, in part, on its "own assessment of who was most closely involved in the securities at issue."  *Id.* at 105-08.  The City's remaining cases show similar conduct or are otherwise inapposite.  *See, e.g.*, *Assured Guar. Mun. Corp. v. UBS Real Estate Sec., Inc.*, 2013 U.S. Dist. LEXIS 41785, at *6-7, *11 n.1 (S.D.N.Y. Mar. 25, 2013) (each party identified a number of its *own* custodians whose documents it would be willing to search and produce); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2013 WL 4838796, at *1 (S.D.N.Y. Sept. 11, 2013) (certain custodians plaintiffs proposed were not appropriate because they were duplicative or unlikely to hold relevant information).

[3] *Zubulake* also makes clear that once a party is in reasonable anticipation of litigation, a duty to preserve relevant ESI attaches.  *Zubulake IV*, 220 F.R.D. at 216.  The City's Opposition makes no effort to address the inconsistent positions it has taken with regard to the NYPD's retention of documents, including emails, and its apparent spoliation of evidence.  Mot. 2 n.1.

Contrary to its intended purpose, e-discovery would resemble a Sisyphean endeavor if a requesting party had to produce evidence of ESI before the responding party was required to search for it. The City's presumption is not only improper—it is sanctionable.

Remarkably, the City also argues that because Plaintiffs' "only claim is one for municipal liability," officials with decision-making authority "<u>are</u> the appropriate custodians to be searched for <u>all</u> purposes." Opp. 3-4. As this Court noted in its Class Certification Order, "Plaintiffs allege that the NYPD is engaged in a widespread pattern and practice of issuing summonses to individuals without probable cause and that NYPD officers are explicitly instructed to issue summonses regardless of whether any crime or violation has occurred in order to meet a minimum quota requirement set forth by the NYPD." Dkt. 34 at 1. Thus, it is inexplicable that the City takes the position that Plaintiffs are not entitled to any ESI evidencing the instructions provided directly to officers regarding enforcement activity. The City's argument that discovery should be limited to top-level decision-makers fails for another reason: municipal liability can be proved in a number of ways, using a variety of evidence. Indeed, Plaintiffs may also establish liability by demonstrating that the use of quotas is a widespread practice that constitutes a "custom or usage" in the NYPD. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978) ("Local governing bodies . . . can be sued directly under § 1983 . . . . for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels.").[4]

## II. At Minimum, The City Should Be Required to Produce Relevant ESI for the Custodian Categories Identified by Plaintiffs

Plaintiffs respectfully request that the Court compel the City to search and produce the ESI of the individuals known to the parties to possess relevant, responsive information, including the obvious categories identified by Plaintiffs below.[5]

### A. <u>NYPD Supervisors Named in Grievances</u>

The City does not deny the obvious relevance of producing the ESI of supervisors named in quota-related grievances submitted to the NYPD.[6] Rather, the City fabricates a different

---

[4] While the City argues that Plaintiffs' request for ESI custodial searches is untimely, the City does not contest that Plaintiffs first learned *in January 2015* that the City was not conducting adequate custodial searches, and that Plaintiffs notified the City of this deficiency *that very same* day and immediately began attempting to meet and confer. Exs. A, C, & D to Mot. The City also omits that despite agreeing in February 2014 to begin producing ESI, the City did not produce a single email until September 2, 2014, and *still* has not completed its production for the limited custodians it has agreed to search, such that it was impossible for Plaintiffs to uncover the faults in the City's production by reviewing the actual production itself. Ex. F to Mot.; Ex. L (correspondence between counsel). Indeed, until January 2015, Plaintiffs understood that the City would be producing emails from all relevant ESI custodians, and that it was simply a matter of the City completing its production before Plaintiffs would receive those emails.

[5] The individuals whose ESI should be searched includes custodians that were charged with the responsibility of investigating the conduct related to the categories below—for example, the NYPD personnel charged with investigating quota-related grievances or audio recordings.

[6] For this reason alone, the Court should deem this issue to be uncontested and order the City to produce the requested ESI. *See Gortat v. Capala Bros., Inc.*, 2010 WL 1423018, at *11 (E.D.N.Y.

standard, arguing that it is somehow Plaintiffs' burden to demonstrate that ESI was actually "created in connection with the grievance, or the substance of the allegations in the grievance, or even that the subject supervisors or persons involved in the underlying matters had or used e-mail in connection therewith." Opp. 4.

As an initial matter, and as discussed in detail in Section I, this is not the legal standard. However, even assuming the City was articulating the correct standard, Plaintiffs did exactly what the City falsely claims is required. In its initial motion papers, Plaintiffs attached an email in which Captain Andrew Benjamin wrote that certain officers would be given interim evaluations "[b]ased on lack of activity." Mot. 2-3; Ex. B to Mot. The email provided direct evidence that the allegations contained in a formal grievance letter that Captain Benjamin had "given police officers poor performance evaluations … for failing to meet illegal quotas" was true. *Id.*; Ex. E to Mot. Plaintiffs were only able to discover this email because a third party provided a copy, not the City. Moreover, Plaintiffs have recently obtained another email—from a third party to this case, not the City—in which Captain Benjamin states: ███████ ███████████████████████████████████████████████████████████ ███████████████████████████████ Ex. M. It is not fathomable that the City continues to argue that it does not have an obligation to search the electronic files of the officers who have been formally accused of enforcing quotas.

### B. NYPD Personnel In Quota-Related Audio Recordings

The City does not—and cannot— contest the relevance of NYPD personnel heard enforcing quotas on audio recordings, and Plaintiffs ask the Court to grant Plaintiffs' request on this basis. Instead, the City falsely suggests that Plaintiffs demand a search of "the accounts of all NYPD personnel involved in Floyd." As is clear from Plaintiffs' Motion, this is false.

The City also claims that Plaintiffs only provided an audio recording containing "one reference to criminal court summonses…." Opp. 4-5. Yet, the transcribed excerpt provided by Plaintiffs is far from a mere "reference to [a] criminal court summons[]." As Judge Scheindlin stated in her *Floyd* liability opinion, this audio excerpt is a clear example of a supervisory officer at roll call "direct[ing] each officer to get five summonses," and shows that Lieutenant Barrett's "primary concern is to 'get those numbers.'" *Floyd v. City of New York*, 959 F. Supp. 2d 540, 600 (S.D.N.Y. 2013). In fact, Judge Scheindlin placed "great weight to the contents" of these audio recordings as a whole, concluding that they provide "abundant evidence during this period of supervisors directing officers to meet numerical enforcement goals, as well as threatening the officers with negative consequences if they did not achieve these goals." *Id.* at 596. If a federal judge rules in an opinion against the City that these audio recordings are evidence of a quota, it is hard to understand how the City chose not to search these custodians.

As for the City's statement that there is only "one reference," the City knows full well that this collection of audio recordings contains many examples of supervisors enforcing quotas. *See* Ex. N (collection of *Floyd* audio transcripts). For example, the transcripts demonstrate that

---

Apr. 9, 2010) (considering an argument not addressed in an opposition brief waived); *see also First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 392-93 & n.116 (S.D.N.Y. 2002).

Lieutenant Doute imposed numerical enforcement requirements on officers during roll call: "LT. DOUTE: . . . five-five-five any questions? . . . SERRANO: You said 5 "C's", 5 250's and what else? . . . LT. DOUTE: . . . Five-five-five. Don't be going up here trying to cut my [****] down cause. Five-five-five, okay? Any five. You know what I mean?" *Id.* at A13424-A13425.

In a separate transcript, Lieutenant Delafuente is recorded telling officers that activity levels dictate officer performance evaluations, and poor activity could result in reassignment: "[Y]our assignment for the day is basically quality of life summonses, all right, 250's, should go along with those also. Last month's activity reports were good, but some—I still have to chase some of you around for UF250's and C's. So we're going to have a little restructuring in January. We're going to have sector teams broken up. . . . Again, it's nothing personal. It's just that, you know, your evaluations are based on your activity." *Id.* at A13370.

In another instance, Sergeant Mervin Bennett is recorded stating: "Okay, because next week it could be 25 and 1. It could be 35 and 1. It could be that and ten other different things. And guess what, until you decide you're gonna quit this job and go become a pizza hut delivery man, this is what you're going to be doing until then…." *Id.* at A13329.

### C.  Officers Who Issued Summonses to Lead Class Representatives

The City argues that Plaintiffs cannot demonstrate that the individuals on the City's initial disclosure—the officers that issued the relevant summonses to the Lead Class Representatives (the "Summonsing Officers")—and their supervisors, are likely to have relevant ESI. This is not true. *First,* the Summonsing Officers issued the same summonses that (i) are discussed in detail in the Amended Complaint, and (ii) have been the subject of multiple depositions, including depositions that the City has taken of the Lead Class Representatives.

*Second*, as the City is well aware, many of the Summonsing Officers have testified that quotas are utilized by the NYPD. For example:

> Officer William Green testified that he was required to issue a minimum number of "around 17" summonses a month, and that a "supervisor" gave him that instruction. Ex. O (Green Dep. Tr. 296:7-297:16).
>
> Officer Marcello Massafra testified that his supervisor in the 48th Precinct—Sergeant Barbarelli—told him to issue more quality of life summonses, and that if an officer does not follow a sergeant's orders, he could face disciplinary action. *Id.* (Massafra Dep. Tr. 54:21-55:9; 60:9-16.
>
> Officer Kevin O'Connell testified, "I believe that overall that we are expected to write approximately 20 summonses a month." *Id.* (O'Connell Dep. Tr. 219:25-220:3). When asked whether officers are "given lousy assignments and transfers within the same command . . . [b]ecause of failure to hit their ticket quotas," Officer O'Connell testified, "I believe so." *Id.* (O'Connell Dep. Tr. 221:17-23).

5

>Officer Chris Serrao testified that a fellow officer got transferred to somewhere "he didn't want to go" because he "didn't like to write summonses so he would get in trouble all the time." *Id.* (Serrao Dep. Tr. 48:10-49:21).

This testimony not only demonstrates that Plaintiffs are entitled to the Summonsing Officers' ESI, but that of their supervisors—who were implementing these quotas—as well.[7]

### D.  CompStat Custodians

The City's primary objection to producing ESI from the commanding and supervising officers who attend COMPSTAT meetings is not relevance, but instead, the false claim that Plaintiffs are seeking "ESI for all members of the NYPD who ever attended Compstat" and for "every individual who has ever attended Compstat since the beginning of the class period in May 2007." Opp. 5. In addition, the City strangely argues that "plaintiffs have never identified any custodians who may be in possession of relevant ESI." *Id.* As Plaintiffs pointed out in their affirmative motion, certain individuals for which the City has not already produced ESI are regular attendants at Compstat meetings, including Phil Pulaski. Mot. 5. Further, as discussed above, Plaintiffs plan to submit a list of such custodians. *See supra* at 1.

### E.  Testimony In Other Matters Implicating the Use of Quotas By the NYPD

The City should also produce the ESI of NYPD custodians that have provided testimony in previous matters implicating the use of quotas.

*****

For the foregoing reasons, Plaintiffs' Motion should be granted.

Respectfully submitted,

/s/ Elinor C. Sutton
_____

Elinor C. Sutton
Quinn Emanuel Urquhart & Sullivan, LLP
*Co-Lead Class Counsel for Plaintiffs*

cc:    Qiana Smith-Williams (via E-File)
       The City of New York Law Department
       *Attorneys for Defendants*

---

[7] The City vaguely states in its Opposition that "prior to this year, NYPD officers did not *all* have department e-mail accounts" and that email is not a "*primary* method of communication" between officers and their supervisors. Opp. 5 (emphasis added). *First*, the City has carefully avoided making any representation as to whether the Summonsing Officers had e-mail accounts prior to this year. *Second*, the relevant time period for this matter is ongoing, and emails from this past year are discoverable. *Third*, ESI is not limited to email accounts. *Finally*, there is no requirement that ESI must be the "primary" means of communication for it to be relevant.