**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 | FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7325**

WRITER'S INTERNET ADDRESS
**elinorsutton@quinnemanuel.com**

June 29, 2015

**VIA E-FILE AND FAX**
Honorable Robert W. Sweet
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re:** *Stinson v. City of New York*, 10-cv-4228 (RWS)

Dear Judge Sweet:

      I write on behalf of Plaintiffs in the above-referenced action to respectfully request that Your Honor grant an adverse inference sanction against the City of New York for spoliation of relevant evidence. Plaintiffs have repeatedly attempted to meet-and-confer with Defendants about issues concerning the preservation of evidence and have been unable to resolve this dispute.

      Over a year ago, Defendants agreed to search for and produce responsive electronically stored information ("ESI") from what the City has described as NYPD "decision-makers," including the Police Commissioner "who is the final policymaker for the NYPD" (as well as a defendant in this matter). Defs.' 5/19/2015 Opp. to Mot. to Compel ("Defs.' ESI Opp.") at 3 (Dkt. 218); Ex. A at 3-4 (4/2/2014 S. Olson Ltr.). On June 12, 2015, the Court-ordered deadline passed for the production of outstanding documents. The City's completed production includes only minimal emails—and in some cases, no emails at all—for the vast majority of the agreed-upon decision-makers.[1] An analysis of the City's production as well as documents obtained from third parties provides clear evidence of spoliation.

---

[1] On June 16, 2015, Plaintiffs wrote Defendants to confirm that Defendants had complied with the Court-ordered document production deadline and to confirm Plaintiffs' understanding that the City had completed its production of all outstanding documents that it intends to produce in this matter. Plaintiffs requested that Defendants contact Plaintiffs immediately if this was not the case. Defendants did not contest Plaintiffs' understanding.

quinn emanuel urquhart & sullivan, llp
LOS ANGELES | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

Defendants also agreed to search the email account of Captain Andrew Benjamin after Plaintiffs discovered emails authored by Capt. Benjamin in a third-party production showing, among other things, that he gave police officers poor performance evaluations for failing to meet illegal quotas.  Ex. B (6/4/2010 Benjamin email); *see also* Ex. C (2/15/2011 Benjamin email); Ex. D (8/5/2012 Benjamin email).  However, the City has not produced a single email authored by Capt. Benjamin, meaning that it has lost or destroyed at least the emails identified by Plaintiffs and the corresponding attachments.

In addition, Defendants have admitted that relevant text messages have been destroyed, and that hard-copy documents have been shredded.  Indeed, it appears the City did not even attempt to implement a litigation hold until three years after Plaintiffs filed the Complaint.

Defendants have acted with bad faith, gross negligence, and at a minimum, negligence in destroying this evidence, and an adverse inference sanction is necessary to cure the prejudice that Plaintiffs have suffered.

**I.     The City Has Engaged In Spoliation**

"The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."  *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (*Zubulake IV*); *see also Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998).  "The duty requires that 'anyone who anticipates being a party or is a party to a lawsuit . . . not destroy unique . . . evidence that it knows, or reasonably should know, is relevant in the action.'"  *Taylor v. City of New York*, 293 F.R.D. 601, 609-10 (S.D.N.Y. 2013) (quoting *Zubulake IV*, 220 F.R.D. at 217) (alterations in original).  "Once the duty to preserve attaches, any destruction of documents is, at a minimum, negligent."  *Zubulake IV*, 220 F.R.D. at 220; *see also Slovin v. Target Corp.*, 2013 WL 840865, at *5, *7 (S.D.N.Y. Mar. 7, 2013) (granting adverse inference sanction for grossly negligent destruction of relevant evidence after duty to preserve attached).

Courts routinely hold that "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents."  *Zubulake IV*, 220 F.R.D. at 218.  A party's discovery obligations continue even after it implements a litigation hold.  Specifically, "[c]ounsel must oversee compliance with the litigation hold, monitoring the party's efforts to *retain* and produce the relevant documents."  *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("*Zubulake V*") (emphasis added).  Counsel's duties include "communicating with the 'key players' in the litigation, in order to understand how they stored information."  *Id.* (internal citation omitted); *see also Stinson v. City of New York*, 2014 WL 4741803, at *2 (S.D.N.Y. Sept. 23, 2014) (counsel must "understand how and where electronic documents, records and emails are maintained and . . . determine how best to locate, review and produce responsive documents" (quoting *Nycomed U.S. Inc. v. Glenmark Generics Ltd.*, 2010 WL 3173785, at *3 (E.D.N.Y. Aug. 11, 2010))).

"The litigation hold should be periodically re-issued so that new employees are aware of it, and so that it is fresh in the minds of all employees."  *Zubulake V*, 229 F.R.D. at 433.  Indeed, to merely issue a litigation hold does not satisfy a party's preservation duty.  *See In re NTL, Inc.*

*Sec. Litig.*, 244 F.R.D. 179, 194-95 (S.D.N.Y. 2007) *aff'd sub nom. Gordon Partners v. Blumenthal*, 2007 WL 1518632 (S.D.N.Y. May 17, 2007) (holding that defendant's litigation hold memos to "key players" "*were not sufficient, since they subsequently were ignored*" (emphasis added)).

Courts have defined spoliation as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Zubulake IV*, 220 F.R.D. at 216 (quotation omitted). "The spoliation of evidence germane to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." *Id.* (quotation omitted).

### A.     All Evidence Indicates That Defendants Waited More than Three Years to Implement a Litigation Hold

Defendants had notice of this litigation and of their duty to preserve relevant evidence at the very latest when Plaintiffs filed the Complaint on May 25, 2010.[2] *Zubulake IV*, 220 F.R.D. at 216. Yet, based on testimony by Defendants' 30(b)(6) witness on document preservation, Lieutenant Paul Scott, it appears that Defendants *waited more than three years* to even attempt to issue a litigation hold. According to Lt. Scott, counsel for Defendants requested that Defendants issue a litigation hold on August 8, 2013—only seven days before they were required to produce a 30(b)(6) deponent on document preservation. Ex. J (City 30(b)(6) Dep. 171:5-174:9); Ex. K at 1, 4-5 (30(b)(6) Notice & Sched. A).[3] Defendants allegedly communicated the preservation notice to NYPD Members of Service ("MOS") via a "FINEST" message that was to be read aloud in all commands. Ex. J (City 30(b)(6) Dep. 174:10-24); Ex. N at NYC5940, 5942

---

[2]  In fact, Defendants should have been on notice to preserve relevant evidence years prior to this litigation. For example, the NYPD has been aware of allegations that it enforces illegal quotas as far back as 2004, when a grievance and arbitration was commenced alleging that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Ex. E at 1 (5/13/2004 Grievance Ltr.). The Arbitrator in that matter, Bonnie S. Weinstock, cited evidence of such C summons quotas in her 2006 ruling that the NYPD maintained a quota for traffic summonses. Ex. F (1/15/2006 Op. at 11) (a supervisor "acknowledged that he told the police officers in his command that if they did not write 33 [C] summonses, they risked being rated 'low,' and that there could be ramifications for failing to meet the numbers"); *id.* at 18 ("[T]he Department also had quotas for arrests and for [C summonses] . . . .").

Further, on January 31, 2008, Defendants were on notice that it must preserve documents related to quotas based on allegations in the complaint filed in *Floyd v. City of New York*, No. 08-cv-1034 (SAS). Ex. G (Compl. ¶¶ 44, 83(b)(iii)). Defendants were on even further notice on December 23, 2008, when plaintiffs in *Floyd* requested documents relating to "productivity standards, productivity goals, or quotas relating to the conducting of stops-and-frisks" and on June 24, 2009, when the plaintiffs in *Floyd* requested documents relating to "productivity standards, productivity goals, or quotas," including for "the issuing of summons [sic]." Ex. H (4th RFPs Request No. 22); Ex. I (6th RFPs Request No. 31). Thus, based on *Floyd* alone, the City has been under a clear obligation to preserve documents related to quotas since at least January 2008.

[3]  Defendants have not provided the date of any earlier litigation hold, despite Plaintiffs' repeated requests for a date certain on which Defendants allegedly issued a hold. Ex. L (1/21/2015 E. Sutton email at 5:51 PM); *id.* (2/6/2015 QSW email at 6:20 PM); Ex. M at 2-3 (2/19/2015 E. Sutton Ltr.). Nor did Defendants' 30(b)(6) witness on the topic provide the date of any earlier litigation hold. In fact, the 30(b)(6) witness confirmed with certainty that based on his knowledge, relevant chiefs were notified at the earliest of their preservation duties on August 8, 2013. Ex. J (City 30(b)(6) Dep. 174:3-175:23).

(FINEST messages). Testimony indicates, however, that the NYPD did not follow this procedure.

Indeed, of the nine officers listed on Defendants' initial disclosure that were questioned about document preservation, not one testified to having received the FINEST message or to having received *any* form of preservation request in the year 2010.[4] The same is true of all four grievance officers that were asked about document preservation in their depositions. This is especially alarming given that Defendants' initial disclosure contained only 14 officers. The fact that Defendants neglected to take the most basic steps to ensure that all 14 officers—the only officers that have discoverable information that they plan to rely on—received a litigation hold when this case commenced, or that they received the FINEST Message in 2013, is indefensible.

Accordingly, Defendants egregiously delayed issuing a litigation hold and also failed to oversee compliance with it, as evidenced by officers' testimony that they did not receive the litigation hold as well as Defendants' admission that they have not communicated with "key players" in this litigation to collect relevant, responsive electronic documents. *See* Defs.' ESI Opp. at 3-4 (stating that "decision-makers" who are the "highest ranking members of the NYPD" are "the appropriate custodians to be searched for all purposes," and arguing that Defendants have complied with their e-discovery obligations by searching ESI *only* for those custodians).

To make matters worse, the City failed to institute a litigation hold even though it was well aware that the NYPD has a written policy called Operations Order 44 that authorizes the ongoing destruction of relevant documents. Ex. AN (12/18/2012 Op. Order 44). For example, Order 44 permits officers to shred Department directives (*e.g.*, Bureau Chief Memos and Personnel Orders, FINEST messages, roll calls, police officer monthly performance reports, and command discipline logs). *Id.* In a paragraph titled "<u>Document Destruction (Shredding)</u>," Order 44 even discusses the availability of "an industrial shredding truck" for "on-site document destruction" that is "capable of shredding large quantities of paper goods (e.g., files, boxes, Command Logs, etc.)." *Id.* (emphasis in original). Order 44 makes clear how crucial appropriate record retention policies are, stating that "[t]he importance of these records cannot be overstated as many of them pertain to … litigation against the Department or City…." *Id.* Thus, even though it knew that spoliation would occur under the NYPD's normal policies, including Order 44, the City chose not to institute a litigation hold for three years.

---

[4] For example, Detective Joseph Bermudez, who issued a summons to a named plaintiff, testified that he did not recall receiving any instructions to preserve relevant emails or other materials, whether through a FINEST message or otherwise. Ex. O (Bermudez Dep. 36:9-39:25, 69:18-70:18). Moreover, Det. Bermudez indicated that this failure to receive a preservation notice may well have prejudiced Plaintiffs when ▇▇▇▇▇▇▇ (*id.* at 231:23-232:34), but his normal practice is to delete emails that he thinks are unimportant (*id.* at 35:19-36:8). Officer William Green, who issued two summonses to a named plaintiff, confirmed that he never received "any notification through FINEST" or otherwise "about not destroying documents, text messages, e-mails, [or] any paperwork" that could be relevant to this case. Ex. P (Green Dep. 163:25-164:5, 330:12-331:5); *see also* Appendix I (compilation of officer testimony).

### B.     Defendants, By Their Own Admission, Destroyed Relevant Evidence

#### 1.    *Defendants Destroyed Relevant ESI*

As discussed above, Capt. Benjamin sent at least three emails relevant to Plaintiffs' claims **after** Plaintiffs filed their Complaint, and long after Defendants' duty to preserve attached. *Supra* at 2. In one email, dated June 4, 2010, Capt. Benjamin stated his intent to conduct interim evaluations for subordinate officers due to "lack of activity," and said, "[h]opefully this is the wakeup call they need, but more than likely some will be going back to patrol." Ex. B. In another, dated February 15, 2011, Capt. Benjamin stated, ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. C. In a third, dated August 5, 2012, Capt. Benjamin discussed "top overtime earners in the boro" and stated, "[t]his has to stop it is ridiculous to have 50 + hours with only one arrest." Ex. D. Plaintiffs discovered these emails only because third parties produced them, and have been unable to obtain any email attachments because they are not in the third parties' possession. *See* Ex. C. Plaintiffs notified Defendants of their failure to produce these emails, and after much correspondence between the parties and in light of the inarguable evidence that Capt. Benjamin had authored relevant emails,[5] Defendants finally agreed to search and produce his ESI.

Defendants made what should have been their final document production on June 12, 2015—the Court-ordered deadline for the production of all outstanding documents. The production did not contain a *single* document listing Capt. Benjamin as the custodian, nor did it contain any of the three clearly relevant emails. In fact, the City's combined email productions in this action contain only two emails that even list Capt. Benjamin's name, and Capt. Benjamin is not listed as the document custodian for either of these emails. Thus, the production confirms what Plaintiffs feared but Defendants have repeatedly denied: Defendants have destroyed evidence that is unquestionably relevant to this matter.

Unfortunately, the evidence of spoliation does not stop with Capt. Benjamin. Despite the fact that Defendants have agreed to search the ESI of only a small fraction of the individuals relevant to this matter, the dearth of emails produced from those individuals' files establishes a stunning pattern of spoliation across custodians. And, these are not just any custodians, but the individuals that Defendants have described as *the* custodians that would be in possession of evidence as to whether there is a citywide policy and/or practice of utilizing quotas within the NYPD.[6] Specifically, Defendants produced:

---

[5]  The City should also have known Capt. Benjamin's obvious relevance to this action because officers he supervised in the Bronx Task Force filed a grievance letter on December 6, 2010 alleging that Capt. Benjamin was enforcing "illegal quotas." Ex. Q (12/6/2010 Grievance Ltr.).

[6]  *See* Defs.' ESI Opp. at 3-4 (describing these individuals as the "highest ranking" decision-makers).

5

- **Zero** emails from Former Police Commissioner Raymond Kelly's files[7];
- **Zero** emails from Former Chief of Department Joseph Esposito's files;
- **Zero** emails from Former Chief of Patrol Robert Giannelli's files;
- **Zero** emails from Former Chief of Transit James Tuller's files;
- **Zero** emails from Former Chief of Transit Raymond Diaz's files;
- **2** emails from Former First Deputy Commissioner George Grasso's files;
- **2** emails from Former Commander of Patrol Borough Manhattan South Thomas Purtell's files;
- **3** emails from Former First Deputy Commissioner Rafael Pineiro's files;
- **18** emails from Commander of Criminal Justice Bureau William Morris's files;
- **89** emails from Former Chief of Patrol James Hall's files;
- **112** emails from Chief of the Housing Bureau James Secreto's files;
- **125** emails from Chief of the Transit Bureau Joseph Fox's files;
- **557** emails from Former Chief of Department Philip Banks's files; and
- **937** emails from Former Chief of the Housing Bureau Joanne Jaffe's files.

Defendants allegedly searched the ESI of each of these individuals with broad search terms[8] (Ex. L (2/6/2015 QSW email at 6:20 PM)), and their production is now complete (*see supra* n.1). It is simply not tenable that Commissioner Kelly and Chief Esposito did not—in the entire period of 2007 through the present—write or receive emails using terms such as summ* (which would capture summons, summonses, summary, etc.), activity, performance, or record*. Further, Commissioner Kelly's status as a named party heightens his responsibility to collect, review, and produce relevant, responsive ESI, making his failure to produce a single email from his files even more egregious. *Stinson*, 2014 WL 4741803, at *2 ("A party that has been served with a request for ESI is charged with find[ing] and disclos[ing] all responsive documents or properly set[ting] forth why the documents are being withheld." (quotation omitted)).

Moreover, Plaintiffs have proof that these key policymakers were at one time in possession of relevant emails that Defendants were unable to produce, including emails that post-

---

[7] Defendants produced 42 emails from custodian "PC_Office," which Plaintiffs believe may correspond with the Office of the Police Commissioner. Of those 42 emails, however, only six emails reflect correspondence to then-Commissioner Kelly in the body of the email, and in none does Commissioner Kelly send a response. Moreover, Mr. Kelly has his own blackberry email address, but he has yet to produce any emails from that account.

[8] Agreed-upon search terms included the following: ACTIVITY or ANDERSON or "C'S" or "Cs" or GROBIN or HICKS or MATTHEWS or MILLER or PALESTRO or PERFORMANCE or POLANCO or QUOTA* or RECORD* or RODRIGUEZ or SCHOOLCRAFT or SERRANO or SUMM* or VELEZ. *See* Ex. A at 4 (4/2/2014 S. Olson Ltr.); Ex. R at 3 (4/10/2015 QSW Ltr. (refusing to search for "Ghost" or "Goal")).

date the Complaint.[9]  Plaintiffs also have proof that Defendants had the ability to produce emails from years 2007, 2008, and 2009.  Yet, Defendants only produced a combined total of 16 emails from the files of the decision-makers for that period—a period during which approximately 350,000 of the summonses that fall into the class were issued.  In short, it is not that the documents never existed or that Defendants' systems prevent them from producing emails from as early as 2007; it is that Defendants are now unable to produce them due to spoliation.

Indeed, testimony by Defendants' 30(b)(6) witness, Lt. Scott, illustrates at least one means by which this spoliation may have occurred.  Lt. Scott stated that when officers reach the size limit on their email inboxes, "*[t]hey delete*."  Ex. J (City 30(b)(6) Dep. 157:20-158:10) (emphasis added).  He also agreed that certain NYPD chiefs would not have known to preserve emails before Defendants allegedly communicated the litigation hold in August 2013, and that as a result, it is possible they deleted relevant emails before then.  *Id.* at 176:5-13.

Plaintiffs have been severely prejudiced by Defendants' inability to produce these emails from key NYPD decision-makers and policymakers.  The spoliation of this evidence clearly demonstrates Defendants' bad-faith, grossly negligent, or at least, negligent destruction of relevant documents.

### 2.  *Defendants Destroyed Relevant Text Messages*

Supervisors and police officers in the NYPD unquestionably communicate by text message about official NYPD activity.  *See* Ex. J (City 30(b)(6) Dep. 158:15-159:3); Ex. T (Brown Dep. 222:9-223:16); Ex. U at 1 (4/23/2015 K. Janus Ltr.).  Indeed, rank-and-file officers use text messages as their primary means of electronic communication.  And, Defendants unquestionably have an obligation to preserve this type of ESI.  *See, e.g.*, *Sawabeh Info. Servs. Co. v. Brody*, 2014 WL 46479, at *3 (S.D.N.Y. Jan. 6, 2014), *aff'd & rev'd in part on other grounds*, 2015 WL 1321314 (2d Cir. Mar. 25, 2015) (describing previous order granting motion for an adverse inference because plaintiffs had been "at least grossly negligent in the preservation and production of [ESI]," such as "text messages, emails, and other relevant documents").

Notwithstanding the above, Defendants have not undertaken *any* proactive or affirmative steps to attempt to preserve and produce relevant text messages, even though they admit that relevant text messages are being destroyed.  To illustrate, Defendants recently admitted that Lt. Stevelle Brown of the 105th Precinct sent an officer a text message exchange in which he denied an officer time off based on his traffic summons activity.[10]  Ex. U at 1 (4/23/15 K. Janus Ltr.).  Defendants have stated that they cannot produce the text message, however, because Lt. Brown

---

[9] For example, Joseph Esposito is listed as a recipient on email collected from Joanne Jaffe's files, Raymond Kelly is listed as a recipient on email produced in the *Schoolcraft* action, and Robert Giannelli is listed as a recipient on an email collected from George Grasso's files.

[10] This is not the only relevant text message evidencing that officers and supervisors regularly communicate about enforcement activity by text message.  *See* Ex. V (message from sergeant to officer stating, "we missed seat belt number by 30 last week unacceptable"); Ex. W (Floyd A-13415) (November 5, 2012 message in which a sergeant tells an officer, "U need to do more 250.").

7

destroyed it. *Id.*[11] It is Plaintiffs' understanding the Defendants did not even attempt to collect the message until *Plaintiffs* specifically asked them to do so after reading a newspaper article about the event (Ex. X (2/19/15 *New York Post* article)), such that days passed during which Lt. Brown had the opportunity to destroy the message.

Plaintiffs have repeatedly requested that Defendants preserve relevant text messages, but Defendants have refused to undertake any general proactive measure to do so, objecting that the request is "vague and ambiguous, or otherwise incredibly overbroad, and accordingly, preservation is not be [sic] feasible." Ex. Y at 2 (5/8/2015 QSW Ltr.). Plaintiffs recognize that it would indeed be difficult for Defendants to locate and preserve each and every relevant text message sent or received by all NYPD officers. But the fact that something is difficult does not excuse Defendants from at least making a good-faith effort to try and meet its obligations. Defendants, however, have refused to implement *any proactive* steps to preserve this type of evidence (*id.*), apparently even one as basic as issuing a department-wide notice that all text messages relevant to this matter must be preserved. Such a basic notice is especially justified in light of Lt. Brown's recent destruction of relevant evidence. Defendants' refusal to even attempt to preserve and produce relevant documents—especially when the parties are aware that such evidence exists and is being destroyed—shows bad faith and willful spoliation of evidence.

### 3. *Defendants Have Destroyed Relevant Hard-Copy Documents*

According to Lt. Scott, Defendants' 30(b)(6) witness, Defendants have shredded, and are continuing to shred, hard-copy documents. Specifically, Lt. Scott testified that when he managed the CompStat unit of the Office of the Chief of Department, he would prepare materials for the Chief's review before CompStat meetings. Ex. J (City 30(b)(6) Dep. 101:7-16, 105:16-22). When asked how these CompStat materials were preserved, Lt. Scott responded that "*[f]or the most part, they are not*," and that due to "[t]he volume of information, *they are typically shredded after a meeting*." *Id.* at 105:23-106:11 (emphasis added). Lt. Scott also testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 141:7-14.

Likewise, police officers have testified that they were unable to locate hard-copy documents relevant to this case, indicating that such documents have been lost. For instance, Officer Deidre Gonzalez testified that she sometimes kept copies of monthly activity reports, but that they were eventually "thrown away in the garbage" and "[n]ow, I have none." Ex. Z (Gonzalez Dep. 30:5-25). Officer Gonzalez stated that no one "at any point direct[ed] [her] to save any of [her] monthly activity reports." *Id.* at 31:1-11. Four other officers testified that they did not have or did not know whether they had destroyed certain monthly activity reports that they filled out during the class period. Ex. AA (Massafra Dep. 186:25-191:16); Ex. AB (Robley Dep. 97:17-99:1); Ex. P (Green Dep. 259:15-260 :11, 266:21-267:15); Ex. AC (Peralta Dep. 192:16-194:10). These monthly activity reports are directly relevant to Plaintiffs' case because supervisors are required to provide written feedback on an officer's activity reports, including

---

[11] Plaintiffs later obtained the messages via a third-party subpoena on the police officer who was denied time off (Ex. U at 1 (4/23/15 K. Janus Ltr.)), but that does not alleviate Defendants' failure to meet its obligations. Moreover, because of the destruction of evidence, Plaintiffs were not able to determine if Lt. Brown sent similar text messages to other MOS.

whether the supervisor believes that the officer's enforcement activity (including the number of C-summonses issued that month) was sufficient.[12]  As further evidence that hard-copy documents have been destroyed, Det. Bermudez testified that in roll call, sergeants would sometimes distribute training materials about the level of suspicion necessary for issuing summonses.  Ex. O (Bermudez Dep. 48:23-49:24).  Det. Bermudez said he did not keep the training materials.  *Id.* at 49:25-50:18; *see also* Ex. AA (Massafra Dep. 333:5-22); Ex. AE (Singh Dep. 24:13-26:25).

## II.     The Court Should Impose an Adverse Inference Sanction on Defendants For Spoliation of Relevant Evidence

An adverse inference sanction is appropriate here because Defendants (1) had "control over the evidence" and "had an obligation to preserve it at the time it was destroyed"; (2) "the records were destroyed with a culpable state of mind"; and (3) "the destroyed evidence was relevant to [Plaintiffs'] claim . . . such that a reasonable trier of fact could find that it would support that claim."  *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F. 3d 99, 107 (2d Cir. 2002) (quotation omitted).  For spoliation purposes, the culpable state of mind factor may be satisfied by a showing of bad faith, gross negligence, or mere negligence.  *Id.* at 108-09; *see also In re NTL, Inc. Sec. Litig.*, 244 F.R.D. at 198 ("The 'culpable state of mind' requirement is satisfied in this circuit by a showing of ordinary negligence."); *Residential Funding*, 306 F.3d at 108 ("[T]he 'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed knowingly. . . or *negligently.*" (emphasis in original)).

An adverse inference sanction "serves a threefold purpose of (1) deterring parties from destroying evidence; (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation."  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001).

Plaintiffs have met their burden of proof to obtain an adverse inference sanction due to Defendants' spoliation of ESI, text messages, and hard-copy documents.  *See Residential Funding*, 306 F. 3d at 107.

### A.     Defendants Have an Obligation to Preserve Evidence and Have Breached It

While Defendants have long been on notice of likely litigation (*see supra* n.2), their duty to preserve relevant evidence arose at the very latest when Plaintiffs filed the Complaint on May 25, 2010.  *Zubulake IV*, 220 F.R.D. at 216.  Yet, based on testimony by Defendants' 30(b)(6) witness, it appears that Defendants did not even attempt to impose a litigation hold until August 2013; did not communicate with "key players" about how documents are stored, *Zubulake V*, 229 F.R.D. at 432; and have intentionally destroyed relevant evidence.  *Supra*, *passim*.

---

[12]  There are two versions of monthly activity reports.  The newer version is attached as Exhibit AD, and it requires supervisors to leave written feedback as described above.  Even the older form required supervisors to leave written feedback at least every three months.

### B.     Defendants' Actions Warrant an Adverse Inference Sanction.

As thoroughly detailed above, Defendants have acted with a culpable state of mind, destroying relevant electronic and hard-copy documents. Under the prevailing authority, Defendants' actions constitute bad faith or gross negligence. At the very least, Defendants' actions were merely negligent and, even so, an adverse inference is still appropriate.

#### 1.     *Bad Faith*

Willful and intentional conduct suffices to demonstrate bad faith, *Zubulake IV*, 220 F.R.D. at 220, which is clear from Defendants' "repeated failure to either produce relevant documents or a credible story regarding their whereabouts."[13] *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 439 (S.D.N.Y. 2009). For instance, as discussed *supra* at 5-7, Defendants were unable to produce emails for custodians who, by Defendants' admission, were key policymakers involved in discussions and decisions concerning issues at the heart of Plaintiffs' claims. Few to no emails have been produced for former Commissioner Kelly, former Chief of Department Esposito, or former Chief of Patrol Giannelli, among others. *Id.* Plaintiffs have even shown proof that these emails existed and must have been destroyed. *See, e.g.*, Ex. AF (Ray Kelly email sent in 2010 and produced only in hard-copy form); *see also* Exs. B-D (Benjamin's emails from 2010, 2011, and 2012). Defendants have spent an entire year searching for these documents and produced few to no emails for top policymakers, despite Ms. Smith-Williams' representation that the NYPD's email system at the relevant time "affords for indefinite retention." Ex. L (2/6/2015 QSW email at 6:20 PM). Defendants' non-production of evidence rises to the level of bad faith. *Residential Funding*, 306 F. 3d at 101; *Arista*, 608 F. Supp. 2d at 439.

#### 2.     *Gross Negligence*

Even if the Court should find that Defendants' conduct does not constitute bad faith, Defendants' "purposeful sluggishness" and "careless, if not intentionally misleading, statements" about document production clearly amount to gross negligence. *Residential Funding*, 306 F. 3d at 111-12. First, it appears Defendants were disturbingly delinquent in issuing a litigation hold, which is conduct consistently treated as a basis for finding gross negligence with respect to spoliation. *See Hawley v. Mphasis Corp.*, 302 F.R.D. 37, 51 (S.D.N.Y. 2014) (defendant did not issue litigation hold until two-and-a-half years after EEOC charges filed); *Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494, 507 (S.D.N.Y. 2013) (plaintiff issued litigation hold 15 months after Notice of Claim sent). Notably, Defendants knew they should have requested a litigation hold when "litigation or investigation becomes reasonably anticipated" because the New York City

---

[13] Despite repeated requests by Plaintiffs, Defendants have been unable to provide any coherent explanation for their failure to produce documents. As discussed in detail at Section II.B.2, *infra*, Defendants instead made numerous, inconsistent representations that they subsequently claimed were incorrect when Plaintiffs pointed out that such representations would be proof of spoliation. *See, e.g.,* Ex. L (1/16/15 QSW email at 10:39 AM) (stating that "the NYPD e-mail system does not retain emails over four years old," which counsel for Defendants later claimed—without any explanation or proof—was a misstatement).

Department of Records mandates this practice.  Ex. AG § 6.2 (Aug. 2007 Guidelines, Policies, and Procedures).

Second, even after Defendants allegedly issued a litigation hold, they failed to ensure that the hold was properly implemented.  As discussed *supra* I.A, of 13 officers deposed in this action and asked about document preservation, including 9 that Defendants listed on their initial disclosure, not a single one testified to having received the FINEST message or to having received *any* form of preservation request in the year 2010.

Third, Defendants have been "careless, if not intentionally misleading," in answering Plaintiffs' questions about its document retention policies.  For example, when Plaintiffs first informed Defendants about Capt. Benjamin's missing ESI, Plaintiffs were shocked when Defendants represented that "the NYPD e-mail system does not retain emails over four years old, so searching for it is not an option."  Ex. L (1/16/15 QSW email at 10:39 AM).  When Plaintiffs stated that such a policy evidenced spoliation, Defendants changed their story and denied that the NYPD systematically destroys emails.  *Id.* (1/21/15 E. Sutton email at 5:51 PM).  Defendants assured Plaintiffs that the email system utilized by the NYPD since January 1, 2009 "affords for indefinite retention," and that emails sent before December 31, 2008 had been preserved and could be accessed, albeit with "a costly and complicated restoration process."  *Id.* (2/6/15 QSW email at 6:20 PM).  Notably, Defendants nevertheless refused to clarify whether the relevant emails had actually been indefinitely retained.  Defendants' evasive tactics are particularly germane to a gross negligence finding because they occurred as the discovery deadline was drawing near, meaning Defendants were "under an obligation to be as *cooperative as possible*." *Residential Funding*, 306 F. 3d at 112 (emphasis added).[14]

A final factor supporting a gross negligence finding is Defendants' pattern of sanctionable discovery violations in recent cases.[15]  Indeed, Defendants' repeated disregard for discovery procedures compelled 18 justices of the Appellate Division, First Department, including the presiding justice, to compose a cautionary letter for publication in the New York Law Journal.  The letter states, in part: "A vast amount of inefficiency impeding the resolution of litigation is also created by the city's oft-demonstrated cavalier attitude toward its discovery obligations. The city's almost routine failure to timely and fully cooperate with its discovery

---

[14] This Court has previously noted Defendants' improper behavior during discovery in this case. For example, in its Order of March 24, 2014, denying Defendants' motion for reconsideration of an order compelling them to produce certain CompStat meeting videos, the Court held, "There is some credence to Plaintiffs' contention that the City employed inappropriate gamesmanship in withholding the proposed alternative only to now suggest what they initially maintained was impractical." Dkt. 102 at 12-13.

[15] *See, e.g.*, *Taylor*, 293 F.R.D. at 613, 616 (granting adverse inference sanction *against the City of New York* and the Dep't of Corrections for negligent spoliation of evidence); *Casale v. Kelly*, 710 F. Supp. 2d 347, 365-67 (S.D.N.Y. 2010) (imposing adverse inference sanction against the City for negligent spoliation of summonses); *United States v. City of New York*, 2011 WL 4639832, at *7-8 (E.D.N.Y. Oct. 5, 2011) (explaining intention to appoint monitor to supervise the City on document retention and preservation where "the City's lawyers were still 'discovering' thousands of documents it had been obligated to produce," and discovery violations were "chronic-now bordering on recalcitrant"); *Fleming v. City of New York,* 2006 WL 2322981, at *3-6 (S.D.N.Y. Aug. 9, 2006) (imposing monetary sanctions because "[t]he City has persistently failed to comply with its discovery obligations in this case, impeding expert disclosure and unnecessarily prolonging discovery.").

obligations, even in the face of repeated court orders, is regularly confronted by city part judges attempting to solve the city's intransigence . . . ." Ex. AH. The letter cites "a litany of cases" in which Defendants engaged in a "pattern of extended delays in compliance with discovery" and was sanctioned for doing so. *Id.* at 2.

Thus, Defendants are well aware of their discovery obligations, including their duty to preserve. Nevertheless, Defendants have taken a "sluggish" approach to discovery in this action, have made "careless, if not intentionally misleading, statements" about document preservation as discovery deadlines have neared, and have destroyed relevant evidence. *Residential Funding*, 306 F. 3d at 111-12. Accordingly, Defendants have acted with gross negligence and an adverse inference is appropriate.

### 3. *Negligence*

Finally, the "culpable state of mind" factor is also satisfied by a finding of mere negligence. *Residential* Funding, 306 F.3d at 108. Thus, even if this Court were to conclude that Defendants were "merely" negligent, an adverse inference instruction would still be warranted. *See, e.g.*, *Taylor*, 293 F.R.D. at 613, 616 (granting adverse inference sanction **against the City of New York** and the Dep't of Corrections for negligent spoliation of evidence). Here, Defendants' conduct is clearly negligent because, as discussed at length above, documents were lost or destroyed after a duty to preserve attached. *Taylor*, 293 F.R.D. at 612 ("As multiple other courts have recognized, once the duty to preserve attaches, any destruction [of relevant evidence] is, at a minimum, negligent." (quotation omitted) (alteration in original)).

### C. The Destroyed Evidence Was Relevant To and Would Have Supported Plaintiffs' Claims

Because Defendants destroyed evidence in bad faith, "that bad faith alone is sufficient circumstantial evidence" to support an inference that the missing evidence was unfavorable to Defendants. *Residential Funding*, 306 F.3d at 109. Likewise, courts are permitted to find that destroyed evidence was likely unfavorable to a party that acted with gross negligence. *See id.*; *see also Hawley*, 302 F.R.D. at 51. In *In re NTL, Inc. Securities Litigation*, for example, the court found that Defendants were grossly negligent in destroying evidence and that under the circumstances, Plaintiffs did not need to supply extrinsic proof of relevance. 244 F.R.D. at 200. The court noted however, that even if extrinsic proof of relevance were necessary, plaintiffs had provided it. *Id.* Among other things, plaintiffs demonstrated that an individual defendant had produced emails that "tend[ed] to support plaintiffs' allegations," and that another party had produced emails from a crucial time period that the corporate defendant had failed to produce. *Id.* Similarly, here, third parties have produced emails and text messages that NYPD supervisors (Capt. Benjamin and Lt. Brown) wrote during a crucial time period and that link "activity," including summonses, to employment consequences. *Supra* I.B.1-2. Plaintiffs have also shown that similar evidence likely exists, that Defendants have likely destroyed it, and that Defendants are likely continuing to destroy such evidence as it is generated. *Supra* I.B.

Finally, even if the Court finds that Defendants' actions were "merely" negligent, an adverse inference is still appropriate because Plaintiffs have demonstrated that the "missing evidence was likely to have been favorable to them." *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. at

12

200; *see also id.* at 199 (noting that "[c]ourts must take care not to 'hold[ ] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence,' because doing so 'would subvert the . . . purposes of the adverse inference . . . .'" (quoting *Residential Funding*, 306 F.3d at 109)); *Taylor*, 293 F.R.D. at 613.

Thus, Plaintiffs have shown that Defendants' spoliation has prevented Plaintiffs from using evidence that goes to the heart of their claims. That prejudice must be cured.

### III. The Court Should Impose the Following Sanctions

For the foregoing reasons, Plaintiffs ask that the Court impose sanctions in the form of the following:

**A.  Adverse Inferences Necessary to Address the Prejudice Caused by Defendants' Destruction of Evidence at the Policy and Decision-Making Level**

1. During the class period, Former Commissioner Raymond Kelly, Former Chief of Department Joseph Esposito, Former First Deputy Commissioner George Grasso, Former First Deputy Commissioner Rafael Pineiro, Former Commander of Patrol Borough Manhattan South Thomas Purtell, Former Chief of Patrol Robert Giannelli, Former Chief of Transit James Tuller, Former Chief of Transit Raymond Diaz, Commander of Criminal Justice Bureau William Morris, Former Chief of Patrol James Hall, Chief of the Housing Bureau James Secreto, Chief of the Transit Bureau Joseph Fox's (together, the "Spoliation Decision-Makers," each of whom Defendants produced 125 or less emails from their files for the entirety of the class period) made a conscious decision to implement, and did implement, a NYPD policy that required officers to issue enough C-summonses to meet a minimum quota.

2. During the class period, the Spoliation Decision-Makers explicitly instructed MOS they supervised to enforce a policy requiring officers to issue enough C-summonses to meet a minimum quota, and to retaliate against any officers that did not meet that minimum quota.

3. During the class period, the Spoliation Decision-Makers retaliated against MOS they supervised if those MOS did not ensure that the officers the MOS supervised issued enough C-summonses to meet a minimum quota.

4. During the class period, the Spoliation Decision-Makers were aware of the number of C-summonses that were dismissed based on a judicial finding that the C-summonses were facially or legally insufficient.

5. During the class period, the Spoliation Decision-Makers were aware of officers reporting, both formally, informally, and through the PBA, that NYPD supervisors were implementing C-summons quotas against officers.

6. During the class period, the Spoliation Decision-Makers were aware of the PBA making public statements that NYPD supervisors were implementing C-summons quotas against officers.

7. During the class period, the Spoliation Decision-Makers should have known that inadequate training or supervision of officers was likely to result in the violation of the constitutional rights of individuals being issued C-summons.

8. During the class period, the Spoliation Decision-Makers made a conscious decision to not address, including through training and supervision practices, the number of C-summonses issued by NYPD officers that were being dismissed based on judicial findings of facial or legal insufficiency, and the Spoliation Decision-Makers failed to make meaningful efforts to address the risk of harm to Plaintiffs.

9. During the class period, the Spoliation Decision-Makers made a conscious decision (i) to not inform officers of the number of C-summonses being issued by NYPD officers that were being dismissed based on judicial findings of facial or legal insufficiency; and (ii) to not inform officers of the number of C-summonses that he or she had issued that were dismissed based on judicial findings of facial or legal insufficiency.

10. During the class period, the Office of the Chief of Department prepared materials for the purpose of Compstat meetings that contained information evidencing that it was the policy and practice of the NYPD to require officers to issue enough C-summonses to meet a minimum quota, and to retaliate against officers that did not issue enough C-summonses to meet that minimum quota.

11. During the class period, Lieutenant Paul Scott took notes that evidenced that it was communicated to the attendees of Compstat meetings by NYPD policy and decision-makers that it was the policy and practice of the NYPD to require officers to issue enough C-summonses to meet a minimum quota, and to retaliate against officers that did not issue enough C-Summonses to meet that minimum quota.

**B.     Adverse Inferences Necessary to Address the Prejudice Caused by Defendants' Destruction of Evidence at Precinct Levels**

1. During the class period, Captain Andrew Benjamin, Lieutenant Stevelle Brown, and Sergeant Carty (and the supervisors under their command) explicitly instructed officers under their command that they must issue enough C-summonses to meet a minimum quota.

2. During the class period, Captain Andrew Benjamin, Lieutenant Stevelle Brown, and Sergeant Carty (and the supervisors under their command) retaliated against officers who did not issue enough C-summonses to meet a minimum quota.

3. During the class period, Captain Andrew Benjamin, Lieutenant Stevelle Brown, and Sergeant Carty were explicitly instructed by their supervisors and/or NYPD policy makers to: (i) monitor the C-summons activity of the officers under their command and (ii) to retaliate against officers if they did not issue enough C-summonses to meet a minimum quota.

      4.      The monthly activity reports of Officers Deidre Gonzalez, Marcello Massafra, Christopher Robley, William Green, and Francia Peralta contained comments from supervisors criticizing officers for not issuing enough C-summonses to meet a minimum quota, and evidencing that the supervisors would retaliate against the officers for not meeting the minimum quota.

      5.      The training materials provided to Officer Bermudez concerning summonses: (i) did not inform officers of the number of C-summonses being issued by NYPD officers that were being dismissed based on judicial findings of facial or legal insufficiency; (ii) did not inform Officer Bermudez of the number of C-summonses that he had issued that were dismissed based on judicial findings of facial or legal insufficiency; and (iii) did not instruct officers that they must change their summons practices to address the number of C-summonses being dismissed based on judicial findings of facial or legal insufficiency.

      **C.**      **Attorneys' Fees and Reasonable Costs**

Finally, Plaintiffs request attorneys' fees and all reasonable costs incurred in connection with this motion. *See In re NTL, Inc. Sec. Litig.*, 244 F.R.D. at 181 (granting attorneys' fees associated with bringing successful motion for an adverse inference sanction and "additional discovery costs caused by" defendant's conduct); *Zubulake V*, 229 F.R.D. at 439 (granting "all reasonable expenses, including attorney's fees," associated with bringing successful motion for an adverse inference sanction (quotation omitted)).

**<u>Conclusion</u>**

For the foregoing reasons, Plaintiffs respectfully request that their motion be granted.

Respectfully submitted,

/s/ Elinor C. Sutton

Elinor C. Sutton
Quinn Emanuel Urquhart & Sullivan, LLP
*Co-Lead Class Counsel for Plaintiffs*

cc:    Qiana Smith-Williams (via E-File and Email)
       The City of New York Law Department
       *Attorneys for Defendants*