UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X
SHARIF STINSON, et al.,

                    Plaintiffs,

                                        10 Civ. 4228 (RWS)

        - against -

                                        OPINION

THE CITY OF NEW YORK, et al.,

                    Defendants.
----------------------------------------X

A P P E A R A N C E S:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6|12|17

        Attorneys for Plaintiffs
        COHEN & FITCH LLP
        233 Broadway, Suite 1800
        New York, NY 10279
        By: Gerald M. Cohen, Esq.
            Joshua P. Fitch, Esq.

        THE LAW OFFICES OF JON L. NORINSBERG PLLC
        225 Broadway, Suite 2700
        New York, NY 10007
        By: Jon L. Norisberg, Esq.

        QUINN EMANUEL URQUHART & SULLIVAN, LLP
        51 Madison Avenue
        New York, NY 10010
        By: Stephen Neuwirth, Esq.
            Elinor C. Sutton, Esq.

        Attorney for Defendants
        ZACHARY W. CARTER
        Corporation Counsel of the City of New York
        100 Church Street
        New York, NY 10007
        By: Rachel Seligman Weiss, Esq.

**Sweet, D.J.**

This civil rights class action is the paradigm of change
and progress achievable in a society undergirded by the rule of
law. Skilled and dedicated counsel for the parties, aided by a
highly experienced and pragmatic mediator, have reached a
resolution benefitting all concerned. The strongly held
positions, vigorously litigated and, initially, diametrically
opposed, have been illuminated by facts developed in the
discovery process and resolved. Thanks to the skill of those
involved and a concerned administration, those injured will be
compensated, police procedures will be clarified and
strengthened, and the rights of all citizens will be fortified
through what has been represented as the largest settlement of
Fourth Amendment claims in New York City history.

To that end, named Plaintiffs Sharif Stinson, Ryburn
Walkes, Gary Shaw, Michael Bennett, Chanel Meausa, David
Thomson, Jeremy Thames, Leander Griffin, Ricardo Jones, and
Victor Breland (collectively, "Class Representatives" or
"Plaintiffs"), on behalf of themselves and the Class[1], have moved
for orders (i) granting final approval of the proposed

---

[1] The Class is represented by Cohen & Fitch, LLP, Jon L.
Norinsberg, Esq., and Quinn Emanuel Urquhart & Sullivan LLP
(hereinafter, the "Class Counsel").

settlement (the "Settlement") with the City of New York ("NYC"),
Raymond Kelly ("Kelly"), the former Commissioner of the New York
Police Department ("NYPD"), and unnamed New York City Police
Officers (collectively, "Defendants"); (ii) the award of service
payments to the Class Representatives; and (iii) the granting of
attorneys' fees and expenses. For the reasons set forth below,
Plaintiffs' motion is granted.

## I. **Prior Proceedings**

The procedural history and factual background of this
lengthy and intensely litigated class action has been set forth
in prior opinions by this Court. See e.g., Stinson v. City of
N.Y., 282 F.R.D. 360, 364-67 (S.D.N.Y. 2012) (laying out of the
allegations and factual background of the case); Stinson v. City
of N.Y., No. 10 Civ. 4228, 2015 WL 4610422 (S.D.N.Y. July 23,
2015) (detailing stages of the discovery process); Stinson v.
City of N.Y., No. 10 Civ. 4228, 2016 WL 817445 (S.D.N.Y. Feb.
24, 2016) (describing multiple motions to unseal). Familiarity
with this case's general background is assumed.

The instant action concerns hundreds of thousands of New
Yorkers who, over the course of many years, were issued
summonses later dismissed after a finding of facial

2

insufficiency or were ticketed without probable cause. The Plaintiff Class is defined as "the Class Representatives and all other individuals who were issued C Summonses by the NYPD that were later dismissed upon a judicial finding of facial or legal insufficiency by the court prior to trial, and whose C Summonses were issued without probable cause during the Class Period [May 25, 2007 through January 24, 2017]." (Declaration of Gerald M. Cohen dated April 14, 2017 ("Cohen Decl."), Ex. D at ¶ 1.32, Dkt. 327); see also Stinson, 282 F.R.D. at 363 (defining and certifying class).

During 2015 and 2016, the parties met with retired Southern District of New York District Judge John S. Martin to meditate and try to reach a settlement. The first full-day mediation session in August 2015 was unsuccessful. (Pls.' Mem. in Supp. at 7-8.) After an additional year of discovery and motion practice, the parties engaged Judge Martin for a series of meditation sessions throughout August 2016. (Id.) These sessions culminated on August 22, 2016 with an agreement between the parties as to a final Class Fund figure and general outline of remedial measured to be taken by the NYPD. (Pls.' Mem. in Supp. at 8.) Subsequent meetings, often with assistance from Judge Martin, resulted in determining proposed amounts for attorneys' fees, expense

reimbursements, the notice and proof of claims language, and
claims procedures. (Pls.' Mem. in Supp. at 9.)

On January 23, 2017, both parties requested preliminary
approval of the Settlement, notice plan, and appointment of Rust
Consulting as the Settlement claims administrator. (Dkt. 319.)
The Court granted preliminary approval of the proposed
Settlement on January 24, 2017, (Dkt. 320), which was amended
with approval on January 30, 2017, (Dkt. 322).

The proposed Settlement contains both monetary and non-
monetary benefits to the Class. Within seventy-five days of the
Settlement's final approval, NYC will create a fund for the
Class that will contain $56.5 million (the "Class Fund"), from
which any service awards for Class Representatives and expense
costs in the administration of the Class Fund would be drawn.[2]
(Cohen Decl., Ex. D at ¶¶ 5.1, 6.4, 6.5.) The remaining Class
Fund will be distributed *pro rata* to eligible claimants on a per
summons incident basis with a maximum payout of $150 per
summons. (Cohen Decl., Ex. D at ¶ 7.2.) A separate and

---

[2] Class Counsel has represented that administrative costs are
estimated to be between 1.35 and 1.5 million dollars. (Pls.'
Mem. in Supp. at 22 n.8.)

additional $18.5 million is to be paid to Class Counsel by NYC
for attorneys' fees and expense. (Cohen Decl., Ex. D at ¶ 5.1.)

In addition, the NYPD has stated that within three to
twelve months of the Settlement's final approval, the NYPD will
undertake remedial measures related to quotas, including:
sending Department-wide communications informing officers that
quotas and other numeric measures of performance are improper
and subject to investigation by the NYPD's Internal Affairs
Bureau; revising the training new NYPD recruits receive with
regard to quotas and teaching recruits how to report observed
issues without fear of reprisal; and improving public relations
by simplifying the process for individuals who receive summons
to identify officers responsible and for voicing complaints
about summons if individuals believe the summons was issued
unfairly.[3] (Cohen Decl., Ex. D at 6-8.)

---

[3] These are in addition to a number of other remedial steps that
the NYC and NYPD have undertaken since the start of the instant
lawsuit, including passing laws that expand the use of civil
summons versus C-Summons and custodial arrests, amending the
NYPD forms for writing and issuing summons to include more
narrative space, providing regular summons issuance data to
increase NYPD transparency, and revising internal NYPD officer
patrol procedures and training on investigative
encounters. (Cohen Decl., Ex. D at 3-6.)

Following preliminary approval, a total of 922,316 copies

of the Notice and Proof of Claim ("Notices") were mailed to

potential Class members after reviewing records provided by the

New York Office of Court Administration. (Cohen Decl., Ex. F.)

At the time of the Fairness Hearing, five objections had been

filed and thirty individuals had opted-out of the Settlement.[4]

(Fairness Hr'g Tr. 48:9-10, May 24, 2017.)

On April 14, 2017, Plaintiffs moved for final approval of

the Settlement, service payments to Class Representatives, and

granting of attorneys' fees and expenses. (Dkt. 324.) On May 24,

2017, a Fairness Hearing was held pursuant to Fed. R. Civ. P.

23(e)(2), at which time counsel from both sides spoke,

objections to the proposed Settlement were heard, and the motion

was marked fully submitted.

## II. **Applicable Standard**

Federal Rule of Civil Procedure 23(e) provides that

"claims, issues, or defenses of a certified class may be

settled, voluntarily dismissed, or compromised only with the

court's approval." Fed. R. Civ. P. 23(e). The Court may approve

---

[4] Objections to the proposed Class Settlement are discussed in
greater detail at Section III(ii)(2), *infra*.

a settlement "only after a hearing and on finding that the settlement . . . is fair, reasonable, and adequate." Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 504 F.3d 229, 247 (2d Cir. 2007) (quoting Fed. R. Civ. P. 23(e)(1)(C)). To determine whether a settlement is fair, reasonable, and adequate, the Second Circuit instructs district courts to examine "the negotiating process leading up to the settlement, i.e., procedural fairness, as well as the settlement's substantive terms, i.e., substantive fairness." McReynolds v. Richards-Cantave, 588 F.3d 790, 803-04 (2d Cir. 2009) (quoting D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001)) (internal quotation marks and alternations omitted). Underlying the court's analysis is a "strong judicial policy in favor of settlements, particularly in the class action context." Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 116 (2d Cir. 2005) (citations omitted).

### III. **The Proposed Settlement is Approved**

#### i.    The Settlement is Procedurally Fair

There is a presumption of fairness when settlements are "reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." Wal-Mart Stores,

7

Inc., 396 F.3d at 116 (citation omitted). This presumption is well-grounded here. The parties are represented by competent, experienced counsel who engaged in over six years of discovery and contentious motion practice, addressing matters both before this Court and the Second Circuit. See Stinson, 282 F.R.D. at 371-72; (discussing the litigation experience of Plaintiffs' counsel); (Pls.' Mem. in Supp. at 5-7). The proposed Settlement was only reached at the tail-end of discovery and on the eve of summary judgment, after multiple arm's-length mediation sessions with Judge Martin, all of which further supports finding procedural fairness in the process. (See Cohen Decl., Ex. E at 2; Pls.' Mem. in Supp. at 7-8, 25.) Accordingly, the proposed Settlement is procedurally fair.

## ii. The Settlement is Substantively Fair

In the Second Circuit, substantive fairness is evaluated by considering the nine factors set forth in City of Detroit v. Grinnell Corp.:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants

to withstand a greater judgment; (8) the range of
reasonableness of the settlement fund in light of the
best possible recovery; [and] (9) the range of
reasonableness of the settlement fund to a possible
recovery in light of all the attendant risks of
litigation.

495 F.2d 448, 463 (2d Cir. 1974) (citations omitted), abrogated

on other grounds by Goldberger v. Integrated Res., Inc., 209

F.3d 43 (2d Cir. 2000).

As set forth below, eight of the nine of the Grinnell

factors weigh, in varying degrees, in favor of approval of the

Settlement, and none weigh against. Accordingly, the proposed

Settlement is substantively fair.

### 1. Complexity, Expense, and Likely Duration of the Litigation

The difficulties presented in this case were legion. The

claims in the lawsuit covered a decade's worth of NYPD issued

summons and arrest quotas from ninety-eight different police

precincts across NYC. The Settlement was preceded by intense

fact discovery, involving the production and examination of

hundreds of thousands of documents and thousands of hours of

audio visual materials. Forty-four depositions were conducted.

Class certification was challenged four times over six years

and, had settlement not been reached, it is reasonable to expect

that there would have been many more substantive motions leading up to a likely trial of Plaintiffs' claims, all of which would have been expensive. Accordingly, the first Grinnell factor supports approval of the proposed Settlement.

### 2. Reaction of the Class to the Settlement

"It is well settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy." In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig., 909 F. Supp. 2d 259, 266 (S.D.N.Y. 2012) (quoting In re Am. Bank Note Holographics, Inc., 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001)).

A total of 922,316 Notices were sent to potential class members. As of May 14, 2017, 39,094 class members have submitted claim forms, and the claim period window remains open until September 6, 2017. (Defs.' Ltr. of May 19, 2017, Dkt. 334) During the Fairness Hearing, Class Counsel represented to the Court that there have been only 30 requests for exclusion. (Fairness Hr'g Tr. 48:3-4.)

Defendants have argued, both in response to the instant motion and during the Fairness Hearing, that the number of

undeliverable Notices — represented to the Court during the hearing as approximately 276,000 Notices (Fairness Hr'g Tr. 52:6) — and the Class' low response rate should forestall the Court's final approval of the Settlement and permit more time to opt-out, (see Defs.' Ltr. of May 19, 2017). The present difficulty in reaching approximately 30% of the potential Class members may be offset by the undertaking of the parties to run an additional advertising campaign in major New York newspapers throughout the summer, particularly targeting publications popular in neighborhoods where summons tended to be issued. (See Fairness Hr'g Tr. 55:3-22.)

Ultimately, though, the Notice mailing was sufficient to comply with the requirements of Rule 23. "[N]otice by mail sent to the last known address of the absent class member meets the due process requirement of notice through 'reasonable effort' even where numerous class members have since changed addresses and do not receive notice." In re Prudential Sec. Inc. Ltd. P'ships Litig., 164 F.R.D. 362 (S.D.N.Y. 1996) (collecting cases); see also Gonzalez v. City of N.Y., 396 F. Supp. 2d 411, 418 (S.D.N.Y. 2005) (finding that individual mailings reaching only one-third of the potential class, even without supplemental newspaper publications, constituted adequate notice). It is not wholly surprising that a sizeable percentage of the Notices were

11

undeliverable. Given the breadth of time covered by the claim period, and the probability of many potential Class members to have moved and changed addresses, the resultant undeliverable rate does not render the Settlement unfair. See In re W. Union Money Transfer Litig., No. 01 Civ. 0335 (CPS), 2004 WL 3709932, at *14 (E.D.N.Y. Oct. 19, 2004) (approving a settlement as fair where undeliverable rate was 45% because of the "the length of the class period, the size and the mobility of the Settlement Class, and the likelihood that some name and address information may not have been accurately provided or entered at the time").

Contrary to the position of Defendants, it is neither improper nor premature for the Court to rule on the fairness of the Settlement at present based on the current response of the Class. While only a small percentage of Class members have made claims, that number may increase in the coming months. It is the "absence of significant exclusion[s] or objection[s]" that courts in this Circuit regularly consider, not low response rates. In re Bear Stearns, 909 F. Supp. 2d at 267 (citing Grant v. Bethlehem Steel Corp., 823 F.2d 20, 24 (2d Cir. 1987)); see also Jermyn v. Best Buy Stores, L.P., No. 08 Civ. 214 (CM), 2012 WL 2505644, at *6 (S.D.N.Y. June 27, 2012) (quoting Sylvester v. CIGNA Corp., 369 F. Supp. 2d 34, 52 (D. Me. 2005)) (observing

that "'claims made' settlements regularly yield response rates of 10 percent or less").

While on occasion courts wait until the close of the claims deadline to determine the fairness of a settlement, the reverse is neither unprecedented, see Lee v. Ocwen Loan Servicing, LLC, No. 14 Civ. 60649 (JG), 2015 WL 5449813, at *23 (S.D. Fla. Sept. 14, 2015) (collecting cases), nor unfounded in the present circumstance, where even Defendants concede that the "terms of the settlement are fair," (Defs.' Ltr. of May 19, 2017). Delay in approving the Settlement delays the Settlement's many positive provisions and prevents the tens of thousands of wronged Class members who are already claimants from receiving just compensation from the as-yet created Class Fund. (See Cohen Decl., Ex. D at 17.) Delay also prolongs the period before the NYPD is required to implement changes to the NYPD's recruit training, its internal reporting protocol, and its officer patrol guidance. (See Cohen Decl., Ex. D at 6-8.) Approval permits these substantive remedies and valuable reforms to begin.

Five objections were filed prior to the Fairness Hearing. Three objections were letters from claimants: Glenn Johnson, Boisey Caldwell, and Jason Montague. (See Cohen Decl., Ex. G;

13

Pls.' Ltr. of May 23, 2017, Ex. A, Dkt. 337.) Mr. Johnson's letter objects to the Settlement's payment of $150 maximum per summons, which he believes is an insufficiently small amount. Mr. Caldwell's letter, if construed as an objection, expresses similar discontent regarding the size of the settlement amount payout.[5] Mr. Montague's letter objects to the need to receive payout from the NYPD for what he terms "a mild inconvenience." (Pls.' Ltr. of May 23, 2017, Ex. A.) To the extent that the handful of objections made based on this issue are grounded in claims actually covered by the Settlement, they do not constitute a basis to reject the Settlement. Given the degree of injury inherent in improperly receiving a summons, on average about five to ten minutes during which time the summons was written up while the Class member simply had to wait, damages of $150 per summons is sufficient to find that portion of the Settlement fair. See, e.g., Watson v. United States, 179 F. Supp. 3d 251, 281 (E.D.N.Y. 2016) (accepting damages of $83 an hour for "loss of liberty" claim).

Two objections, while differing slightly, both fundamentally focus on the "Released Claims" language of the

---

[5] Several individuals who spoke at the Fairness Hearing also expressed discontent at the size of the Settlement amount, similar to the letters of Messrs. Johnson and Caldwell. (See, e.g., Fairness Hr'g Tr. 13:1-6, 15:10, 23:18.)

Settlement. (See Cohen Decl., Ex. D at ¶ 1.28.) One objection was made by attorney Jeffrey Rothman ("Rothman") on behalf of some of his clients; one objection was made by the firms Stecklow & Thompson and Wolf Haldenstein Adler Freeman & Herz LLP on behalf of their clients in a separate litigation, Packard v. City of N.Y., 15 Civ. 7130 (S.D.N.Y. 2015) ("Packard"). Both provided both written submissions and made oral argument at the Fairness Hearing. Rothman objects that the release language has the potential to release Class members' other claims that stem from the issuance of improper summonses, even if those derivative claims are substantially more serious, such as claims for excessive force by the NYPD. (See Fairness Hr'g Tr. 3:21-6:1.) Packard objects that the release language might release claims by potential class members of their yet-uncertified class action against the NYPD based on arrests made during the Occupy Wall Street first anniversary, during which some potential Packard class members might have received summons. (See Fairness Hr'g Tr. 8:3-12:21.) Rothman requests that the release language be removed; Packard requests a carve-out be included in the language for their nascent class action. Rothman and Packard claim they have standing to object because some of their clients are potential Class members covered by the instant Settlement.

As a threshold matter, it is not apparent that either

Rothman or Packard have standing to object. Only a "class member

may object to the [settlement] proposal," Fed. R. Civ. P.

23(e)(5), which implies that "[o]bjectors who are non-Class

members lack standing to object to . . . the settlement." In re

Drexel Burnham Lambert Grp., Inc., 130 B.R. 910, 923 & n.8

(S.D.N.Y. 1991) (collecting cases); see also Cent. States Se. &

Sw. Areas Health, 504 F.3d at 244 ("Nonparties to a settlement

generally do not have standing to object to a settlement of a

class action."). Rothman contends that he has clients who are

members of the instant Class, but the only clients he has

identified he also states have opted out. (See Rothman Ltr. of

Apr. 24, 2017 at 3 & n.3, Dkt. 330; Fairness Hr'g Tr. 67:19-24;

Pls.' Mem. in Resp. to Objections at 2 n.1, Dkt. 335.) Class

members who opt-out of the settlement extinguish their ability

to object to it and those objections need not be considered.

See, e.g., People United for Children, Inc. v. City of N.Y., No.

99 Civ. 648 (KTD), 2007 WL 582720, at *3 (S.D.N.Y. Feb. 26,

2007). Packard states that, of their potential class members,

"[s]ome may have been issued summonses," but have not identified

any particular individual shown to be a class member of the

instant action. (Fairness Hr'g Tr. 10:21; see also Fairness Hr'g

Tr. 63:20-21.) In all likelihood, this renders both objectors

non-parties. Nevertheless, the breadth of the release claim

16

language is a legitimate concern for the Class and these objectors attended the Fairness Hearing alleging to represent Class members. See United States v. N.Y., No. 13 Civ. 4165 (NGG) (MDG), 2014 WL 1028982, at *10 (E.D.N.Y. Mar. 17, 2014) (considering objections when possible non-party merely "claim[ed]" to include class members, even when objectors failed to attend Fairness Hearing).

Rothman's concern about the Settlement extinguishing potential claims derivative to improperly issued summons is based principally on language from the Notice, not the release language of the Settlement, which unlike the Notice does not mention particular causes of action to be released by the Settlement. (See Rothman Ltr. of Apr. 24, 2017 at 1-2, Dkt. 330; Fairness Hr'g Tr. 65:17-66:1.) Some of Rothman's concerns were sufficiently resolved at the Fairness Hearing, during which the parties stipulated that the Settlement's release language was not to include claims for excessive force. (Fairness Hr'g Tr. 69:4-12, 72:23-25.) However, insofar as the release language states that it releases claims "based upon or arising out the same transaction, series of connected transactions, occurrences or nucleus of operative facts that form the basis of the claims that were or could have been asserted in the [instant] Civil Action," both Rothman and Packard's concern remain outstanding:

17

some potential claims connected to issued summonses encompassed by the instant Settlement could be released if the Settlement is approved. (Cohen Decl., Ex. D ¶ 1.28.) Defendants conceded as much during the Fairness Hearing, stating that, "If there was something that was factually similar to the summons charge, then there may be an argument that [a class member] cannot recover damages for the arrest based on the release language." (Fairness Hr'g Tr. 45:10-15.)

"May" is the correct and operative word here: the thrust of these objections is a hypothetical exercise. The Settlement's release language does not, by its terms, release any class member's claims of constitutional violation, even if such claims were connected in some way to the issuance of a summons otherwise resolved by the instant Settlement. As Class Counsel stated during the Fairness Hearing, this Settlement is narrowly about "the improper Fourth Amendment violation of improper seizure of individuals. . . . [T]o the extent that someone has a claim outside that, this would not prevent that individual from bringing that claim." (Fairness Hr'g Tr. 39:6-15.) To argue otherwise, while perhaps not impossible, would be attenuated, and is an argument for another day.

Given the hypothetical nature of the objections, foreclosed

in part by the oral stipulation of the parties and their

constraining language at the Fairness Hearing, these objections

are noted but do not weigh against approving a Settlement that

even the objectors acknowledge obtains "a very significant

public good." (Rothman Ltr. of Apr. 24, 2017 at 1); see also In

re Literary Works in Elec. Databases Copyright Litig., 654 F.3d

242, 247-48 (2d Cir. 2011) (citing Wal-Mart Stores, 396 F.3d at

106) ("Parties often reach broad settlement agreements

encompassing claims not presented in the complaint in order to

achieve comprehensive settlement of class actions, particularly

when a defendant's ability to limit his future liability is an

important factor in his willingness to settle.")


In sum, the Court does not find the Notice procedure,

presently low claims rate, or objections to show a negative

Class reaction to the Settlement. Rather, the overall low number

of objections and requests for exclusion, in the context of the

hundreds of thousands of Notices already delivered, is itself a

positive indication of general approval. See Grant, 823 F.2 at

24 (finding an otherwise fair settlement should be approved even

when 36% of the total class was in opposition); Wright v. Stern,

553 F. Supp. 2d 337, 344-45 (S.D.N.Y. 2008) (holding that "[t]he

fact that the vast majority of class members neither objected

nor opted out is a strong indication" of fairness). The objections raised are thoughtful, appreciated, and give the Court pause, but ultimately this Grinnell factor leans in favor of approval.

### 3. Stage of Proceedings and Amount of Discovery

"In considering this factor, the question is whether the parties had adequate information about their claims such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action for purposes of settlement." In re Bear Sterns, 909 F. Supp. 2d at 267 (quoting In re IMAX Sec. Litig., 283 F.R.D. 178, 190 (S.D.N.Y. 2012) (internal quotation marks omitted). Here, the parties reached the Settlement after years of discovery, depositions, extensive motion practice, and arguments before this Court and the Second Circuit. At this "advanced stage," the parties were in a position to evaluate intelligently their claims and defenses and to negotiate a fairly valued settlement. In re Marsh ERISA Litig., 265 F.R.D. 128, 139 (S.D.N.Y. 2010) (finding the stage of the proceeding "strongly" favored approval when counsel had "reviewed millions of pages of documents, participated in 100 depositions, exchanged expert reports and

rebuttal reports, and fully briefed the issue of class

certification"). This Grinnell factor greatly weighs in favor of

approval.

## 4. Risks of Establishing Liability and Damages

"Litigation inherently involved risk," and had this class

action advanced to trial, itwould have been no exception. In re

PaineWebber Ltd. P'ships Litig., 171 F.R.D. 104, 126 (S.D.N.Y.

1997). This was a wide-reaching, complicated civil rights that

would have presented Plaintiffs significant obstacles at trial.

First, Plaintiffs needed to establish municipal liability by

proving the existence of an official NYPD policy, pattern, or

practice that required officers to issue summonses regardless of

probable cause to meet a minimum quota requirement established

by the Department or face punishment. Plaintiffs then needed to

show that such a policy resulted in violations of their

constitutional rights. Given the breadth of summonses issued

over the span of a decade, across almost one hundred precincts,

and by countless different police officers, proving their case

would have indeed been "a difficult task." Gentile v. Cnty. of

Suffolk, 129 F.R.D. 435, 444 (E.D.N.Y. 1990) (citing Rizzo v.

Goode, 423 U.S. 362 (1976)). Establishing damages would have

been no easier, as putting a value on the violation of one's

coffers' before a settlement can be found adequate." In re IMAX
Sec. Litig., 283 F.R.D. 178, 191 (S.D.N.Y. 2012) (quoting In re
Sony SXRD Rear Projection Television Class Action Litig., No. 06
Civ. 5173 (RPP), 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008)).
Even with a $75 million Settlement, this Grinnell factor is
neutral as to approval of the Settlement.

### 7. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation

"[I]n any case there is a range of reasonableness with
respect to a settlement." Newman v. Stein, 464 F.2d 689, 693 (2d
Cir. 1972). "The adequacy of the amount achieved in settlement
may not be judged 'in comparison with the possible recovery in
the best of all possible worlds, but rather in light of the
strengths and weaknesses of plaintiffs' case.'" In re Giant
Interactive Grp., Inc. Sec. Litig., 279 F.R.D. 151, 162
(S.D.N.Y. 2011) (quoting In re Agent Orange Prod. Liab. Litig.,
597 F. Supp. 740, 762 (E.D.N.Y. 1984), aff'd, 818 F.2d 145 (2d
Cir. 1987)). "The fact that a proposed settlement may only
amount to a fraction of the potential recovery does not, in and
of itself, mean that the proposed settlement is grossly
inadequate and should be disapproved." Grinnell, 495 F.2d at 455
& n.2 ("In fact there is no reason, at least in theory, why a
satisfactory settlement could not amount to a hundredth or even

23

$4,000 to over $50,000 based on "personal risk (if any) incurred by the plaintiff-applicant in becoming and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the prosecution of the litigation . . . , [and] any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim").

## V.   **Approval of Requested Attorneys' Fees**

"The Second Circuit has authorized district courts to employ a percentage-of-the-fund method when awarding [attorneys'] fees in common fund cases, although the Circuit has encouraged district courts to cross-check the percentage fee against counsel's "lodestar" amount of hourly rate multiplied by hours spent. It bears emphasis that whether calculated pursuant to the lodestar or the percentage method, the fees awarded in common fund cases may not exceed what is 'reasonable' under the circumstances." In re Giant Interactive Grp., 279 F.R.D. at 163-64 (quoting Goldberger, 209 F.3d at 47, 50) (internal citation and quotation marks omitted). As a general matter, however, "the trend in this Circuit is toward the percentage method." McDaniel v. Cnty. of Schenectady, 595 F.3d 411, 417 (2d Cir. 2010).

The six factors laid out by the Second Circuit in
Goldberger "are applicable to the court's reasonableness
determination whether a percentage-of-fund or lodestar approach
is used." Id. at 423. The factors are: "(1) the time and labor
expended by counsel; (2) the magnitude and complexities of the
litigation; (3) the risk of the litigation; (4) the quality of
representation; (5) the requested fee in relation to the
settlement; and (6) public policy considerations." Goldberger,
209 F.3d at 50.

As set forth below, all the Goldberger factors weigh in
favor of finding the requested fee award reasonable.

### 1. Time and Labor Expended by Counsel

Class Counsel and their para-professional staff have
dedicated 27,753.50 hours to the instant class action. (See
Pls.' Mem. in Supp. at 29; see also Declaration of Stephen
Neuwirth dated Apr. 14, 2017, Ex. A, Dkt. 325 ("Neuwirth
Decl."); Declaration of Jon L. Norinsberg dated Apr. 14, 2017 at
¶¶ 49-51, Ex. A, Dkt. 326 ("Norinsberg Decl."); Cohen Decl. at
¶¶ 52-61, Ex. H.) Over the years of litigation, these hours were
spent engaged in the work necessary to organize and maintain a
successful class action: coordinating with Class members;

responding to and making motions, including successfully for Class certification; attending court appearances; engaging in discovery resulting in hundreds of thousands of produced, organized, and analyzed documents; taking and defending forty-four depositions; and participating in mediation sessions. Given the scope of this case, the time and labor spent by Class Counsel is both reasonable and weigh in favor of approval.

A lodestar cross-check confirms this view.[6] Based on their total hours worked, Class Counsel has reported an aggregated lodestar of $16,614,153.50. (Pls.' Mem. in Supp. at 29) The requested attorneys' fees thus represents a multiplier of 1.11 of the lodestar. As neither the rates billed nor the multiplier sought are outside the normal ranges regularly accepted in this district, this cross-check supports approval. See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany & Albany Cnty. Bd. of Elections, 522 F.3d 182, 191 (2d Cir. 2008) (stating that "a reasonable, paying client would in most cases hire counsel from within his district, or at least counsel whose rates are consistent with those charged locally"); Febus v. Guardian First Funding Grp., LLC, 870 F. Supp. 2d 337, 340

---

[6] The "lodestar" is a numeric value that aims to capture the value of a firm's work over the course of a particular litigation. It is calculated by multiplying hours reasonably expended by a reasonable hourly rate.

(S.D.N.Y. 2012) (accepting a lodestar multiplier of 2.2 as "well within the range of acceptable").

### 2. Magnitude and Complexities of Litigation

As set forth above, the issues present in the instant class action were factually vast, spanning many years and many precincts, and legally complex. See Section III(ii)(4) *supra*. This factor weighs in favor of approval.

### 3. Risk of Litigation

As discussed above, there were many risks in this class action, including sustaining the Class, proving municipal liability, establishing causation, and calculating damages. In addition, there is the risk attendant to when attorneys take a case on a contingency fee: for the past seven years, Class Counsel has had to dedicate resources without guarantee of compensation. When considering attorneys' fees in such circumstances, "[n]o one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success." Grinnell, 495 F.2d

at 470. Taken together, the risks inherent to this lawsuit weigh toward approval.

### 4. Quality of Representation

While the Class has been represented by attorneys rightfully recognized as some of the top class action litigators in the country, (see Pls.' Mem. in Supp. at 25 (citing cases)), it is the results of this class action that evidence strongest the quality of the representation. Six years of a vigorous yet forward-moving litigation strategy, a successful Class certification, and, ultimately, a settlement for which the monetary amount is the second largest in NYC history and the non-monetary benefits could be, in the Court's view, "a game-changer" for NYC communities, all are the true testaments to the strength of the representation provided to the Class and weigh in favor of approval. (Fairness Hr'g Tr. 76:24.)

### 5. Requested Fee in Relation to the Settlement

The requested fee is 24.6% of the total Settlement, a figure that falls at the higher end of fees historically approved in civil rights class actions in this district but nevertheless lands comfortably within permissible bounds. See

Trinidad v. Pret a Manger (USA) Ltd., No. 12 Civ. 6094 (PAE),
2014 WL 4670870, at *11-12 (S.D.N.Y. Sept. 19, 2014) (collecting
civil rights class action cases showing a range of award
percentages from 13% to 25% and ultimately approving 25%, down
from an initial request of 33%); Cronas v. Willis Grp. Holdings,
Ltd., No. 06 Civ. 15295 (RMB), 2011 WL 6778490, at *6 (S.D.N.Y.
Dec. 19, 2011) (awarding 21.7% in discrimination class action
and noting similar historically approved ranges). Thus, this
factor leans in favor of approval.

### 6. Public Policy Considerations

There is a "strong federal public policy favoring
enforcement of the civil rights laws so important to the
advancement of modern society." Red Bull Assocs. v. Best W.
Int'l, Inc., 862 F.2d 963, 967 (2d Cir. 1988). The proposed fee
award properly balances moderation with encouraging litigants to
bring forward substantive and impactful cases that are crucial
to enforcing our constitutional liberties. See Goldberger, 209
F.3d at 53. Accordingly, this factor weighs in favor of
approval.

For the foregoing reasons, and in the absence of any objections to the proposed attorneys' fees, the request is found reasonable and approved.

## VI. **Approval of Requests for Reimbursement of Expenses**

"It is well-settled that attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long they were incidental and necessary to the representation of those clients." In re Bear Sterns, 909 F. Supp. 2d at 272 (citations omitted). Class Counsel have requested $374,224.19 to date in expenses. (Pls.' Mem. in Supp. at 34-35.) The list of submitted expenses include items like "deposition transcript[s]," "investigator," "online research," data storage and document ingestion," "video deposition/videotaping," "mediation fee," and many line items that are, in different turns of phrase, related to document printing and reproduction. (Neuwirth Decl., Ex. B at 1; see also Norinsberg Decl., Ex. B; Cohen Decl., Ex. H.) "These expenses are the type for which the paying, arms' length market reimburses attorneys." Cronas, 2011 WL 6778490, at *7 (internal quotation marks and citation omitted). Moreover, there were no objections to these requests. Reimbursement for these expenses is therefore approved.

**Conclusion**

For the foregoing reasons, Plaintiffs' motion for final approval of the Settlement, award of service payments to the Class Representatives, and attorneys' fees and expenses is granted.

It is so ordered.

**New York, NY**
**June /, 2017**

ROBERT W. SWEET
U.S.D.J.